## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | | |
|---|---|---|
| JAMES COREY GOODE, individually, | § | |
| and GOODE ENTERPRISE SOLUTIONS | § | |
| INC. | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. _____ |
| v | § | |
| | § | |
| GAIA, INC., JAY WEIDNER, | § | JURY TRIAL DEMANDED |
| CLIF HIGH, BENJAMIN ZAVODNICK, | § | |
| and ALYSSA MONTALBANO | § | |
| Defendants. | § | |

## ORIGINAL COMPLAINT

**COMES NOW**, Mr. James Corey Goode ("Mr. Goode") and Goode Enterprise Solutions, Inc. ("GES", collectively "Goode") for their claims against defendants Gaia, Inc. ("Gaia"), Jay Weidner ("Weidner"), Clif High ("High"), Benjamin Zavodnick ("Zavodnick") and Alyssa Montalbano ("Montalbano") (each a "Defendant" and collectively, "Defendants"), and respectfully alleges as follows:

## NATURE OF THE ACTION

1. This is an action at law and in equity against Defendants for various claims of defamation, deceptive trade practices, breaches of contract, misrepresentation, tortious interference, harassment and racketeering arising from a desire to usurp, tarnish and misappropriate the character, goodwill and work of Mr. James Corey Goode ("Mr. Goode") and that of his company, GES.

2.   Mr. Goode is a Colorado resident of Broomfield, Colorado having a business address of 1140 US Highway 287 Suite 400-266, Broomfield, Colorado, 80020. Mr. Goode is an educational and motivational speaker, influencer, author and media figure and is well-known and respected in the Conscious Community.[1]

3.   GES is a Colorado corporation based out of Broomfield, Colorado and formed by Mr. Goode and his wife, Stacy Renee Goode ("Mrs. Goode"). GES produces educational, spiritual, health and entertainment goods and services geared towards the Conscious Community. GES' address is 1140 US Highway 287 Suite 400-266, Broomfield, Colorado, 80020.

4.   Upon information and belief Gaia is a Colorado corporation with its principal place of business located at 833 W. South Boulder Road, Louisville, Colorado, 80027.

5.   Upon information and belief, Weidner is a Colorado resident and may be served at his residence at 1342 Badger Road, Crestone, Colorado, 81131.

6.   Upon information and belief, High is a Washington resident and may be served at his residence at 4305 Biscay Street NW, Olympia, Washington, 98502.

7.   Upon information and belief, Zavodnick is a New Jersey resident with his principal place of business located at 4914 John F. Kennedy Blvd # 203, West New York, NJ 07093.

---

[1] The "Conscious Community" is a group of people focused on bettering and furthering their research and experiences in topics such as spirituality, health, wellness, the cosmic and metaphysical. *See* http://consciouscommunitymagazine.com/ [last accessed March 17, 2020] for an example of a publication catered to the Conscious Community.

8. Upon information and belief, Montalbano is a Colorado resident and may be served at her residence at 2222 Da Vinci Place, Grand Junction, CO 81507.

## JURISDICTION AND VENUE

9. Goode files this action against Defendants for claims arising under the Lanham Act, 15 U.S.C. 1143(a) et seq. (the "Lanham Act") as well as under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S. Code § 1964 ("RICO") thus granting this Court federal question jurisdiction under 28 U.S.C. §§1331 and 1338.

10. This Court also has jurisdiction over this matter under 28 U.S.C. §§1337 because the parties are diverse and the amount in controversy is well over $75,000.00.

11. This Court has supplemental jurisdiction over Goode's common law and state law claims of defamation, deceptive trade practices, breaches of contract, promissory estoppel, misrepresentation, tortious interference and harassment pursuant to 28 U.S.C. §§1367. Because these claims are so related to the claims within the Court's original jurisdiction, they form part of the same case or controversy under Article 3 of the U.S. Constitution.

12. This Court has personal jurisdiction over Defendants Gaia, Weidner and Montalbano because they reside in, and/or are organized in Colorado. Further, aforementioned Defendants have availed themselves of the benefits and protections of this District and have substantial contacts with this forum through business activities and otherwise.

13. This Court has personal jurisdiction over Defendants High and Zavodnick because they have availed themselves of the benefits and protections of this District and have substantial contacts with this forum through business activities and otherwise.

14. Venue is proper pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims stated herein occurred in this District.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

15. Mr. Goode is a motivational speaker, influencer, author, producer and public figure. Since about 2014, Mr. Goode has been publicly sharing the story of his life experiences to the world and garnering the attention of scientists, researchers and media personalities across the globe. Mr. Goode professes a message of light and love for everyone and encourages others to focus on living a life of service to others and raising their consciousness of the world around us.

16. Mr. Goode's charisma and positivity attracts a following that spans the spectrum of race, religion and nationality. For the most part, those that follow his journey are of the same mindset: that we should all, as a whole, lift each other up and be kind and loving towards one another. Unfortunately, in the recent years past, Mr. Goode has also attracted the attention of a group of characters that focus on the exact opposite—and who have made it their mission to destroy Mr. Goode, his message, his legacy and ultimately his following.

17. GES was formed by Mr. Goode and holds all right, title and interest to the intellectual property ("IP") that he formed and developed in addition to other work and projects he

undertakes, including classes, movies, comic books and other goods and services tied to his branding and story.

**The Beginning: Mr. Goode Begins to Come Forward with
His Experiences Tied to the Secret Space Program**

18. When Mr. Goode first came forward with his stories and experiences as a government insider it was not as a person in the spotlight—in fact, it was his intention to stay "under the radar" but to get his experiences and information out to researchers and scientists in order to promote an understanding of the greater picture and the worlds existing beyond those that we know on a day-to-day basis.

19. Through Mr. Goode's recounting of his experiences and various events, the "Sphere Being Alliance®" ("SBA®") and its progeny came to fruition. Mr. Goode, starting as early as 2008, began to recount memories, stories and experiences involving angelic beings that he called the "Blue Avians™" that preached a love for light, inclusion and understanding of everyone and accepting of all things positive. In connection with this, he shared his story of what he termed the "20 and Back™" missions that the Secret Space Program—a top-secret military project focused on travel beyond the confines of our Earth—undertook and developed a narrative that the Conscious Community began to quickly take notice of.

20. During the early years of Mr. Goode's public dissemination of his story and testimony, he became close friends with an author and researcher by the name of David Wilcock. The two shared their experiences, knowledge and love for advanced technologies and ancient histories alike and began to work together to bring their stories to humanity.

21. After a sudden turn of events thrust him into the forefront of the "Disclosure" movement[2], Mr. Goode garnered the attention of the movie and television network by the name of Gaia, a defendant in the instant action.

**Mr. Goode's Testimony Launches the Show "Cosmic Disclosure" on Gaia**

22. In June of 2015, Gaia approached Mr. Goode and Mr. Wilcock with a proposal to star on a show premised on Mr. Goode's testimony by the name of "Cosmic Disclosure" ("CD"). The two agreed and the hit show took off for a roaring three-year stint that doubled Gaia's worth and brought hundreds of thousands of subscribers.

