IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-00742-RBJ

JAMES COREY GOODE, individually, and GOODE
ENTERPRISE SOLUTIONS INC.

                                        Plaintiffs,

v.

GAIA, INC., JAY WEIDNER, CLIF HIGH, BENJAMIN
ZAVODNICK, ALYSSA MONTALBANO, JIRKA
RYSAVY, BRAD WARKINS AND KIERSTEN MEDVEDICH

                                        Defendants.

_____

## SECOND AMENDED COMPLAINT
_____

**COMES NOW**, Mr. James Corey Goode ("Mr. Goode") and Goode Enterprise

Solutions, Inc. ("GES", collectively "Goode") for their claims against defendants Gaia, Inc.

("Gaia"), Jay Weidner ("Weidner"), Clif High ("High"), Benjamin Zavodnick ("Zavodnick")

Alyssa Montalbano ("Montalbano"), Jirka Rysavy ("Rysavy"), Brad Warkins ("Warkins")

(each a "Defendant" and collectively, "Defendants"), and respectfully alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.      This is an action at law and in equity against Defendants for various claims of

defamation, deceptive trade practices, breach of contract, misrepresentation, tortious interference,

and racketeering arising from a desire to usurp, tarnish and misappropriate the character, financial

gain, goodwill and work of Mr. James Corey Goode ("Mr. Goode") and that of his company, GES.

2.      Mr. Goode is a Colorado resident of Broomfield, Colorado having a business address

of 1140 US Highway 287 Suite 400-266, Broomfield, Colorado, 80020. Mr. Goode is an educational

and motivational speaker, influencer, author and media figure and is well-known and respected in

the Conscious Community.[1]

3.     GES is a Colorado corporation based out of Broomfield, Colorado and formed by Mr. Goode and his wife, Stacy Renee Goode ("Mrs. Goode"). GES produces educational, spiritual, health and entertainment goods and services geared towards the Conscious Community. GES' address is 1140 US Highway 287 Suite 400-266, Broomfield, Colorado, 80020.

4.     Upon information and belief Gaia Inc. ("Gaia"), is a Colorado corporation with its principal place of business located at 833 W. South Boulder Road, Louisville, Colorado, 80027.

5.     Upon information and belief, Rysavy is the founder and Chairman of Gaia and may be served at Gaia's principal place of business or wherever else he may be found.

6.     Upon information and belief, Warkins is the Chief Operating Officer of Gaia and may be served at Gaia's principal place of business or wherever else he may be found.

7.     Upon information and belief, Medvedich is the Senior Vice President of Content Production for Gaia and may be served at Gaia's principal place of business or wherever else she may be found.

8.     Upon information and belief, Weidner is a Colorado resident and may be served at his residence at 1342 Badger Road, Crestone, Colorado, 81131.  Upon information and belief, Weidner has been both employed and contracted by Gaia to produce a program that featured the Plaintiff, Mr. Goode, as the talent and has continued a relationship with Gaia with the aims to further deprive Goode of its occupation and livelihood.

9.     Upon information and belief, High is a Washington resident and may be served at his residence at 4305 Biscay Street NW, Olympia, Washington, 98502 and has targeted much of his YouTube postings—that reach tens of thousands of followers throughout the United States including in, upon information and belief, Colorado—towards harming Goode in Colorado.

---

[1] The "Conscious Community" is a group of people focused on bettering and furthering their research and experiences in topics such as spirituality, health, wellness, the cosmic and metaphysical. *See* http://consciouscommunitymagazine.com/ [last accessed March 17, 2020] for an example of a publication catered to the Conscious Community

10.     Upon information and belief, Zavodnick is a New Jersey resident with his principal place of business located at 4914 John F. Kennedy Blvd # 203, West New York, NJ 07093 and has targeted much of his YouTube and Twitter postings—that reach thousands of followers throughout the United States including in, upon information and belief, Colorado—towards harming Goode in Colorado.

11.     Upon information and belief, Montalbano is a Colorado resident and may be served at her residence at 2222 Da Vinci Place, Grand Junction, CO 81507.

**JURISDICTION AND VENUE**

12.     Goode files this action against Defendants for claims arising under the Lanham Act, 15 U.S.C. 1143(a) et seq. (the "Lanham Act") as well as under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S. Code § 1964 ("RICO") thus granting this Court federal question jurisdiction under 28 U.S.C. §§1331 and 1338.

13.     This Court has supplemental jurisdiction over Goode's common law and state law claims of defamation, deceptive trade practices, breach of contract, promissory estoppel, misrepresentation, and tortious interference pursuant to 28 U.S.C. §§1367. Because these claims are so related to the claims within the Court's original jurisdiction, they form part of the same case or controversy under Article 3 of the U.S. Constitution.

14.     This Court has personal jurisdiction over Defendants Gaia, Weidner, Montalbano, Rysavy, Warkins and Medvedich because they reside in, and/or are organized in Colorado. Further, aforementioned Defendants have availed themselves of the benefits and protections of this District and have substantial contacts with this forum through business activities and otherwise.

15.     This Court has personal jurisdiction over Defendants High and Zavodnick because they have availed themselves of the benefits and protections of this District and have substantial contacts with this forum through business activities and otherwise, have aimed activities that have caused harm that has been felt in Colorado, and have consented to jurisdiction in Colorado.

16.     Venue is proper pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims stated herein occurred in this District.

## ALLEGATIONS COMMON TO ALL
## CAUSES OF ACTION

17.     Mr. Goode is a motivational speaker, influencer, author, producer and public figure. Since around 2014, Mr. Goode has been publicly sharing the story of his life experiences and garnering the attention of scientists, researchers, and media personalities across the globe.

18.     Mr. Goode's charisma and positivity attracts a following that spans the spectrum of race, religion and nationality. Unfortunately, in the last several years, Mr. Goode has also attracted the attention of a group of individuals who seek to slander and disparage Mr. Goode, his message, his reputation, and ultimately, deprive him of his following, career and livelihood.

19.     GES was formed by Mr. Goode and holds all right, title and interest to the intellectual property ("IP") that Mr. Goode has formed and developed, in addition to other work and projects he undertakes, including classes, movies, comic books and other goods and services tied to his branding and message.

## The Beginning: Mr. Goode's Early Career as a Public
## Speaker and Influencer

20.     As early as 2008, Mr. Goode began speaking at various events and recounting his personal experiences tied to a secret space program, which he termed the "20 and Back™" missions undertaken by the Secret Space Program—a top-secret military project focused on travel beyond the confines of Earth. As a result of Mr. Goode publicly sharing his story and experiences, the "Sphere Being Alliance ®" ("SBA") branding and message and its progeny were developed by Mr. Goode. In connection with this, Mr. Goode also began sharing his stories and experiences involving angelic beings that he called the "Blue Avians™", which inspired Mr. Goode's message advocating for love, inclusion, and acceptance of all people and all things positive. Mr. Goode's message, and the narrative he developed, began garnering attention in the Conscious Community.

GOODE v. GAIA et al SECOND AMENDED COMPLAINT                                    4

21.     During the early years of Mr. Goode's public dissemination of his story, he became close friends with an author and researcher by the name of David Wilcock. The two began working together to share their knowledge of, and passion for, both advanced technologies and ancient histories alike, and their personal stories and experiences with a wider audience. After a sudden turn of events thrust Mr. Goode into the forefront of the "Disclosure" movement, Mr. Goode garnered the attention of the movie and television network by the name of Gaia, a defendant in the instant action.