23. Indeed, taking a look at Gaia's stock price shows a constant increase starting when CD was first premiered up until June 2018, when Mr. Goode left the show—where it takes a sudden, and continued, downturn…that has yet to right itself:



---

[2] The "Disclosure" movement is a movement geared towards bringing to mainstream research evidence of interstellar travel and/or extraterrestrial existence.

24. Over the span of each year while working on CD, Mr. Goode was filming what worked out to be an episode a week—52 episodes each year. This contributed thousands of hours of content, hundreds of hours of in-person presentation and testimony, and millions of dollars of revenue.

 

25. While Mr. Goode was on Cosmic Disclosure, he spoke about the testimony that he had been sharing and developing prior to his involvement with Gaia regarding the Blue Avians ™, 20 and Back ™, and SBA ®.

### Broken Agreements and Hostile Work Environment

26. While negotiating his talent contract, Mr. Goode met with Gaia CEO Jirka Rysavy ("Rysavy") and employees Brad Warkins ("Warkins") and Kiersten Medvedich. ("Medvedich").

27. Mr. Goode was promised various forms of compensation in exchange for his appearance on Cosmic Disclosure ("CD") including, inter alia, $150,000.00 in stock options, a percentage of the revenue brought in by CD through Talent Fees, fees under the "Ambassador Program" and monthly access to the information that showed the revenue brought in by CD. Mr. Goode agreed

to work with Gaia in exchange for these promises in addition to a monetary amount agreed to by the parties.

28. Gaia, through Rysavy, never reduced these agreements to writing although Mr. Goode requested they be memorialized in his written contract. Rysavy assured Mr. Goode that he would keep his word. Rysavy, to date, has reneged on all of these agreements.

29. On August 22, 2016 (the "August 22 Contract"), Gaia entered into a contracting agreement (the August 22 Contract and all amendments hereafter the "Contracting Agreement") with Mr. Goode promising certain compensation for his testimony by and through CD as well as various speaking arrangements.

30. During Mr. Goode's time at Gaia shooting CD, he came to meet—and work with—Defendant Weidner. While working with Weidner, Mr. Goode—and the entire CD crew—were subject to verbal harassment, abuse and outbursts that sometimes included Weidner throwing objects and insults at the cast and crew.

31. Additionally, on a regular basis, Weidner was known to continually scream and curse at Mr. Goode and other CD hosts and guests, disperse deprecating, defaming and untrue comments that spread throughout the cast and crew and created an environment toxic to all involved. Sometimes he threatened to fire, or even threatened to cancel benefits, to cast and crew.

32. This harassment, abuse and violence caused severe mental and emotional anguish to Mr. Goode.

33. In addition to the almost-daily abuse that he endured at the hand of Weidner, Mr. Goode was forced to show up for filming on little-to-no notice, sometimes cramming so many hours of filming into a day that he was severely physically and mentally exhausted. As an example, one shoot included 26 episodes shot in one week. That equaled half of the year's content shot in under seven days.

34. Mr. Goode reported Weidner's hostile outbursts multiple times to Gaia, Rysavy, Medvedich, and Warkins.

35. Weidner retaliated against Mr. Goode when he found out that Mr. Goode had reported him.

36. Weidner was eventually fired from Gaia due to his abusive outbursts.

37. After almost three years of the hostile work environment, lack of compensation that was promised, and more broken promises, Mr.  Goode decided that it was time to part ways with Gaia. He fulfilled his contracted requirement of a year's worth of filmed content and decided to seek other possible work opportunities and a healthier work environment.

## Mr. Goode Files to Protect His Trademarks

38. Just prior to Mr. Goode's departure from CD, he decided to make the wise business decision to protect his independent branding by filing for various federal trademarks with the United States Patent and Trademark Office ("USPTO").

39. Mr. Goode had worked autonomously on print, clothing and media goods and services tied to his arbitrary, protected phrases: Blue Avians ™, 20 and Back ™, Sphere Being Alliance ® and SBA®.

40. Mr. Goode filed for Federal Trademark Registrations for BLUE AVIANS (Application No. 87821423), 20 AND BACK (Application No. 87821401), SPHERE BEING ALLIANCE (Application No. 87821504), and SBA (Application No. 87821495) in March of 2018.

41. Mr. Goode was granted the rights to SBA® and SPHERE BEING ALLIANCE® in November of 2018 and April of 2019, respectively. (*See* Exhibit A).

42. After BLUE AVIANS and 20 AND BACK were published by the USPTO, Gaia instituted opposition proceedings with the Trademark Trial and Appeal Board ("TTAB") against the claimed marks despite Mr. Goode having sent various Cease and Desist and Demand Letters to Gaia instructing them to cease use of his protected phrases (as further explained below).

43. Gaia claimed, in its oppositions to Goode's trademark applications, that the applied-for marks are descriptive, not arbitrary. Gaia has yet to be able to explain what goods and services they are descriptive of.

44. To date, Gaia has failed to effectively pursue its claims. Indeed, the discovery periods for both oppositions are now closed and Gaia failed to propound but minimal discovery requests—altogether failing to respond to GES' attempt to move things along discovery-wise.

45. GES sent over abundant discovery requests for both oppositions, receiving scant responses that were effectively copies of the discovery produced for the other opposition.

46. Subsequent to Mr. Goode filing for his federal trademarks, Gaia filed a number of trademarks as well, including: DISCLOSURE, OPEN MINDS (both now abandoned), DEEP SPACE, MISSING LINKS, COSMIC DISCLOSURE, WISDOM TEACHINGS and HEALING MATRIX.

47. Despite the descriptiveness of the marks applied for by Gaia, Mr. Goode did not oppose any of Gaia's trademark applications at the USPTO.

48. Gaia continues to use Goode's protected phrases and materials on various advertising and promotional materials.

### Gaia's Hiring of Imposter Talent that Used Mr. Goode's Protected Terms and Content and Ensuing Attacks on Goode and his IP

49. Just prior to Mr. Goode's departure from Gaia and CD, Gaia hired additional talent to take over Mr. Goode's role on the show.  Individuals like Jason Rice, Emery Smith and others appeared on CD and, to Mr. Goode's shock and dismay, proceeded to use Goode's protected phrases and testimony that copied his.

50. In response, and in an attempt to prevent any dilution and tarnishment of his branding and goodwill, Goode sent out multiple Cease and Desist letters to Gaia and the talent that was appearing on Gaia utilizing Goode's protected IP. In response, Gaia's attorneys and talent (in an

attempt to turn the Conscious Community against Goode) launched an attack on Mr. Goode for attempting to protect his business assets.

51. The talent at issue at that time, Jason Rice, released a statement attempting to shame Goode for protecting his IP.

52. Later, through discovery in the trademark oppositions, Goode discovered that Gaia offered to provide legal representation for Rice's defense. After Warkins and Medvedich sent Rice a letter offering legal protection in response to Goode's Cease and Desist letter, Rice sent it back signed and released the aforementioned public statement. This was not the first nor the last time that Gaia used bribery, witness tampering, counterfeiting and fraud against Mr. Goode in conjunction with its agents named in this suit.