### Mr. Goode's Testimony Launches the Show "Cosmic Disclosure" on Gaia

22.     On or about June 2015, Gaia—through Weidner, Rysavy, Warkins and Medvedich—approached Mr. Goode and Mr. Wilcock with a proposal to star on a show premised on Mr. Goode's testimony by the name of "Cosmic Disclosure" ("CD"). The two agreed, and the hit show took off for a successful three-year stint that doubled Gaia's worth and brought in hundreds of thousands of new subscribers. Indeed, taking a look at Gaia's stock price shows a constant increase in its worth beginning when CD first premiered through June 2018, when Mr. Goode left the show, at which time it took a sudden and continued downturn…that has yet to right itself:

[2]



---

[2] Last accessed August 31, 2020 at
https://www.google.com/search?q=NASDAQ:GAIA&tbm=fin&stick=H4sIAAAAAAAAAONgecRoyi3w8sc9Y SmdSWtOXmNU4-IKzsgvd80rySypFJLgYoOy-KR4uLj0c_UNzKtyLctzeRaxcvs5Brs4Blq5O3o6AgD-1vF_SAAAAA#scso=_T49NX82FJMmGsQXU0bvoDg1:0&wptab=OVERVIEW

23.     While working on CD, Mr. Goode filmed approximately 52 episodes each year for a period of three years, which generated thousands of hours of content, hundreds of hours of in-person presentation and testimony, and millions of dollars in revenue, which directly benefited and enriched Gaia. Further, during the three years that Mr. Goode was working on CD, the content he generated included his personal story and subject matters that he had been sharing and developing prior to his involvement with Gaia, including but not limited to the Blue Avians ™, 20 and Back ™, and SBA ® branding and message.

### Defendants Directly Caused Losses for Mr. Goode and GES

24.     Mr. Goode and GES were harmed by Defendants' actions, as discussed more fully herein below, because he was forced to leave CD as a result of, *inter alia*, various broken promises and false, harmful remarks and misrepresentations that caused confusion and mistake throughout the Conscious Community and his fanbase. Defendants tarnished his reputation with malicious attacks, causing financial harm, and disparaging social media posts, which have caused a loss of goodwill in his community that substantially and negatively affects his ability to continue to earn an income.  The Defendants all have strong ties to Gaia.  These actions were taken in retaliation to either [1] Mr. Goode terminating his professional relationship with Gaia and leaving CD, or [2] jealousy of Mr. Goode's sudden rise to status in the Conscious Community as a leader and influencer .

### Breach of Contract by Gaia and Resulting Financial Loss to Plaintiff

25.     While negotiating his talent contract, as well as any amendments thereto and subsequent verbal agreements, Mr. Goode met with Gaia CEO, Rysavy, and/or employees and agents of Gaia, Warkins, Weidner and Medvedich.

26.     On August 22, 2016, Gaia entered into a Talent Agreement (the "2016" Contract") with Mr. Goode, promising certain compensation for his work on Cosmic Disclosure, as well as various speaking arrangements. The parties executed an Amendment to the 2016 Contract on or about

August 29, 2017, under which Gaia promised Mr. Goode additional compensation for his word on CD (the "2017 Amendment"). Subsequently, Gaia entered into a verbal agreement with Plaintiff, promising to issue him stock options in exchange for Mr. Goode's agreement to continue working on CD. The 2016 Contract, all amendments thereto, and any and all subsequent oral agreement(s) are collectively referred to herein as the "Contracting Agreement."[3]

27.     Under the Contracting Agreement, Gaia, through Rysavy, promised Mr. Goode various forms of compensation in exchange for his appearance on Cosmic Disclosure ("CD") including, inter alia: (a) Talent Fees or a Performance Bonus and monthly reports on the revenue brought in by CD used to calculate any such performance bonus; (b) Fees under the "Ambassador Program", (c) Licensing Royalties; and (d) $150,000.00 in stock options. Mr. Goode agreed to work with Gaia in exchange for these promises, as well as additional monetary amounts agreed to by the parties. Mr. Goode fulfilled his contractual obligations.

28.     Gaia, through Rysavy, breached the contracting agreement by failing to pay the promised Performance Bonus and/or the fees owed under the "Ambassador Program" in full. Further, no qualified viewing time data, which is used to calculate the performance bonus, was provided to Mr. Goode.  Since Mr. Goode was not given access to the monthly revenue reports, he was unable to calculate financial losses for the bonus.

29.     In addition, Gaia, through Rysavy, wholly failed to pay the Licensing Royalties owed to Mr. Goode under Section 6(E) of the 2016 Contract, which was not modified by the 2017 Amendment. Gaia licensed CD to Amazon for syndication, and pursuant to Section 6(E), Mr. Goode was entitled to a royalty payment of 20% of the television syndication licenses paid to Gaia by third parties, less expenses paid by Gaia directly related to the license. To date, Gaia has failed to pay Mr. Goode the promised royalty payments.

---

[3] All documents included in the Contracting Agreement are filed in addition to this filing under restriction as agreed to by counsel for Plaintiffs and Gaia.

30.     Furthermore, Gaia has failed and refused to issue Mr. Goode the $150,000.00 in stock options that he was promised. Based on information and belief, Gaia—through Medvedich, Warkins and Rysavy—verbally agreed to issue $150,000.00 in stock options to Mr. Goode prior to the execution of the 2017 Amendment, and subsequently ratified that agreement by promising to issue the stock options to Mr. Goode in 2018, if Mr. Goode agreed to participate in the filming of additional CD episodes through June 2018. Mr. Goode accepted the offer and fulfilled his obligations to stay on the show through June 2018. However, Mr. Goode was never issued the stock options.

31.     Rysavy repeatedly assured Mr. Goode that he would keep his word throughout Mr. Goode's tenure working on CD. Rysavy, to date, has reneged on all of these agreements. Thus, Gaia, through Rysavy, breached the Contracting Agreement, causing financial loss to Mr. Goode in the form of unpaid performance bonuses, "Ambassador Program" fees, royalty payments, and unissued stock options.

## Goode's Departure from CD

32.     During Mr. Goode's time at Gaia shooting CD, he came to meet—and work with—Defendant Weidner.

33.     On a regular basis, Weidner was known to continually scream and curse at Mr. Goode and other CD hosts and guests, disperse deprecating, defaming and untrue comments that spread throughout the cast and crew.

34.     Mr. Goode reported Weidner's hostile outbursts multiple times to Gaia, Rysavy, Medvedich, and Warkins.

35.     Weidner was eventually fired from Gaia due to his abusive outbursts.

36.     After almost three years of the harassment, lack of compensation that was promised, and more broken promises, Mr. Goode decided that it was time to part ways with Gaia. He fulfilled his contracted requirement of a year's worth of filmed content and went off on his own.

## Mr. Goode Files to Protect His Trademarks

37.     Just prior to Mr. Goode's departure from CD, he decided to make the prudent business decision to protect his independent branding by filing for various federal trademarks with the United States Patent and Trademark Office ("USPTO").

38.     Mr. Goode had worked autonomously on print, clothing and media goods and services tied to his arbitrary, protected phrases: Blue Avians ™, 20 and Back ™, Sphere Being Alliance ® and SBA® (the "Goode Marks"). This work was done well in advance of—and separate and apart from—his work with and for Gaia. The Goode Marks have become a source indicator of Goode's goodwill, branding and message and have, as such, acquired secondary meaning.

39.     Mr. Goode filed for Federal Trademark Registrations for BLUE AVIANS (Application No. 87821423), 20 AND BACK (Application No. 87821401), SPHERE BEING ALLIANCE (Application No. 87821504), and SBA (Application No. 87821495) in March of 2018.