> With respect to *Cosmic Disclosure* episodes or other Gaia programs relating to the Secret Space Program, Gaia will indemnify you and assume the defense of any intellectual property infringement claims made by Mr. Goode against you arising from Gaia's use, distribution, production or sale of the programs or any advertising or promotional use of the programs in accordance with the rights Gaia has in such programs. Please confirm your agreement with these arrangements by signing below and returning a copy of this letter to us, and upon receipt we will instruct our lawyers to contact Mr. Goode's lawyer and advise her that Gaia has assumed the defense of the claims she alleged in her October 3 letter and furthermore she should direct any further correspondence to our law firms and not to you.

53. In its letter to Rice (reproduced in part above, *also see* <u>Exhibit B</u>), Gaia states: "With respect to Cosmic Disclosure episodes or other Gaia programs relating to the Secret Space Program, Gaia will indemnify you and assume the defense of any intellectual property infringement claims made by Mr. Goode against you arising from Gaia's use, distribution, production or sale of the programs or any advertising or promotional use of the programs in

accordance with the rights Gaia has in such programs. Please confirm your agreement with. These arrangements by signing below [. . .]"

54. Gaia did not have any 'rights' to the IP Goode was claiming and requesting Rice cease and desist from using, effectively making its offer a hollow attempt to further harm and disparage Mr. Goode.

55. In Rice's letter (portion reproduced below, *also see* <u>Exhibit C</u>), not only does Rice grossly misstate the factual nature of what Mr. Goode *actually* did in his attempt to secure his intellectual property rights, but he also includes a call to action--on a large scale--based upon his misrepresentations and false statements:

In March 2018, Corey Goode filed for copyright protection with the USPTO for intellectual property protection of the terms "20 & back", "SSP", "Secret Space Program", and "countless other topics and areas of interest."

No one owns these terms or programs nor the efforts to bring this truth forward.  To trademark and thus control or restrict use of the terms by Corey Goode goes against everything that the seeking truth community has been working on for decades.

...If you support keeping the terms "20 & back", "SSP", "Secret Space Program", "and "countless other topics and areas of interest" free, uncontrolled & in the free-use public domain, I ask for your support by reposting this article (with link and acknowledgement) and by proclaiming that No One Owns Disclosure.

56. Mr. Goode has not yet—even today—filed for copyright protection on *anything*…much less the phrases Rice includes in his statement (why he thinks Goode is claiming ownership in the phrase "countless other topics and areas of interest" escapes any reasoning we can reach).

57. Focusing on the last line reproduced above shows exactly why these individuals that have targeted Goode are doing so: "I ask for your support by reposting this article (with link and acknowledgement) [. . .]". (emphasis added). It is the same reason that defendants Zavodnick, High and Montalbano (and to a lesser extent, Weidner and Gaia) constantly and consistently tag Mr. Goode in their Social Media posts—to ride off of the notoriety and reach of Mr. Goode's followers. In sum, they crave, are obsessed with, and need attention.

58. Rice is not the only individual comprising part of the corrupt enterprise that consistently fails to discern between "copyright" protections and "trademark" protections. Similarly, other actors included in said enterprise are defendants Weidner and Montalbano. All three make repeated misuse of the designations while defaming and harassing Goode—further harming Goode by spreading untruths and baseless statements while bolstering their viewership through the use of "tagging" on various social media platforms.

## **Weidner's Continued, Violent Harassment and Stalking**

59. Weidner has engaged in repeated threats and invaded Mr. Corey Goode's privacy by incessantly and repeatedly divulging his private information and disparaging him through social media posts he has posted on YouTube, Twitter, Facebook and the like. In addition to this, he has engaged in sending implicit and explicit threats via email and through videos, livestreams, and other media produced both by him and by others at his direction. (*See* Exhibits D, E and F).

## THREATENING EMAILS

60. Indeed, most of Weidner's threats today are finished with a "dare" to come on his YouTube "show":

Open invite for your client to come on Reality Check and man up.

J

[3]

I am Irish and I like a good fight but this letter is like swinging in the wind.

Perhaps Corey should get a real attorney who lives in Colorado.

Love

J

PS Corey or David are welcome to come on my show Reality Check to discuss anything. That's what a man would do but Corey is not that.

(taken from emails sent by Weidner to undersigned counsel in response to notice of a pending TRO by Goode to Weidner over the weekend of March 13, 2020).

61. As shown above, Weidner is inclined to issue violent threats against Mr. without a second thought. In fact, Weidner has even threatened Mr. Goode's life with a gun. Weidner makes threats of bodily harm *and* harm to Goode's business and reputation through his multitude of videos that he posts on various social media platforms. (*See also* Exhibits D, E and F).

62. Weidner has sent as least two threatening emails to Mr. Goode that caused Mr. Goode to fear for his life and the life of his family. One was sent on February 12, 2019 and merely said: (in

---

[3] "Reality Check" is Weidner's YouTube handle, the sole purpose of its existence is which is to produce countless videos harassing and attempting to extort and defame Mr. Goode.

the subject line) "C U", presumably meant to stand for the phonetic words "See you" and (in the body of the email) simply: "soon …".

63. Obviously this message was sent to imply that Weidner was suggesting that he was following him while he was traveling for various speaking arrangements. Mr. Goode had no plans to meet up with Weidner at that point in time, no contact with him at that time, nor were their relations in any way "friendly" given the negative information and social media posts that Weidner had been disseminating at that point in time. (*See* Exhibit D).

64. The second such email was sent on April 5, 2019 and accused Mr. Goode of "doxing" (leaking private information about) "a friend of [his]", included an expletive, and what amounts to written maniacal laughter. (*See* Exhibit E).

65. This email using crude language in addition to profanity and what seems to be maniacal laughter would make any reasonable person feel uncomfortable and in fear of their safety.

66. Weidner had, at this point, started to propagate multiple lies about Mr. Goode and his followers saying that they were "fakes", a "cult" and that they were "doxing" various people within the Conscious Community.

67. In fact, it was Weidner that somehow obtained various "recordings", documents and other information that—whether fabricated or of genuine nature—was an invasion of Mr. Goode's privacy. Often, this "information" was actually fabricated and thus more aptly called "disinformation"…a fact that Weidner never has ever admitted.

THREATENING VIDEOS

68. Weidner is the owner of the YouTube account "REALiTY CHeCK", as shown on the platform in the picture below, is devoted almost solely to harassing and invading Mr. Goode's privacy:



69. In fact, the video that begins to play immediately upon opening up Weidner's YouTube channel is one that ridicules and harasses Mr. Goode:



*See* https://www.youtube.com/channel/UCN7Hdc3Rb3YBMHwd_qi-DpQ (last accessed March 6, 2020).

70. Perhaps the most disturbing YouTube videos was made by Weidner wherein he makes underhanded death threats against Mr. Goode and his colleague David Wilcock by posting a graphic on his video "Corey Goode Falling From the Clif Episode 7," on May 24th, 2019, now visible at https://www.youtube.com/watch?v=FNJyi4JnmOk . Notably, a number of Weidner's videos include Mr. Goode's name, a snapshot below:



71. The above representing hours and hours of false and threatening narrative that is made up by Weidner and broadcast to thousands of individuals across the internet.