40.     Mr. Goode was granted the rights to SBA® and SPHERE BEING ALLIANCE® in November of 2018 and April of 2019, respectively. (See Exhibit A).

41.     After BLUE AVIANS and 20 AND BACK were published by the USPTO, Gaia instituted opposition proceedings Nos. 91245558 and 91246954 (the "Opposition Proceedings") with the Trademark Trial and Appeal Board ("TTAB") against the claimed marks (the "Opposed Marks") despite Mr. Goode having sent various Cease and Desist and Demand Letters to Gaia instructing them to cease use of his protected phrases (as further explained below).

42.     Gaia claimed, in its oppositions to the Opposed Marks, that the applied-for marks are descriptive, not arbitrary. Gaia has yet to be able to explain what goods and services they are descriptive of.

43.     To date, Gaia has failed to effectively pursue its claims against the Opposed Marks. Indeed, the discovery periods for both oppositions are now closed and Gaia failed to propound but

minimal discovery requests— altogether failing to respond to GES' attempt to move things along discovery-wise.

44.    GES sent over abundant discovery requests for both oppositions, receiving scant responses that were effectively copies of the discovery produced for the other opposition.

45.    Subsequent to Mr. Goode filing for his federal trademarks, Gaia filed a number of trademarks as well, including: DISCLOSURE, OPEN MINDS (both now abandoned), DEEP SPACE, MISSING LINKS, COSMIC DISCLOSURE, WISDOM TEACHINGS and HEALING MATRIX.

46.    Gaia merely filed the Oppositions to prevent Mr. Goode from expanding and profiting off of his branding, message and goodwill. Goode has been financially harmed due to his inability to utilize his intellectual property freely because of the Oppositions filed by Gaia.

47.    Gaia, including through Rysavy, Warkins and Medvedich, violated the trademark application for 20 AND BACK by continuing to use Goode's protected phrase on various advertising and promotional materials, and staging the opposition to the 20 AND BACK mark without any intention to defend their opposition in good faith, failing to stop using 20 AND BACK, not participating in discovery, and neglecting to pursue its claims.  Gaia, including through Rysavy, Warkins and Medvedich, demonstrated bad faith in continuing to use the mark 20 AND BACK after the application was filed, after receiving notice from Mr. Goode, building on a cornerstone of his testimony.

### Gaia's Hiring of Imposter Talent that Used Mr. Goode's Protected Terms and Content and Ensuing Attacks on Goode and his IP

48.    Just prior to Mr. Goode's departure from Gaia and CD, Gaia hired additional talent to take over Mr. Goode's role on the show. Individuals like Jason Rice, Emery Smith and others appeared on CD and, to Mr. Goode's shock and dismay, proceeded to use Goode's Marks protected

phrases and testimony.

49.     Gaia defrauded consumers by continuing to use Mr. Goode's content and claimed marks after Mr. Goode left the show, and after it received cease and desist letters from GES.

50.     In response, and in an attempt to prevent any dilution and tarnishment of his branding and goodwill, Goode sent out multiple Cease and Desist letters to Gaia and the talent that was appearing on Gaia utilizing Goode's protected IP. In response, Gaia's attorneys and talent (in an attempt to turn the Conscious Community against Goode) launched an attack on Mr. Goode for attempting to protect his business assets.

51.     The talent at issue at that time, Jason Rice, released a statement attempting to shame Goode for protecting his IP.

52.     Later, through discovery in the trademark oppositions, Goode discovered that Gaia offered to provide legal representation for Rice's defense. After Warkins and Medvedich sent Rice a letter offering legal protection in response to Goode's Cease and Desist letter, Rice sent it back signed and released the aforementioned public statement. This was not the first nor the last time that Gaia used bribery, witness tampering, counterfeiting and wire fraud against Mr. Goode in conjunction with its agents named in this suit.

53.     Gaia hired Rice to shame Goode, and they protected Rice from legal liability. Although Gaia did not make explicit statement against Goode, any harm to Mr. Goode's reputation that was caused by Rice's statements, are the direct result of his contract with Gaia, and the legal protection provided by Gaia, so Gaia is indirectly responsible for the shaming statements.

54.     In its letter to Rice (Exhibit B), Gaia states: "With respect to Cosmic Disclosure episodes or other Gaia programs relating to the Secret Space Program, Gaia will indemnify you and assume the defense of any intellectual property infringement claims made by Mr. Goode against you arising from Gaia's use, distribution, production or sale of the programs or any advertising or

promotional use of the programs in accordance with the rights Gaia has in such programs. Please confirm your agreement with. These arrangements by signing below [. . .]"

55.     Gaia did not have any 'rights' to the IP Goode was claiming and requesting Rice cease and desist from using, effectively making its offer a hollow attempt to further harm and disparage Mr. Goode.

56.     In Rice's letter (Exhibit C), not only does Rice grossly misstate the factual nature of what Mr. Goode actually did in his attempt to secure his intellectual property rights, but he also includes a call to action—on a large scale—based upon his misrepresentations and false statements.

57.     Focusing on the last line of Rice's letter shows exactly why these individuals that have targeted Goode are doing so: "I ask for your support by reposting this article (**with link and acknowledgement**) [. . .]". (emphasis added). It is the same reason that defendants Zavodnick,

58.     High, Zavodnick, Montalbano, Weidner and Gaia consistently tag Mr. Goode and use the Goode Marks in their Social Media posts—to ride off of the notoriety and reach of Mr. Goode's followers. All four make repeated misuse of the Goode Marks while defaming and harassing Goode—further harming Goode by spreading untruths and baseless statements while bolstering their viewership through the use of "tagging" on various social media platforms.

### Weidner's Continued, Violent Harassment and Stalking

59.     Weidner has engaged in repeated threats and invaded Mr. Corey Goode's privacy by incessantly and repeatedly divulging his private information and disparaging him through social media posts he has posted on YouTube, Twitter, Facebook and the like. In addition to this, he has engaged in sending implicit and explicit threats via email and through videos, livestreams, and other media produced both by him and by others at his direction. (See Exhibits D, E and F).

## THREATENING EMAILS

60.     Indeed, most of Weidner's threats today are finished with a "dare" to come on his YouTube "show".

61.     Weidner is inclined to issue violent threats against Mr. Goode without a second thought. In fact, Weidner has even threatened Mr. Goode's life with a gun. Weidner makes threats of bodily harm and harm to Goode's business and reputation through his multitude of videos that he posts on various social media platforms. (See also Exhibits D, E and F).

62.     Weidner has sent as least two threatening emails to Mr. Goode that caused Mr. Goode to fear for his life and the life of his family. One was sent on February 12, 2019 and merely said: (in the subject line) "C U", presumably meant to stand for the phonetic words "See you" and (in the body of the email) simply: "soon …".

63.     The second such email was sent on April 5, 2019 and accused Mr. Goode of "doxing" (leaking private information about) "a friend of [his]", included an expletive, and what amounts to written maniacal laughter. (See Exhibit E).

64.     Weidner had, at this point, started to propagate multiple lies about Mr. Goode and his followers saying that they were "fakes" and that they were "doxing" various people within the Conscious Community.

65.     In fact, it was Weidner that somehow obtained various "recordings", documents and other information that—whether fabricated or of genuine nature—was an invasion of Mr. Goode's privacy. Often, this "information" was actually fabricated and thus more aptly called "disinformation"…a fact that Weidner never has ever admitted.