72. The abuse has not stopped there—in a recent video by Weidner called "Corey Goode and the Sphere Being Alliance Finally Exposed!" from February 4, 2020 he refers to Mr. Goode as a "terd in a punchbowl". Weidner asks his viewers to "like" and "subscribe" and "share" in order to "get the word out".

73. He then refers to a conference that he was scheduled to speak at in February, a speech he did give and trashed Mr. Goode the entirety of his speech.

74. Later, Weidner threatens Mr. Goode that he has "investigators" doing an "analysis" of various documents he believes that Mr. Goode distributed throughout the community and that were harmful (allegedly) to some third-party figures. He goes on to accuse Mr. Goode of threatening himself, a man named Emery Smith ("Smith") and of infidelity with a woman who

has minimal contact with Mr. Goode—**all (false accusations) without a scintilla of supporting**
**evidence**. The trashing goes on, and Weidner states multiple times that he will not stop
disseminating this (mis)information until Corey "comes forward" to "tell the truth"…meaning,
accepting Weidner's false accusations as truth.

75. Weidner's statements are inflammatory of the community and meant to incite violence
against Mr. Goode, the same violence that Weidner threatened in his emails and videos.

76. As shown above, Weidner has terrified, emotionally hurt and threatened to hurt Mr.
Goode and his family. Mr. Goode and his family are in constant terror that Weidner may show
up where they live, or to a conference they are attending, and attempt to harass, follow, or
worse…inflict bodily harm—based on the multitude of postings and various harassment that they
have all been exposed to.


### The Two-Year Lawsuit for "Theft of Dream Visions"

77. Mr. Goode has undergone years of repeated stalking and harassment by Montalbano that
unfortunately, even though she has lost the case she brought against him, **has been assessed**
**attorneys fees for frivolous prosecution,** and received a Report and Recommendation from a
Magistrate that she was delusional and that her case should be dismissed, still shows no sign of
going away.

### THE FIRST TRO/STALKING APPLICATION

78. Mr. Goode has had to seek a TRO/Stalking Order against Montalbano twice in the last
two years due to her repeated stalking, threats, and invasion of Mr. Corey Goode's privacy.

79. Montalbano has stalked Mr. Goode by incessantly and repeatedly contacting and attempting to contact him with the sole purpose of coercing him into some fictitious and fanciful relationship that she has concocted in her mind. (*see* <u>Exhibit K</u>) In Mr. Goode's first application for protection order, filed with Broomfield Court in June of 2018 and granted in July of 2018, Mr. Goode laid out a particularly terrifying and threatening communication she sent to him:

> ""Alyssa sent an email after she agreed to cease contact with me on February 2, 2018. In it she references the Conference we forbade her to attend that I was presenting at due to her 400 emails and repeated calls, letters, etc. In her email she says "did something occur in Hawaii? I ask because of a couple dreams.  One, you may not be aware of anything... in the dream you were playing (yes in a disguise) **and I scooped you up so the sniper on the hill wouldn't shoot you and eat you.  I took you and placed you somewhere safe**.  You seemed oblivious the entire time.  In the next dream (disguise again) you seemed to have caught a cold or had something occur that reminded me of my trip to Hawaii as a kid with my bff when she got sucked into the undertow by the shore and when she got back on shore she puked this clear mucally type bile vomit onto the sand.  We promptly buried it and moved to the next cabana. :::grin::: Something similar to the bile - vomit was seen in the dream but with shuffles like a really bad cold and you were having a hard time breathing.  I helped keep you breathing.  Did you have any kind of ocean incident or catch a cold or have any kind of breathing issues?"

(emphasis added).

80. This incident premised Mr. Goode's Stalking/TRO filed and granted in 2018, but the underlying threats to life and body still loom, especially in light of her reaction to the most recent ruling on her lawsuit filed in Mesa County dismissing the action

81. Montalbano has sent him, since as early as 2017, messages, emails and letters with incomprehensible, made up legal-sounding language (as outlined in Mr. Goode's previous TRO filed with Broomfield Court in June of 2018) threatening Mr. Goode with a lawsuit and/or criminal charges (Montalbano is not, nor has she even been, a government attorney or anyone that may bring criminal charges on behalf of the state) unless and until he engaged with her.

82. Mr. Goode respectfully requests this Court take judicial notice of his prior TRO/Stalking Application in June/July of 2018 and the materials contained therein.

## THE RETALIATORY MESA LAWSUIT

83. In retaliation to Mr. Goode's Stalking/TRO lawsuit filed on or around June 15, 2018, Montalbano opened a lawsuit in Mesa County against Mr. Goode on June 25, 2018.

84. Attached is the Register of Actions of the Mesa Action prior to removal, showing thirty-six filings in less than three months. (Exhibit G). These filings are replete with Montalbano's fanciful ideas of being married to Mr. Goode in another dimension, having romantic meetings through astral projection, and other disturbing stories as well as a painstakingly detailed review of Mr. Goode's career and personal life details.

85. The detail of her musings over Mr. Goode show the massive amounts of hours every day she spends obsessing over Mr. Goode. The thought of this attention causes severe emotional distress to Mr. Goode and his family and is arguably something upon which many horror movies are premised.

86. Due to the nature of Montalbano's claims seeming—to Mr. Goode's counsel's best analysis of the purported claims—to be of the nature of copyright, Mr. Goode removed the action to federal court on or around September of 2018.

87. After the case was removed, Montalbano amended her claims—at the suggestion of Judge Moore and after Magistrate Gallagher recommended dismissal of the action—and the case was sent back to state court on or around December of 2018. (Exhibit H).

88. In the **just over two months** that the case was in federal court, the docket entries totaled **eighty docket entries**. *Id*.

89. Over 95% of the filings in both cases were by Montalbano, most stricken and/or ignored by the judges due to their sheer unfounded (in legal or reason), baseless and innocuousness nature.

90. The amount of filings mounted after removal, and has doubtless reached over a hundred. All have been sent to Mr. Goode. All have been so voluminous that they necessitated packaging in boxes and caused repeated and continuing emotional distress.

91. For two years now Mr. Goode has dealt with Montalbano's repeated harassment, defamation and unwanted affections and attention. He has suffered physical stress due to the ongoing fear he endures.

92. Now, after years of Montalbano's ongoing and repeated harassment, stalking, and unwanted contact and attention, Mr. Goode has reached the point where he fears an impending attack of Montalbano's intense focus resulting in harm to himself and his family.

93. Last year, Montalbano received a report and recommendation from a Federal Magistrate Judge calling her "delusional" (*see* Exhibit I, see also Exhibit J [someone who has met Montalbano stating that when she met her "she was missing a few screws even back then"]).