## THREATENING VIDEOS

66.     Weidner is the owner of the YouTube account "REALiTY CHeCK" that is devoted almost solely to harassing and invading Mr. Goode's privacy.

67.     In fact, the video that begins to play immediately upon opening up Weidner's YouTube channel is one that ridicules and harasses Mr. Goode:



*See* https://www.youtube.com/channel/UCN7Hdc3Rb3YBMHwd_qi-DpQ (last accessed March 6, 2020). The Goode Mark "Sphere Being Alliance ®" used in the summary of Weidner's video utilizes the YouTube algorithm to link Weidner's channel of nine thousand followers to Goode's YouTube channel of one hundred and forty-eight thousand followers.

68.     Perhaps the most disturbing YouTube video was made by Weidner wherein he makes underhanded death threats against Mr. Goode and his colleague David Wilcock by posting a graphic on his video "Corey Goode Falling From the Clif Episode 7," on May 24th, 2019, now visible at https://www.youtube.com/watch?v=FNJyi4JnmOk . Notably, a number of Weidner's videos include Mr. Goode's name, a snapshot below:



69.     The above representing hours and hours of false and threatening narrative that is made up by Weidner and broadcast to thousands of individuals across the internet.

70.     Weidner's statements are inflammatory of the community and meant to incite violence against Mr. Goode, the same violence that Weidner threatened in his emails and videos.

### Montalbano's Two-Year Lawsuit for "Theft of Dream Visions"

71.     Mr. Goode has undergone years of repeated stalking and harassment by Montalbano that unfortunately, even though she has lost the case she brought against him, has been assessed attorneys fees for frivolous prosecution, and received a Report and Recommendation from a Magistrate that she was delusional and that her case should be dismissed, still shows no sign of going away.

### THE FIRST TRO/STALKING APPLICATION

72.     Mr. Goode has had to seek a TRO/Stalking Order against Montalbano twice in the last two years due to her repeated stalking, threats, and invasion of Mr. Corey Goode's privacy.

73.     Montalbano has stalked Mr. Goode by incessantly and repeatedly contacting and attempting to contact him with the sole purpose of coercing him into some fictitious and fanciful relationship that she has concocted in her mind. (see Exhibit K).

### THE RETALIATORY MESA LAWSUIT

74.     In retaliation to Mr. Goode's Stalking/TRO lawsuit filed on or around June 15, 2018, Montalbano opened a lawsuit in Mesa County against Mr. Goode on June 25, 2018.

75.     Attached is the Register of Actions of the Mesa Action prior to removal, showing thirty- six filings in less than three months. (Exhibit G). These filings are replete with Montalbano's fanciful ideas of being married to Mr. Goode in another dimension, having romantic meetings through astral projection, and other disturbing stories as well as a painstakingly detailed review of

Mr. Goode's career and personal life details.

76.     Due to the nature of Montalbano's claims seeming—to Mr. Goode's counsel's best analysis of the purported claims—to be of the nature of copyright, Mr. Goode removed the action to federal court on or around September of 2018.

77.     After the case was removed, Montalbano amended her claims—at the suggestion of Judge Moore and after Magistrate Gallagher recommended dismissal of the action—and the case was sent back to state court on or around December of 2018. (Exhibit H).

78.     In the just over two months that the case was in federal court, the docket entries totaled eighty docket entries. *Id*.

79.     Over 95% of the filings in both cases were by Montalbano, most stricken and/or ignored by the judges due to their sheer unfounded (in legal or reason), baseless and innocuousness nature.

80.     The amount of filings mounted after removal, and has reached over a hundred.

81.     All have been sent to Mr. Goode. All have been so voluminous that they necessitated packaging in boxes and caused repeated and continuing emotional distress.

82.     For two years now Mr. Goode has dealt with Montalbano's repeated harassment, defamation and unwanted affections and attention.

83.     Now, after years of Montalbano's ongoing and repeated harassment, stalking, and unwanted contact and attention, Mr. Goode has reached the point where he fears an impending attack of Montalbano's intense focus resulting in harm to himself and his family.

84.     Last year, Montalbano received a report and recommendation from a Federal Magistrate Judge calling her "delusional" (see Exhibit I, see also Exhibit J [someone who has met Montalbano stating that when she met her "she was missing a few screws even back then"]).

85.     This, in addition to a dismissal of her case against Mr. Goode by a State Court Judge, her response to both being inflammatory and a huge outlash. An excerpt reproduced below:

> Plaintiff asserts the violation of a legal interest that clearly does not exist or facts that do not support an arguable claim for relief. The complaint(s) lack coherent factual allegations or claims. They describe what seems a delusional scenario of use of supposed dreams emailed to another party. The nonsensical allegations do not support an arguable claim for relief, and a more specific pleading would not cure the failure of the purported claims nor place them in a position to clear the hurdles of Rule 8 or 12. The complaint fails to provide a short

86.    She has since filed multiple motions against the Judge in the Mesa action calling for his recusal for "perjury" and accusing him of working with Mr. Goode and his counsel.

### MONTALBANO'S YOUTUBE ACCOUNT FOCUSED SOLELY ON MR. GOODE

87.    Most recently, Montalbano has created a YouTube account purely for the purpose to harass, defame, threaten and discredit Mr. Goode.[4]

88.    On her YouTube channel Montalbano reads aloud—for hours at a time—her voluminous, nonsensical court filings and inserts delusional commentary about her imaginary husband-and-wife or "twin flame" relationship she has been asserting since at least 2018 exists between herself and Mr. Goode. She accuses Goode of criminal acts and links her channel to Zavodnick and Weidner's YouTube channels.

### Goode is Blacklisted from Conferences Sponsored or Held by Gaia

89.    Upon information and belief, Goode has been blacklisted from major ufology events sponsored by Gaia, as well as by two leading ufology radio shows including Coast to Coast and Fade to Black Radio. This was due to the direct influence by both Gaia, Rysavy, Medvedich, Warkins and

---

[4] Accessible at https://www.youtube.com/channel/UCyiuJjzwQKX0dQGp8_kd8_w on March 17, 2020

Weidner both before and after he was fired from Gaia. Upon information and belief, the aforementioned malicious postings by Zavodnick, High and Montalbano contributed to Goode's blacklisting from said events.

90. Goode regularly attended a conference called "Conscious Life Expo" ("CLE").

91. Upon information and belief, Gaia has an ownership interest in CLE.

92. After the relationship between Goode and Gaia started breaking down, CLE no longer invited Goode to attend as a speaker. In fact, Goode was not invited to attend at all.

93. Goode regularly attended a conference called "Contact in the Desert" ("CITD").

94. Upon information and belief, Gaia was a sponsor of CITD.

95. After the relationship between Goode and Gaia started breaking down, CITD no longer invited Goode to attend as a speaker. In fact, Goode was not invited to attend at all.

96. Goode regularly attended a conference called "New Living Expo" ("NLE").

97. Upon information and belief, Gaia was a sponsor of NLE.

98. After the relationship between Goode and Gaia started breaking down, NLE no longer invited Goode to attend as a speaker. In fact, Goode was not invited to attend at all.

99. Upon information and belief, Weidner, Rysavy, Medvedich and/or Warkins spoke to the heads of CLE, CITD and NLE and told them not to invite Goode to their Conferences.

### CW Chanter and Clif High Disturbing Posts and Baseless Accusations of Doxing

100. Perhaps the most violent and offensive harassment has been spearheaded by a New Jersey-licensed attorney by the name of Zavodnick. In addition to his disturbing chanting and singing, often with a slurred voice, Zavodnick litters his YouTube videos with expletives.