94. This, in addition to a dismissal of her case against Mr. Goode by a State Court Judge, her response to both being inflammatory and a huge outlash. An excerpt reproduced below:

Plaintiff asserts the violation of a legal interest that clearly does not exist or facts that do not support an arguable claim for relief. The complaint(s) lack coherent factual allegations or claims. They describe what seems a delusional scenario of use of supposed dreams emailed to another party. The nonsensical allegations do not support an arguable claim for relief, and a more specific pleading would not cure the failure of the purported claims nor place them in a position to clear the hurdles of Rule 8 or 12. The complaint fails to provide a short

95. She has since filed multiple motions against the Judge in the Mesa action calling for his recusal for "perjury" and accusing him of working with Mr. Goode and his counsel.

MONTALBANO'S YOUTUBE ACCOUNT FOCUSED SOLELY ON MR. GOODE

96. Most recently, Montalbano has created a YouTube account purely for the purpose to harass, defame, threaten and discredit Mr. Goode. A screenshot of her channel is below:



(accessed at https://www.youtube.com/channel/UCyiuJjzwQKX0dQGp8_kd8_w on March 17, 2020).

97. On her YouTube channel Montalbano reads aloud—for hours at a time—her voluminous, nonsensical court filings and inserts delusional commentary about her "relationship" with Mr. Goode, an imaginary husband-and-wife or "twin flame" relationship she has been asserting since at least 2018 exists between herself and Mr. Goode.

## Fear of Bodily Harm by Weidner and Montalbano

98. Weidner and Montalbano have both issued threats of harm to Mr. Goode. Both live only four hours away from Mr. Goode's house.

99. Mr. Goode has never had any face-to-face interaction with Montalbano. He is happily married to his wife, and Montalbano's repeated unwanted advances has caused severe emotional distress on the entire Goode family. Her disturbing "dream visions" involve twisted scenarios often blending Star Wars elements with Alice in Wonderland. Her advances are constant and unabating.

100.     Weidner has bragged to Mr. Goode that he has a multitude of guns at his house.

101.     As shown above, Weidner and Montalbano have terrified, emotionally hurt and threatened to hurt Mr. Goode and his family and they are in imminent danger of further abuse or threats.

102.     Mr. Goode and his family are in constant terror that Weidner and/or Montalbano may show up where they live, or to a talk or conference they are attending, and attempt to harass, follow, or worse…inflict bodily harm—based on the multitude of postings and various harassment that they have all been exposed to.

103.    Mrs. Goode does not answer the door when Mr. Goode is gone and instructs her son and daughter to do the same out of fear for their safety.

104.    Mr. Goode checks in on his family more often than he did before out of fear for the safety of his wife and children. Their children do not play outside as much as they used to for fear of being watched, harassed or followed.

105.    The fact that the Goode family has altered their day-to-day, once carefree way of living is a tragedy to the extreme, especially for his son and daughter who should be allowed to enjoy life as any other child.

### Goode is Blacklisted from Conferences Sponsored or Held by Gaia

106.    Upon information and belief, Goode has been blacklisted from major ufology events sponsored by Gaia, as well as by two leading ufology radio shows including Coast to Coast and Fade to Black Radio. This was due to the influence by both Gaia and Weidner both before and after he was fired from Gaia.

107.    Goode regularly attended a conference called "Conscious Life Expo" ("CLE").

108.    Upon information and belief, Gaia has an ownership interest in CLE.

109.    After the relationship between Goode and Gaia started breaking down, CLE no longer invited Goode to attend as a speaker. In fact, Goode was not invited to attend at all.

110.    Goode regularly attended a conference called "Contact in the Desert" ("CITD").

111.    Upon information and belief, Gaia was a sponsor of CITD.

112.    After the relationship between Goode and Gaia started breaking down, CITD no longer invited Goode to attend as a speaker. In fact, Goode was not invited to attend at all.

113.     Goode regularly attended a conference called "New Living Expo" ("NLE").

114.     Upon information and belief, Gaia was a sponsor of NLE.

115.     After the relationship between Goode and Gaia started breaking down, NLE no longer invited Goode to attend as a speaker. In fact, Goode was not invited to attend at all.

116.     Upon information and belief, Weidner spoke to the heads of CLE, CITD and NLE and told them not to invite Goode to their Conferences.

### CW Chanter and Clif High Disturbing Posts and Baseless Accusations of Doxing

117.     Perhaps the most violent and offensive harassment has been spearheaded by a New Jersey-licensed attorney by the name of Zavodnick.

118.     In addition to his disturbing chanting and singing, often with a slurred voice, Zavodnick litters his YouTube videos with expletives.

119.     Zavodnick began his attacks on Goode starting at least in 2015.

120.     As shown below, his videos are creepy and highly disturbing. Most are filled with curse words and are hard to listen to, much less watch:



121.     Weidner at one point brings Zavodnick on his "show" for what amounts to an a all-star "Corey Goode-Bashing" where all involved engage in making harassing and defamatory statements about Goode:



Attorney Benjamin I Zavodnick aka CW Chanter alleged Doxxing & Cyber-Stalking of Corey Goode



https://www.youtube.com/watch?v=FFjVml8bGM0 last accessed March 17, 2020

122.     Similarly, Defendant High uses social media to attack Goode. High is the

individual responsible for making the claim that Mr. Goode started a cult; High came up with the

perjorative "Blue Chicken Cult" to describe Goode and his followers.

123.     High took to social media to make threats of bodily harm and further attempt to

defame Mr. Goode.



124.     The author of the above Tweet, High, has known, established relationships with

Zavodnick and Weidner. In addition, he has made statements, on video, that he is an unstable

person. (*See* https://www.youtube.com/watch?v=FNJyi4JnmOk, accessed on March 17, 2020).

**Interconnectedness of the Parties – The Enterprise**

125.     There is a reasonable suspicion there is an underlying motivation to remove

Goode from his livelihood by creating a lengthy campaign of innuendo, possible presentation of

doctored evidence and continual rehash of prior statements using different individuals to make

them by the "enterprise" of Gaia, Weidner, High, Zavodnick and Montalbano.

126.     This endeavor rises to the level of multiple criminal acts including stalking, harassment, and fraud. The rise of this motivation is observed in multiple statements made throughout this period of time by the individual Defendants.

127.     As shown above, Zavodnick, Weidner and High are all clearly connected. Upon information and belief, and the below statement by Weidner, Gaia is a strong influence on—undoubtedly, the nexus and impetus of—the enterprise as well:



Screenshot taken from Weidner's Facebook account on March 5, 2020.

128.     Weidner does not state that he is NOT still "with" (i.e., "working") for Gaia—and he further says that he thinks that Gaia is "[his] child".

129.     Montalbano, aka "Ari Stone" is known to be connected with at least Weidner on social media, an example below:



Screenshot taken from Montalbano's Twitter account on March 17, 2020.

130.     Note, again, the "watch, share like and subscribe" Montalbano includes after using the hashtag "#CoreyGoode" so that she can reach the tens of thousands of people who follow Mr. Goode's hashtag. Montalbano's following on Twitter is one-tenth as large.

**Gaia's Recent Removal of Goode's Content and Goode's Loyal FanBase**

131.     Gaia took down tapings of CD including Mr. Goode on or around the beginning of March, 2020. The response has been overwhelming—Goode's followers want to see his material. Gaia is clearly taking down his content in an attempt to harm Goode's reputation. Like the old adage goes, out of sight—out of mind.