101. Zavodnick began his attacks on Goode starting at least in 2015. They have increased in intensity and with more and more information as to the connectedness of the Association. In fact, Zavodnick, High and Weidner have all been on each other's YouTube channels to accuse Goode of

criminal acts and support each others' live streams on multiple occasions. (*See* https://www.youtube.com/watch?v=LHN1hW3936U last accessed August 31, 2020 Clif High and Jay Weidner on June 1, 2019; see also https://www.youtube.com/watch?v=z-cey6QBks8&feature=share Zavodnick and High doing the same, referencing Montalbano on November 5, 2017; last accessed August 31, 2020; https://www.youtube.com/watch?v=ykDCraGusdM&feature=share Zavodnick bashing Goode on August 23, 2020 last accessed August 31, 2020).

102.    Weidner at one point brings Zavodnick on his "show" for what amounts to an a all-star "Corey Goode-Bashing" where all involved engage in making harassing and defamatory statements about Goode:



https://www.youtube.com/watch?v=FFjVml8bGM0 last accessed March 17, 2020. All involved spin a narrative of Goode supposedly "doxing" various influencers in the Conscious Community.

103.    Similarly, Defendant High uses social media to attack Goode. High took to social media to make threats of bodily harm and further attempt to defame Mr. Goode.



104.    The author of the above Tweet, High, has known, established relationships with Zavodnick and Weidner. In addition, he has made statements, on video, that he is an unstable person.  (See  https://www.youtube.com/watch?v=FNJyi4JnmOk,  accessed  on  March  17, 2020).

### Interconnectedness of the Parties – The Association

105.    There is a reasonable suspicion there is an underlying motivation to remove Goode from his livelihood by creating a lengthy campaign of innuendo, possible presentation of doctored evidence and continual rehash of prior statements using different individuals to make  them  by  the  "enterprise"  of  Weidner,  High,  Zavodnick  and  Montalbano  (the "Association").

106.    The Association's purpose is simple: to accuse Goode of criminal activities through social media outlets and other wirings and to use extortion (specifically, through an email sent by Weidner), harassment and any other manipulative tactic to deprive him of his livelihood.

107.    The  Association  does  not  even  try  to  hide  its  connectedness  through relationships evidenced through social media and built on the same purpose as shown through their various social media posts and "live streams" wherein they host discussions by and

between each other and use the same terms and phrases in order to promote their purpose.

108.    This has been going on since at least 2015, and continues until as recently as within the last week—with no sign of cessation.

109.    This endeavor rises to the level of multiple criminal acts including stalking, harassment, mail and wire fraud and various obstructions of justice such as witness tampering. The rise of this motivation is observed in multiple statements made throughout this period of time by the Association.

110.    As shown herein, and upon further information and belief, the Association is interconnected and functioning for the purpose of preventing Goode from disseminating his message and providing for himself and family. The below statement by Weidner shows Gaia (a separate "enterprise" as further explained herein) is a strong influence on the Association as well:



Screenshot taken from Weidner's Facebook account on March 5, 2020.

111.    Weidner does not state that he is NOT still "with" (i.e., "working") for Gaia—and he further says that he thinks that Gaia is "[his] child".

112.    Montalbano, aka "Ari Stone" is known to be connected with Weidner on social media (and since at least 2017 through discussions regarding a potential work relationship with Gaia), an example below:



Screenshot taken from Montalbano's Twitter account on March 17, 2020. Montalbano and Weidner's connection was first revealed to Goode by Montalbano through an email she sent to him on Tue, Sep 12, 2017 at 12:58 AM (Exhibit N).

113.   Note, again, the "watch, share like and subscribe" Montalbano includes after using the hashtag "#CoreyGoode" so that she can reach the tens of thousands of people who follow Mr. Goode's hashtag. Montalbano's following on Twitter is one-tenth as large.

114.   Members in the Conscious Community have come forward to speak out on the harassment of Goode by Gaia and those involved in the Association. Mr. Robert Vannoy has witnessed much of the harassment that has gone on through the years. (See Exhibits L and M).

<u>**Gaia's Recent Removal of Goode's Content and Goode's**</u>
<u>**Loyal FanBase**</u>

115.   Gaia took down tapings of CD including Mr. Goode on or around the beginning of March, 2020. The response has been overwhelming—Goode's followers want to see his material. Gaia is clearly taking down his content in an attempt to harm Goode's reputation. Like the old adage goes, out of sight—out of mind.

116.   Despite Gaia's best efforts, Goode's following is loyal—Gaia has every motive to harm Goode since he made the decision to leave them:



Accessed on March 17, 2020 at https://twitter.com/Jeffrey33793811/status/1239008355961593858



Accessed on March 17, 2020 at https://twitter.com/shaneceriale/status/1235251769514397696



Accessed on march 17, 2020 at https://twitter.com/MsAnnabellucy/status/1235289988503396354

117.    Gaia is falsely accusing Goode of disparaging them, when it is the other way around, in an attempt to tarnish his name:



Accessed on March 17, 2020 at https://twitter.com/shaneceriale/status/1235251769514397696

118.    Unfortunately, some of Goode's former supporters have chosen to believe the misrepresentations of the Association. Despite his mostly-faithful following, Goode has indeed felt a backlash from some that believe the lies the Association has propagated in addition to the loss of the monetary support that he was formerly able to rely on from speaking at the aforementioned conferences.

119.    Goode has appeared on shows like the Jenny McCarthy show—a testament to his versatility and ability to connect with people from every walk of life.[5]

_____

[5] The Jenny McCarthy Show reaches hundreds of thousands of viewers daily.



120.    The nefarious activities of the Association as a whole as well as the actions of each individual Defendant has taken a toll on Goode who has for almost two years tried every avenue to make things right outside of litigation, but alas has been forced to bring the issues in front of a tribunal that can hopefully lend some guidance.

121.    Mr. Goode suffered financial losses through the breach of contract with Gaia, he suffered damages from the harassment and loss of reputation, losses by the abuse of his trademarks, and monetary losses by the consternation in the community that followed his loss of good will.  Gaia's actions, and the people who perpetrated actions to harm Mr. Goode, were unconscionable.

## I.    Claim I: Racketeer Influenced and Corrupt

Organizations Act, 18 U.S. Code § 1964

**(Defendants Rysavy, Warkins, Medvedich, the "Gaia Defendants")**

122. Plaintiff realleges each and every allegation and fraud set forth in Paragraphs 1 through 122 as if set forth herein at length .

## APPLICABLE STATUTES

123. 18 U.S. Code § 1962(c) makes it unlawful for "any person employed by or associated with an enterprise engaged in or the activity of which affect, interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such enterprise's affairs for a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(d) makes it unlawful to conspire to violate any of the RICO substantive provisions, including section 1962(c).

124. 18 U.S. Code § 1964(c) creates a private right of action for any person injured in his business or property by reason of violation of § 1962 and provides for threefold the damages sustained as a result of recovery for the cost of suit including reasonable attorney fees.

### THE ENTERPRISE

125. Gaia, Inc., a legal entity, is an Enterprise as described in 18 U.S.C. § 1961(4). Defendants Rysavy, Warkins and Medvedich (the "Gaia Defendants"), are senior officers and employees of Gaia Inc. and with others, conduct and manage the affairs of Gaia Inc.

126. The activities of Gaia Inc, a legal entity which provides services in interstate commerce, was engaged in and its activities affected interstate commerce.  Gaia broadcasts various content to the Conscious Community throughout the United States and the world.