132.     Despite Gaia's best efforts, Goode's following is loyal—Gaia has every motive to

harm Goode since he made the decision to leave them:



Accessed on March 17, 2020 at https://twitter.com/Jeffrey33793811/status/1239008355961593858



Accessed on March 17, 2020 at https://twitter.com/shaneceriale/status/1235251769514397696



Accessed on march 17, 2020 at https://twitter.com/MsAnnabellucy/status/1235289988503396354

133.     Gaia is falsely accusing Goode of disparaging them, when it is the other way around, in an attempt to tarnish his name:



Accessed on March 17, 2020 at https://twitter.com/shaneceriale/status/1235251769514397696

134.     Unfortunately, some of Goode's former supporters have chosen to believe the misrepresentations of the Enterprise. Despite his mostly-faithful following, Goode has indeed felt a backlash from some that believe the lies the Enterprise has propagated in addition to the loss of the monetary support that he was formerly able to rely on from speaking at the aforementioned conferences.

135.      Goode has appeared on shows like the Jenny McCarthy show—a testament to his

versatility and ability to connect with people from every walk of life.[4]



136.      The nefarious activities of the Enterprise as a whole as well as the actions of each

individual Defendant has taken a toll on Goode. Goode has for almost two years tried every

avenue to make things right outside of litigation, but alas has been forced to bring the issues in

front of a tribunal that can hopefully lend some guidance.

---

[4] The Jenny McCarthy Show reaches hundreds of thousands of viewers daily.

## I.   Claim I: Racketeer Influenced and Corrupt Organizations Act, 18 U.S. Code § 1964

137.       Goode incorporates by reference the allegations in paragraphs 1-136.

138.       The Defendants have engaged in a course of conduct, of, by, or through an enterprise, through a pattern of racketeering activity as discussed below, the evidence of which is largely if not uniquely within Defendants' possession, constituting civil RICO violations.

139.       On information and belief, Defendants' scheme and enterprise was conducted through the U.S. Mail and the internet, both statewide and nationwide.

140.       Because evidence of Defendants' scheme—a scheme spanning at least five years, since 2015—is uniquely within Defendants' possession, Goode requires discovery on the specific details of the who, what, where, and how underlying Defendants' long-running and well-concealed scheme.

141.       The overall scheme is straightforward: disenfranchise Goode of its property interest and protected rights in contravention of federal statutes protective of those rights and execute the scheme though the U.S. Mail and the internet, all under an express or implied agreement(s) to cut Goode out by any means necessary.

Case 1:20-cv-00742-KLM   Document 1   Filed 03/17/20   USDC Colorado   Page 36 of 53

142.     Otherwise, the who, what, where, and how are:

a.  Who:  Gaia, Weidner, Zavodnick, High and Montalbano (among others not named Defendants);

b.  What: Defendants' coordinated efforts to misappropriate Goode's products and services and re-brand them as Defendants' own (or otherwise as an authorized use) in violation of intellectual property laws—all through prohibited and unlawful means. Defendants knowingly engaged in a scheme to intentionally defraud GES out of sales and profits through Defendants' distribution, production, and sales of its inferior knock-off(s). Defendants knowingly engaged in a scheme to intentionally defraud consumers. All Defendants knowingly engaged in a scheme to intentionally defraud GES out of sales and profits through Defendants' participation in wrongful and unlawful distribution, production, and sales of inferior knock-off(s). All Defendants knowingly engaged in a scheme to bribe, extort and harass Goode and consumers as well as to intimidate potential witnesses who could testify to these unlawful acts. All Defendants knowingly engaged in a scheme to intentionally defraud consumers;

c.  When: as early as 2015 through today; and

d.  Where: throughout the United States, but specifically in Colorado where many Conferences and filmings took place at Gaia's studios.

143.     Gaia, Weidner, Zavodnick, High and Montalbano,  through social media and other means of communication, aided and abetted each other in using GES' IP and promoting

their own infringing versions of GES' IP. They also aided, encouraged and abetted other individuals to infringe on GES' IP by, among other things, assisting and guiding in the creating of counterfeit or knock-off products.

144.     Since at least 2015, Gaia has filmed and recorded other individuals such as Rice, Emery Smith ("Smith") and others infringing on Goode's IP by using the same trademarked and/or copyrighted words or phrases that were created, independently, by Goode.

145.     Upon information and belief, Gaia has employed the individual defendants in various capacities and encouraged them to extort and harass Goode.

146.     These illegal activities affected interstate commerce and formed a pattern of conduct that took place—and continues to take place—since at least 2015.

## II.  **Claim II: FEDERAL TRADEMARK INFRINGEMENT**
## **(Under 15 U.S.C. §§ 1114 and 1125(a))**

147.     Goode incorporates by reference the allegations in paragraphs 1-146.

148.     GES is the owner of the valid and subsisting federal trademark registrations for the SPHERE BEING ALLIANCE® and SBA® marks, the federal registration documents attached hereto as Exhibit A.

149.     GES is also the Owner of common law marks 20 AND BACK™ and BLUE

AVIANS™, currently the subject of oppositions with the TTAB but will be filing a motion to

stay proceedings upon filing of this First Complaint.

150.     GES' paper, clothing and educational and entertainment goods and services are

marketed and sold globally. In offering and selling its products GES uses the marks SPHERE

BEING ALLIANCE ®, SBA®, 20 AND BACK ™ and BLUE AVIANS ™ (the "GES Marks").

151.     GES has invested tremendous time, effort and financial resources in developing

and promoting its products and services bearing the SPHERE BEING ALLIANCE ®, SBA®, 20

AND BACK ™ and BLUE AVIANS ™ marks (the "GES Goods and Services") with the

marketing and sale of GES' goods in interstate commerce. The GES Marks have become,

through widespread and favorable industry acceptance and recognition, an asset of substantial

value symbolizing GES, its quality products and services and its goodwill.

152.     Consumers of paper, clothing and educational and entertainment goods and

services in the Conscious community recognize the GES Marks as a source indicator for Goode.

153.     As evidenced by the valid and subsisting trademark registrations, the SPHERE

BEING ALLIANCE® and the SBA® (the "SBA Marks") are inherently distinctive. The marks

20 AND BACK ™ and BLUE AVIANS™ (the "Pending GES Marks") are also inherently

distinctive and entitled to trademark protection under the Lanham Act.

154.     Defendants (and/or Defendants' agents or affiliates) wrongfully and illegally

made use of GES Marks by wrongfully and illegally obtaining access to Goode's content and

asking its talent NOT including Mr. Goode but appearing on Gaia TV in a role akin to Mr.

Goode's to use the GES Marks in their commentary and dialogue in Gaia-produced and/or Gaia-related content thereby causing the GES marks to be displayed prominently and in association with the Gaia (or other Defendant-related) names when searching for GES Marks in a Google (or other search engine or Social Media) search. These activities were carried out without GES' or Mr. Goode's consent or knowledge.