### THE RACKETEERING VIOLATION

127. From on or about 2016, and continuing up through the date of the filing of this Complaint, the Gaia Defendants, each of whom are persons associated with or employed by Gaia Inc., did knowingly and unlawfully conduct or participate, directly or indirectly, in the

affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and § 1961(5), all in violation of 18 U.S.C. § 1962(c).

128.    The Gaia Defendants have engaged in a pattern of racketeering activity by committing at least two acts of racketeering activity after the effective date of RICO and also within 10 years of each individual act, specifically, Gaia Defendants' actions described violate the following provisions:  a) the federal wire fraud statute 18 U.S. Code § 1343, which is identified by 18 U.S. Code § 1961(1)(A) as indictable predicate act for purposes of racketeering; and the federal mail fraud statute, 18 U.S.C. § 1341, which is identified by 18 U.S. Code § 1961(A) as an indictable predicate act for purposes of racketeering.

## RACKETEERING ACTIVITY

129.    Over the course of years, the Gaia Defendants knowingly, intentionally and recklessly engaged in an ongoing pattern of racketeering activity under 18 U.S. Code § 1962(c) by committing the predicate acts of wire fraud and mail fraud as set forth below.  The fraudulent schemes involved using the mails and wires to defraud Plaintiffs of millions of dollars.

Mail and Wire Fraud

130.    In furtherance of their scheme to defraud, and with the purpose of executing their schemes to defraud, the Gaia Defendants herein, caused the use of the mails, and interstate wires for the purpose of defrauding Plaintiffs of millions of dollars.   Some representations of these mailings and interstate wirings, which consist of electronic messages which constitute interstate transmissions and interstate telephone calls between Gaia Defendants and Plaintiff, are as follows:

131.    Medvedich: on March 27, 2018 at 5:53 pm, knowing that Gaia had no intent on fulfilling its financial obligations to Mr. Goode, Medvedich sent an email to him demanding he appear for filming episodes of Cosmic Disclosure. Mr. Goode declined, stating that a few days' notice was not sufficient. That same day at 11:07 pm she informed him that Gaia would

be moving forward with shooting scenes for CD with or without him, knowing Gaia was intending to use Goode's branding, Marks and message (his "IP") through another guest on CD that was not authorized by Goode to use Goode's protected IP.

132.    Warkins: on February 25, 2016 at 7:02 pm Warkins sent an email to his colleague at Gaia, Kevin Spracht, asking for information on a payment that had been sent to Goode. Goode stated he did not believe that it was the right amount. Warkins knew it was not the right amount. On February 26, 2018 at 12:38 pm Warkins replied to Goode that he had spoken with Rysavy and that the amount was correct. Both Warkins and Rysavy knew it was an underpayment. Neither remedied the payment.

133.    Rysavy: On February 26, 2018 Rysavy and Warkins exchanged emails related to an underpayment to Goode that they knew was an underpayment. Rysavy was to get back to Goode personally. Over a week later, on March 5, 2018 at 10:36 pm Rysavy finally responded to Goode and "explained" how the pay structure was to work, knowing that it was not what Goode and Gaia/Rysavy himself had agreed to.

Racketeering Acts: the Broken Agreements

134.    While negotiating his talent contract, Mr. Goode met with the Gaia Defendants. Mr. Goode was promised various forms of compensation in exchange for his appearance on CD including, inter alia, $150,000.00 in stock options, a percentage of the revenue brought in by CD through Talent Fees, fees under the "Ambassador Program" and monthly access to the information that showed the revenue brought in by CD.  Mr. Goode agreed to work with Gaia in exchange for these promises in addition to a monetary amount agreed to by the parties. Gaia, through Rysavy, Warkins and Medvedich, never reduced these agreements to writing although Mr. Goode requested they be memorialized in his written contract. All three Defendants through interstate emails and phone calls assured Mr. Goode that Gaia would keep its word. All three Defendants, to date, have reneged on all of these agreements.

Racketeering Acts: the Contract Breaches

135.    As herein alleged, the Contracting Agreements were breached by the Gaia Defendants, who made multiple misrepresentations to Mr. Goode as to the monetary compensation he was due and receiving through interstate emails and phone calls.

Racketeering Acts: Defrauding Plaintiffs' of His Trademarks

136.    The Gaia Defendants knew that the Goode Marks belonged to, and were claimed by, Goode. They intentionally caused, through interstate emails and phone calls, the Goode Marks to be used in interstate commerce through its broadcasts without Goode's approval.

**Racketeering Acts: Hiring of Imposter Talent to Defraud Plaintiffs**

137.    As alleged herein, Goode discovered that Gaia offered to provide legal representation for Rice's defense. After Warkins and Medvedich sent Rice a letter offering legal protection in response to Goode's Cease and Desist letter, Rice sent it back signed and released the aforementioned public statement. This was in furtherance of the scheme to defraud Goode of his claimed marks.

**PATTERN OF RACKETEERING ACTIVITY**

138.    Plaintiffs allege that the course of conduct engaged in by the RICO defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).  Plaintiffs can show the relatedness prong because the predicate acts have the "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise."  All predicate acts had the same purpose of defrauding Plaintiffs of millions of dollars, all for the personal enrichment of the Defendants and their associates.

139.    Plaintiffs allege that the continuity of the pattern of racketeering activity arises from the threat of continued activity given the predicate activity is continuous, ongoing and will continue unless Defendants are stopped from continuing these racketeering activities.  The threat of continued activity also is shown by the fact that Defendants throughout the years have repeatedly engaged in the same illegal and illicit activities involving other entities such as a former talent actor with Gaia

by the name of Patty Greer.

140.    Thus, engaging in the pattern of racketeering as set forth herein is the regular way Defendants regularly conducted the operations of Gaia, Inc., the legal entity enterprise.  Although certain of the players have changed, the Defendants named herein have been conducting the operations of Gaia Inc. since at least 2016, and will continue the cycle of deception and illegal actions against Goode  into the future if not stopped.   Thus, the Gaia Defendants remain a threat to others and their racketeering activity meets the open-ended continuity test.

## II.    Claim II: Civil RICO Conspiracy Pursuant to 18 U.S.C. § 1962(d) – RICO Defendants

### (Weidner, High, Zavodnick and Montalbano)

141.    Goode repeats each of the allegations contained in Paragraphs 1 through 140 as if set forth herein at length.

142.    Goode alleges that commencing in 2016, and during and continuing at all times through the date of this Amended Complaint, the Defendants conspired to violate section 1962(c), i.e., each defendant agreed that a conspirator would conduct or participate in the affairs of the Enterprise through a pattern of racketeering, including acts indictable under 18 U.S.C. §§ 1341, and §1343, as more fully described in Count One.   Goode alleges that the conspiratorial objective of that mutual agreement was intended to obtain Goode's interests in business and/or property, and that such conspiratorial conduct violates RICO § 1962(d).

143.    Defendants acted in concert with one another in deceiving and defrauding Plaintiffs. Each knew or should have known that the others' conduct constituted a breach of duty and provided assistance to accomplish unlawful results.

## III.    Claim III: FEDERAL TRADEMARK INFRINGEMENT (Under 15 U.S.C. §§ 1114 and 1125(a))

### (All Defendants)

144.    Goode repeats each of the allegations contained in Paragraphs 1 through 143 as if set

forth herein at length.

145.    GES is the owner of the valid and subsisting federal trademark registrations for the SPHERE BEING ALLIANCE® and SBA® marks, the federal registration documents attached hereto as Exhibit A.