155.    The activities in the foregoing paragraph continued for a period of months until GES was able to have Defendants (and/or Defendants' agents or affiliates) comply with its Cease and Desist letters sent by its counsel throughout 2018.

156.    Defendants (and/or Defendants' agents or affiliates) sent existing and prospective Goode customers numerous emails and social media messages and marketing which promoted their own products or services under the GES Marks or represented that their products or services were offered under GES Marks when in fact they are not.

157.    The wrongful and illegal attribution of the GES Marks with Defendants (and Defendants' agents or affiliates) have created a likelihood that consumers will be confused or deceived as to the source of the parties' products and any quality assurance with resulting substantial and irreparable harm to GES' Marks, reputation, and goodwill residing therein.

158.    Defendants' (and/or Defendants' agents or affiliates) actions are knowing, intentional, willful, and carried out with clear intent to trade on the reputation and goodwill associated with GES' business and Marks.

159.       Defendants' (and/or Defendants' agents or affiliates) actions are knowing, intentional, willful, and carried out with clear intent to divert and harm Goode's business and convert the reputation and goodwill associated with Goode's names and GES Marks.

160.       Defendants' (and/or Defendants' agents or affiliates) have caused and are likely to continue to cause substantial injury to Goode's names and GES Marks, and are entitled to injunctive relief, recovery of Defendants' profits, Atlas' damages, enhanced damages, costs and reasonable attorney fees.

## III. Claim III: False Designation of Origin and Federal Unfair Competition under 15 U.S.C. § 1125

161.       Goode incorporates by reference the allegations in paragraphs 1-160.

162.       Defendants' (and/or Defendants' agents or affiliates) made repeated representations about the source, origin, and nature of Defendants' products that have created the false and misleading impression that Defendants' goods or services are manufactured by GES, affiliated with GES, connected or associated with Atlas, and/or endorsed, controlled, or approved by GES when, in fact, they are not.

163.       Defendants' (and/or Defendants' agents or affiliates) have made false representations, false descriptions, and false designations of origin regarding Defendants and Defendants' goods or services in violation of 15 U.S.C. § 1125(a), and such activities have caused, and unless enjoined, will continue to cause a likelihood of confusion and deception of members of the trade and the public and, additionally, injury and harm to GES' goodwill and reputation.

164.     Defendants' (and/or Defendants' agents or affiliates) have caused and are likely to continue to cause substantial injury to the public and to GES, for which GES is entitled to obtain injunctive relief and to recover profits, actual damages, enhanced damages, and other damages as may be provided by statute. The knowing, willful, and continuing nature of Defendants' conduct makes this an exceptional case for which Atlas is entitled to recover its costs and reasonable attorney fees.

## IV. Claim IV: Colorado Common Law Trademark and Trade Name Infringement

165.     Goode incorporates by reference the allegations in paragraphs 1-164.

166.     GES' Marks and its associated trade names are all trademarks and names used by Goode in connection with its goods and services, which names and marks are inherently distinctive.

167.     Defendants' (and/or Defendants' agents' or affiliates') unauthorized use of GES' trademarks and names for in connection with the same or similar products and services infringes upon Goode's common law trademark and trade name rights.

168.     As a result of aforementioned infringing conduct, Goode has suffered irreparable harm to its marks and the reputation and goodwill associated therewith, and will continue to suffer irreparable harm, for which there is no adequate remedy at law.

## V. **Claim V: Colorado Common Law Unfair Competition**

169.     Goode incorporates by reference the allegations in paragraphs 1-168.


170.     As its fifth grounds for relief, Goode asserts violation of Colorado common law unfair competition.


171.     Defendants' (and/or Defendants' agents or affiliates) have made unauthorized and infringing use of Goode's trademarks and trade names, wrongfully and illegally took control of Goode's content causing Goode's information and favorable social media content to be associated with Defendants', clearly intending to benefit from the reputation and goodwill residing in Goode's, utilized Gaia's position as an content provider and director of CD to gain access to Goode's existing and prospective customers with the intent of and undertaking actions and deceptive communications to create confusion and misperception and thereby diverting their business to Gaia.


172.     Defendants' (and/or Defendants' agents or affiliates) conduct as described above has led to confusion and deception of consumers with regard to the identity of the parties and the products offered by them.


173.     Defendants' (and/or Defendants' agents or affiliates) have, or have sought to, pass off their goods as those of Defendants' by virtue of use of Goode's trademarks and trade names, leading to actual confusion on the part of the consumer.

174.     Defendants' (and/or Defendants' agents or affiliates) have misappropriated and exploited GES' business values.

175.     Goode has no adequate remedy at law for the damages caused by Defendants (and/or Defendants' agents or affiliates) and their common law unfair competition, conduct and activities, and Goode has been irreparably damaged thereby.

**VI. Claim VI: Colorado Consumer Protection Act**

176.     Goode incorporates by reference the allegations in paragraphs 1-175.

177.     Defendants' (and/or Defendants' agents or affiliates) engaged in deceptive trade practices in the course of business in violation of C.R.S. § 6-1-105 and otherwise in violation of Colorado law.

178.     Without limiting the generality of the foregoing paragraph, Defendants' (and/or Defendants' agents or affiliates) knowingly: (a) sought to pass off Defendants' products and/or services as being Goode products or otherwise affiliated with, controlled or approved by GES; (b) made false representations attributing the source, sponsorship, approval, or certification of Defendants' goods and/or services to GES; and (c) made false representations that Defendants and Defendants' goods and/or services are affiliated, connected, associated with, or certified by Goode.

179.     Defendants' (and/or Defendants' agents' or affiliates') deceptive trade practices occurred in the course of their occupation and business.

180.     Defendants' (and/or Defendants' agents' or affiliates') deceptive trade practices significantly impact the consumers of paper, clothing and educational and entertainment goods and services in the Conscious community as actual or potential consumers of Defendants' products and/or services who have been deceptively led to believe that Goode and its commitment to high-quality products and services underlies the products and/or services being offered and sold by Defendants when in fact this is false; consumers acting in reliance on Goode's stellar reputation and history of quality products in dealing with Defendants are unaware of the lack of this safety net and the risk being assumed to their detriment.

181.     In the course of its business, Goode has been and will continue to be injured as a result of Defendants' deceptive trade practices.

182.     Goode has suffered and will continue to suffer injury in fact to a legally-protected interest as a result of Defendants' deceptive trade practices.

183.     Goode has suffered and will continue to suffer actual damages as a result of Defendants' deceptive trade practices.

184.     Goode is entitled to injunctive relief to prohibit Defendants from continuing their deceptive trade practices pursuant to C.R.S. §§ 6-1-110(1) and 6-1-113(1).

## VII.   Claim VII: Breach of Contract

185.      Goode incorporates by reference the allegations in paragraphs 1-184.

186.      Goode entered into a contract with Gaia governing the terms and conditions of his ongoing contractual relationship with Gaia, including Defendant Weidner.

187.      On information and belief, Weidner's job description included compliance with company policies and procedures, as did Goodes and Gaia's.