146.    GES is also the Owner of common law marks 20 AND BACK™ and BLUE AVIANS™, currently the subject of oppositions with the TTAB but will be filing a motion to stay proceedings upon filing of this First Complaint.

147.    GES' paper, clothing and educational and entertainment goods and services are marketed and sold globally. In offering and selling its products GES uses the marks SPHERE BEING ALLIANCE ®, SBA®, 20 AND BACK ™ and BLUE AVIANS ™ (the "GES Marks").

148.    GES has invested tremendous time, effort and financial resources in developing and promoting its products and services bearing the SPHERE BEING ALLIANCE ®, SBA®, 20 AND BACK ™ and BLUE AVIANS ™ marks (the "GES Goods and Services") with the marketing and sale of GES' goods in interstate commerce. The GES Marks have become, through widespread and favorable industry acceptance and recognition, an asset of substantial value symbolizing GES, its quality products and services and its goodwill.

149.    Consumers of paper, clothing and educational and entertainment goods and services in the Conscious community recognize the GES Marks as a source indicator for Goode.

150.    As evidenced by the valid and subsisting trademark registrations, the SPHERE BEING ALLIANCE® and the SBA® (the "SBA Marks") are inherently distinctive. The marks 20 AND BACK ™ and BLUE AVIANS™ (the "Pending GES Marks") are also inherently distinctive and entitled to trademark protection under the Lanham Act.

151.    Defendants (and/or Defendants' agents or affiliates) wrongfully and illegally made use of GES Marks by wrongfully and illegally obtaining access to Goode's content and asking its talent NOT including Mr. Goode but appearing on Gaia TV in a role akin to Mr. Goode's to use the GES Marks in their commentary and dialogue in Gaia-produced and/or Gaia- related content thereby

causing the GES marks to be displayed prominently and in association with the Gaia (or other Defendant-related) names when searching for GES Marks in a Google (or other search engine or Social Media) search. These activities were carried out without GES' or Mr. Goode's consent or knowledge.

152.    The activities in the foregoing paragraph continued for a period of months until GES was able to have Defendants (and/or Defendants' agents or affiliates) comply with its Cease and Desist letters sent by its counsel throughout 2018.

153.    Defendants (and/or Defendants' agents or affiliates) sent existing and prospective Goode customers numerous emails and social media messages and marketing which promoted their own products or services under the GES Marks or represented that their products or services were offered under GES Marks when in fact they are not.

154.    The wrongful and illegal attribution of the GES Marks with Defendants (and Defendants' agents or affiliates) have created a likelihood that consumers will be confused or deceived as to the source of the parties' products and any quality assurance with resulting substantial and irreparable harm to GES' Marks, reputation, and goodwill residing therein.

155.    Defendants' (and/or Defendants' agents or affiliates) actions are knowing, intentional, willful, and carried out with clear intent to trade on the reputation and goodwill associated with GES' business and Marks.

156.    Defendants' (and/or Defendants' agents or affiliates) actions are knowing, intentional, willful, and carried out with clear intent to divert and harm Goode's business and convert the reputation and goodwill associated with Goode's names and GES Marks.

157.    Defendants' (and/or Defendants' agents or affiliates) have caused and are likely to continue to cause substantial injury to Goode's names and GES Marks, and are entitled to injunctive relief, recovery of Defendants' profits, GES' damages, enhanced damages, costs and reasonable attorney fees.

## IV.   Claim IV: False Designation of Origin and Federal Unfair Competition under 15 U.S.C. § 1125

### (All Defendants)

158.   Goode repeats each of the allegations contained in Paragraphs 1 through 157 as if set forth herein at length.

159.   Defendants' (and/or Defendants' agents or affiliates) made repeated representations about the source, origin, and nature of Defendants' products that have created the false and misleading impression that Defendants' goods or services are manufactured by GES, affiliated with GES, connected or associated with GES, and/or endorsed, controlled, or approved by GES when, in fact, they are not.

160.   Defendants' (and/or Defendants' agents or affiliates) have made false representations, false descriptions, and false designations of origin regarding Defendants and Defendants' goods or services in violation of 15 U.S.C. § 1125(a), and such activities have caused, and unless enjoined, will continue to cause a likelihood of confusion and deception of members of the trade and the public and, additionally, injury and harm to GES' goodwill and reputation.

161.   Defendants' (and/or Defendants' agents or affiliates) have caused and are likely to continue to cause substantial injury to the public and to GES, for which GES is entitled to obtain injunctive relief and to recover profits, actual damages, enhanced damages, and other damages as may be provided by statute. The knowing, willful, and continuing nature of Defendants' conduct makes this an exceptional case for which GES is entitled to recover its costs and reasonable attorney fees.

### V.   Claim V: Colorado Common Law Trademark and Trade Name Infringement

### (All Defendants)

162.   Goode repeats each of the allegations contained in Paragraphs 1 through 161 as if set forth herein at length

163.    GES' Marks and its associated trade names are all trademarks and names used by Goode in connection with its goods and services, which names and marks are arbitrary and/or inherently distinctive.

164.    Defendants' (and/or Defendants' agents' or affiliates') unauthorized use of GES' Marks and names for in connection with the same or similar products and services infringes upon Goode's common law trademark and trade name rights.

165.    As a result of aforementioned infringing conduct, Goode has suffered irreparable harm to its marks and the reputation and goodwill associated therewith, and will continue to suffer irreparable harm, for which there is no adequate remedy at law.

## VI. <u>Claim VI: Colorado Common Law Unfair Competition</u>

### (All Defendants)

166.    Goode repeats each of the allegations contained in Paragraphs 1 through 165 as if set forth herein at length

167.    As its fifth grounds for relief, Goode asserts violation of Colorado common law unfair competition.

168.    Defendants' (and/or Defendants' agents or affiliates) have made unauthorized and infringing use of Goode's trademarks and trade names, wrongfully and illegally took control of Goode's content causing Goode's information and favorable social media content to be associated with Defendants', clearly intending to benefit from the reputation and goodwill residing in Goode's, utilized Gaia's position as an content provider and director of CD to gain access to Goode's existing and prospective customers with the intent of and undertaking actions and deceptive communications to create confusion and misperception and thereby diverting their business to Gaia.

169.    Defendants' (and/or Defendants' agents or affiliates) conduct as described above has led to confusion and deception of consumers with regard to the identity of the parties and the products

offered by them.

170.    Defendants' (and/or Defendants' agents or affiliates) have, or have sought to, pass off their goods as those of Defendants' by virtue of use of Goode's trademarks and trade names, leading to actual confusion on the part of the consumer.

171.    Defendants' (and/or Defendants' agents or affiliates) have misappropriated and exploited GES' business values.

172.    Goode has no adequate remedy at law for the damages caused by Defendants (and/or Defendants' agents or affiliates) and their common law unfair competition, conduct and activities, and Goode has been irreparably damaged thereby.

## VII.    Claim VII: Colorado Consumer Protection Act

### (All Defendants)

173.    Goode repeats each of the allegations contained in Paragraphs 1 through 172 as if set forth herein at length.

174.    Defendants' (and/or Defendants' agents or affiliates) engaged in deceptive trade practices in the course of business in violation of C.R.S. § 6-1-105 and otherwise in violation of Colorado law.

175.    Without limiting the generality of the foregoing paragraph, Defendants' (and/or Defendants' agents or affiliates) knowingly: (a) sought to pass off Defendants' products and/or services as being Goode products or otherwise affiliated with, controlled or approved by GES; (b) made false representations attributing the source, sponsorship, approval, or certification of Defendants' goods and/or services to GES; and (c) made false representations that Defendants and Defendants' goods and/or services are affiliated, connected, associated with, or certified by Goode.