188.      Weidner and Gaia breached that contract by failing to adhere to company policies, including but not limited to those concerning the confidentiality and use of Atlas' confidential and proprietary information.  Weidner and Gaia also breached that contract by failing to act appropriately in a work environment.

189.      Gaia further breached that contract by failing to adhere to the compensation guidelines laid out in in and the subsequent amendments.

190.      Weidner and Gaia further breached their contract with Goode by acting in a manner contrary to the implied duty of good faith and fair dealing.

191.      Goode suffered damages as a result of Gaia and Weidner's breaches of contract, in an amount to be proven at trial, together with restitution and disgorgement.

### VIII.   Claim VIII: Fraudulent Misrepresentation

192.     Goode incorporates by reference the allegations in paragraphs 1-190.

193.     On multiple occasions Gaia made misrepresentations regarding the employment contract between Goode and Gaia that included compensation beyond what Gaia did in fact pay to Goode.

194.     Gaia knew such representations were false.

195.     Gaia knew Goode would rely—and in fact did rely—on such misrepresentations.

196.     Gaia induced Goode to enter the Contractor Agreement by relaying said misrepresentations to Goode.

197.     The aforementioned acts or omissions by Gaia have caused harm or injury to Goode.

### IX.  Claim IX: Intentional Infliction of Emotional Distress Under Federal and Colorado State Law

198.     Goode incorporates by reference the allegations in paragraphs 1-197.

199.     Defendants' (and/or Defendants' agents' or affiliates') engaged in extreme and outrageous conduct.

200.     Defendants' (and/or Defendants' agents' or affiliates') did so recklessly or with the intent of causing Goode severe emotional distress.

201.     Defendants' (and/or Defendants' agents' or affiliates') conduct caused Goode severe emotional distress.

## X.  Claim X: Negligent Infliction of Emotional Distress Under Federal and Colorado State Law

202.     Goode incorporates by reference the allegations in paragraphs 1-201.

203.     Defendants' (and/or Defendants' agents' or affiliates') conduct is negligent.

204.     The aforementioned conduct created an unreasonable risk of physical harm that caused Goode to. Be in fear of his own safety.

205.     Goode suffered physical injury or was in the "zone of danger" created by the aforementioned negligent conduct. This fear had physical consequences or long-continued emotional disturbance.

206.     Defendants' (and/or Defendants' agents' or affiliates') conduct caused the aforementioned damage.

## XI. <u>Claim XI: Harassment at Work Under Colorado State Law</u>

207.     Goode incorporates by reference the allegations in paragraphs 1-206.

208.     Gaia and Weidner were in a position related to Goode's position as independent contractor with Gaia.

209.     Goode is an independent contractor of Gaia who harassed or allowed Goode to be harassed.

210.     Goode endured offensive behavior at work which was offensive to a reasonable person and offensive to Goode.

211.     Goode was required to endure the offensive conduct as a condition of continued retention as contractor with Gaia, this offensive conduct was so severe or pervasive such that it created an environment that is abusive, i.e., a hostile work environment.

212.     The offensive conduct was motivated by an illegal reason, i.e., as retaliation for Goode reporting the hostile work environment to Gaia employees.

**XII.** **Claim XII: Slander Per Se**

213.     Goode incorporates by reference the allegations in paragraphs 1-212.

214.     Defendants' (and/or Defendants' agents' or affiliates') made a multitude of false, spoken statements (e.g., accusing Goode of a criminal act) purporting to be facts.

215.     These statements were published or communicated to a third person (e.g., through any of Defendants' social media accounts).

216.     Defendants did so intentionally—or, at the very least, negligently.

217.     Goode suffered damages because of the aforementioned defamatory statements.

**XIII.** **Claim XIII: Libel Per Se**

218.     Goode incorporates by reference the allegations in paragraphs 1-217.

219.     Defendants' (and/or Defendants' agents' or affiliates') made a multitude of false, written statements (e.g., accusing Goode of a criminal act) purporting to be facts.

220.     These statements were published or communicated to a third person (e.g., through any of Defendants' social media accounts).

221.     Defendants did so intentionally—or, at the very least, negligently.

222.     Goode suffered damages because of the aforementioned defamatory statements.

### XIV.   Claim XIV: Tortious Interference with a Business Expectancy

223.     Goode incorporates by reference the allegations in paragraphs 1-222.

224.     Goode had a multitude of actual or prospective business contracts with the aforementioned Conferences and various entertainment agencies.

225.     Defendants knew of these actual or prospective business contracts and intentionally and improperly interfered with the performance of these contracts.

226.     The aforementioned interference with the aforementioned contracts resulted in monetary loss and harm and damage to Goode's reputation and goodwill.

### XV.   Claim XV: Cyberstalking

227.     Goode incorporates by reference the allegations in paragraphs 1-226.

228.     Defendants made credible threats against Goode, and did so by repeatedly approaching, contacting, communicating with or placing under surveillance Goode or his immediate family or partner.

229.     Defendants did so in a manner that would cause a reasonable person to suffer serious emotional distress.

230.     Goode did indeed suffer severe emotional distress.

## XVI.   Claim XVI: Declaratory Judgments of Validity of GES Trademarks

231.     GES has suffered injury due to Gaia's filing of oppositions against its 20 AND BACK ™ and BLUE AVIANS ™ trademarks. GES has not been able to license the IP that it has poured countless hours, money and effort into building because Gaia filed oppositions against the pending marks merely to harass and delay.

232.     This delay has caused GES to lose out on licensing fees as well as other media deals due to the pending oppositions,  who are not set to go to trial until early 2021. Gaia has been slow to respond to requests for discovery and for early settlement.

233.     This harm is certain to be curtailed if this honorable Court determines the validity of GES' Marks.

## CONCLUSION AND PRAYER FOR RELIEF

CONSIDERING THE HEREIN DESCRIBED, GES and Mr. Goode pray this Court consider the facts allegations contained hereby:

A. Enter judgment against Defendants for all aforementioned claims;

B. Enter an injunction barring Defendants from any of the aforementioned harmful conduct;

C. Ordering Gaia to withdraw any Opposition proceeding it has brought in front of the TTAB;

D. Find that all individual Defendants are liable individually for their transgressions as well as any attributable to Gaia;

E. Order Defendants to pay all actual damages suffered by Goode as a result of Defendants' fraudulent and harmful activities;

F. Order Defendants to give Goode all right and title to any materials at issue;

G. Order Defendants to pay for additional damages Goode has and will incur from reliance on Defendants' false representations;

H. Grant Goode special damages, due to the willful, reckless, wanton, egregious, unfair, unethical, deceptive and unscrupulous conduct of Defendants;

I. Grant Goode an award of attorneys' fees;

J. Grant Goode all monetary and other relief available at law and in equity.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, SDS hereby demands a trial by jury of all claims in this litigation.

Date: March 17, 2020                    Respectfully submitted,

Valerie A. Yanaros
Texas Bar No. 24075628
Yanaros Law, P.C.
5057 Keller Springs Rd, Suite 300
Addison, TX, 75001
Telephone: (512) 826-7553
valerie@yanaroslaw.com


**ATTORNEY FOR PLAINTIFF**