176.    Defendants' (and/or Defendants' agents' or affiliates') deceptive trade practices occurred in the course of their occupation and business.

177.    Defendants' (and/or Defendants' agents' or affiliates') deceptive trade practices significantly impact the consumers of paper, clothing and educational and entertainment goods and services in the Conscious community as actual or potential consumers of Defendants' products and/or services who have been deceptively led to believe that Goode and its commitment to high-quality products and services underlies the products and/or services being offered and sold by Defendants when in fact this is false; consumers acting in reliance on Goode's stellar reputation and history of quality products in dealing with Defendants are unaware of the lack of this safety net and the risk being assumed to their detriment.

178.    In the course of its business, Goode has been and will continue to be injured as a result of Defendants' deceptive trade practices.

179.    Goode has suffered and will continue to suffer injury in fact to a legally-protected interest as a result of Defendants' deceptive trade practices.

180.    Goode has suffered and will continue to suffer actual damages as a result of Defendants' deceptive trade practices.

181.    Goode is entitled to injunctive relief to prohibit Defendants from continuing their deceptive trade practices pursuant to C.R.S. §§ 6-1-110(1) and 6-1-113(1).

### VIII.    Claim VIII: Breach of Contract
### (Gaia, Rysavy, Warkins, Medvedich, and Weidner)

182.    Goode repeats each of the allegations contained in Paragraphs 1 through 181 as if set forth herein at length .

183.    Goode entered into a contract with Gaia governing the terms and conditions of his ongoing contractual relationship with Gaia, including Defendant Weidner and the Gaia Defendants.

184.    On information and belief, Weidner's job description included compliance with company policies and procedures, as did Goode's, the Gaia Defendants' and Gaia's.

185.    Weidner and Gaia breached that contract by failing to adhere to company policies,

GOODE v. GAIA et al SECOND AMENDED COMPLAINT                                    37

including but not limited to those concerning the confidentiality and use of GES' confidential and proprietary information. The Gaia Defendants, Weidner and Gaia also breached that contract by failing to act appropriately in a work environment.

186.    Gaia and the Gaia Defendants further breached that contract by failing to adhere to the compensation guidelines laid out in in and the subsequent amendments.

187.    Weidner, the Gaia Defendants and Gaia further breached their contract with Goode by acting in a manner contrary to the implied duty of good faith and fair dealing.

188.    Goode suffered damages as a result of Gaia, the Gaia Defendants and Weidner's breaches of contract, in an amount to be proven at trial, together with restitution and disgorgement.

## IX.    Claim IX: Fraudulent Misrepresentation

### (Gaia and the Gaia Defendants)

189.    Goode repeats each of the allegations contained in Paragraphs 1 through 188 as if set forth herein at length.

190.    On multiple occasions Gaia and the Gaia Defendants made misrepresentations regarding the employment contract between Goode and Gaia that included compensation beyond what Gaia did in fact pay to Goode.

191.    Gaia and the Gaia Defendants knew such representations were false.

192.    Gaia and the Gaia Defendants knew Goode would rely—and in fact did rely—on such misrepresentations.

193.    Gaia and the Gaia Defendants induced Goode to enter the Contractor Agreement by relaying said misrepresentations to Goode.

194.    The aforementioned acts or omissions by Gaia and the Gaia Defendants have caused harm or injury to Goode.

## X.  Claim XIII: Slander Per Se

**(All Defendants)**

195.   Goode repeats each of the allegations contained in Paragraphs 1 through 193 as if set forth herein at length.

196.   Defendants' (and/or Defendants' agents' or affiliates') made a multitude of false, spoken statements (e.g., accusing Goode of a criminal act) purporting to be facts.

197.   These statements were published or communicated to a third person (e.g., through any of Defendants' social media accounts).

198.   Defendants did so intentionally—or, at the very least, negligently.

199.   Goode suffered damages because of the aforementioned defamatory statements.

## XI. **Claim XIV: Libel Per Se**

**(All Defendants)**

200.   Goode repeats each of the allegations contained in Paragraphs 1 through 199 as if set forth herein at length.

201.   Defendants' (and/or Defendants' agents' or affiliates') made a multitude of false, written statements (e.g., accusing Goode of a criminal act) purporting to be facts.

202.   These statements were published or communicated to a third person (e.g., through any of Defendants' social media accounts).

203.   Defendants did so intentionally—or, at the very least, negligently.

204.   Goode suffered damages because of the aforementioned defamatory statements.

## XII.      **Claim XV: Tortious Interference with a Business Expectancy**

**(All Defendants)**

205.   Goode repeats each of the allegations contained in Paragraphs 1 through 204 as if set

forth herein at length.

206.    Goode had a multitude of actual or prospective business contracts with the aforementioned Conferences and various entertainment agencies.

207.    Defendants knew of these actual or prospective business contracts and intentionally and improperly interfered with the performance of these contracts.

208.    The aforementioned interference with the aforementioned contracts resulted in monetary loss and harm and damage to Goode's reputation and goodwill.

### XIII.    Claim XVII: Declaratory Judgments of Validity of GES Trademarks

### (Gaia)

209.    Goode repeats each of the allegations contained in Paragraphs 1 through 245 as if set forth herein at length.

210.

211.    GES has suffered injury due to Gaia's filing of oppositions against its 20 AND BACK ™ and BLUE AVIANS ™ trademarks. GES has not been able to license the IP that it has poured countless hours, money and effort into building because Gaia filed oppositions against the pending marks merely to harass and delay.

212.    This delay has caused GES to lose out on licensing fees as well as other media deals due to the pending oppositions, who are not set to go to trial until early 2021. Gaia has been slow to respond to requests for discovery and for early settlement.

213.    This harm is certain to be curtailed if this honorable Court determines the validity of GES' Marks.

### CONCLUSION AND PRAYER FOR RELIEF

CONSIDERING THE HEREIN DESCRIBED, GES and Mr. Goode pray this Court consider the facts allegations contained hereby:

A.  Enter judgment against Defendants for all aforementioned claims;

B.  Enter an injunction barring Defendants from any of the aforementioned harmful conduct;

C.  Ordering Gaia to withdraw any Opposition proceeding it has brought in front of the TTAB;

D.  Find that all individual Defendants are liable individually for their transgressions as well as any attributable to Gaia;

E.  Order Defendants to pay all actual damages suffered by Goode as a result of Defendants' fraudulent and harmful activities;

F.  Order Defendants to give Goode all right and title to any materials at issue;

G.  Order Defendants to pay for additional damages Goode has and will incur from reliance on Defendants' false representations;

H.  Grant Goode special damages, due to the willful, reckless, wanton, egregious, unfair, unethical, deceptive and unscrupulous conduct of Defendants;

I.  Enter judgment against the Defendants for compensatory consequential damages, trebled;

J.  Grant Goode an award of attorneys' fees, costs and interest;

K.  Grant Goode all monetary and other relief available at law and in equity.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, GES hereby demands a trial by jury of all claims in this litigation.

Date: August 31, 2020                    Respectfully  submitted,


                                        s/ Valerie A. Yanaros
                                        Valerie A. Yanaros
                                        Texas Bar No. 24075628
                                        Yanaros Law, P.C.
                                        5057 Keller Springs Rd, Suite 300
                                        Addison, TX, 75001
                                        Telephone: (512) 826-7553
                                        valerie@yanaroslaw.com


                                        **ATTORNEY FOR PLAINTIFF**