# EXHIBIT A

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Colorado ▾

James Corey Goode and Goode Enterprise Solutions, Inc. )
_____ )
*Plaintiffs* )
v. ) Civil Action No.  1:20-cv-00742-DDD-KAS
)
Gaia, Inc. )
_____ )
*Defendant* )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: David Wilcock
1455 Ridge Road, Nederland, CO 80466-9715

*(Name of person to whom this subpoena is directed)*

☛ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A

| Place: Belzer Law<br>737 29th Street Suite 100A, Boulder, CO 80303 or<br>via email to aaron@belzerlawfirm.com | Date and Time:<br><br>01/06/2025 9:00 am |
|---|---|

❐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  12/06/2024

CLERK OF COURT

OR

_____     /s/ Daniel Dingerson
*Signature of Clerk or Deputy Clerk*        *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Gaia, Inc. _____ , who issues or requests this subpoena, are:
Daniel Dingerson, Davis+Gilbert LLP, 1675 Broadway, NY, NY 10019, ddingerson@dglaw.com, (212) 237-1488

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  1:20-cv-00742-DDD-KAS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____.

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

---

JAMES COREY GOODE and GOODE
ENTERPRISE SOLUTIONS, INC.,

      *Plaintiffs and Counter-*
      *Defendants*,

      v.

GAIA, INC.,

      *Defendant and Counter Claimant*.

Case No. 20-cv-742-DDD-KAS

**SCHEDULE A TO SUBPOENA**

---

**DEFINITIONS**

    A.    "GES" means and shall refer to Plaintiff Goode Enterprise Solutions Inc. and its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

    B.    "Goode" means and shall refer to Plaintiff James Corey Goode.

    C.    "Plaintiffs" or "Plaintiff" means and shall refer to GES and Goode collectively or individually, as defined above.

    D.    "Defendant" means and shall refer to Defendant Gaia, Inc., and its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

    E.    "You" means and shall refer to David Wilcock.

    F.    "Action" means and shall refer to the above-captioned litigation, *James Corey Goode., et al. v. Gaia, Inc.*, Case No. 20-cv-742-DDD-KAS (D. Colo).

    G.    "Complaint" means and shall refer to the Seconded Amended Complaint and Jury Demand, dated December 8, 2020, filed by Plaintiffs in the Action.  The Complaint is attached hereto as Exhibit A.

H.    "Counterclaims" means and shall refer to Gaia's Amended Answer and Counterclaims to the Second Amended Complaint, dated April 15, 2024, filed by Gaia in the Action.  The Counterclaims are attached hereto as Exhibit B.

I.    "CD" means and shall refer to the series produced by Gaia entitled *Cosmic Disclosure*.

J.    "Wilcock Email" means and shall refer to the July 1, 2018, email sent by You to Gaia executives Brad Warkins and Kiersten Medvedich.

K.    "Wilcock Email Defamatory Statements" means and shall refer to the quoted statements from the Wilcock Email as identified in Paragraphs 97 through and including 103 of the Counterclaims.

L.    "2015 Contract" means and shall refer to the agreement dated June 20, 2015, entered into between Gaia and GES for the services of Goode to appear in Gaia programs, including CD.

M.    "2016 Contract" means and shall refer to the agreement dated August 22, 2016, entered into between Gaia and GES for the services of Goode to appear in Gaia programs, including CD.

N.    "August 2017 Amendment" means and shall refer to the agreement dated August 29, 2017, between Gaia and GES to amend the 2016 Contract for the continued services of Goode to appear in Gaia programs, including CD.

O.    "November 2017 Amendment" means and shall refer to the agreement between Gaia and GES to further amended the 2016 Contract for the continued services of Goode to appear in Gaia programs, including CD.

P.    "2017 Amendments" means and shall collectively refer to the November 2017

Amendment and the August 2017 Amendment.

Q.      "Petition" means and shall refer to the Change.org petition posted on or before June 11, 2018, titled "Please, Cancel Your GAIA Subscription", as referenced in Paragraph 121 of the Counterclaims.

R.      "Video" means and shall refer to the video titled "Corey Goode As You Wish Talk Radio Exclusive Tell All Interview" published on YouTube.com on March 21, 2020, as referenced in Paragraph 153 of the Counterclaims.

S.      "GEM" means and shall refer to a purported group of current and former Gaia employees as alleged in Paragraphs 137 through and including 144 of the Counterclaims.

T.      "FTL Blog" means and shall refer to the website https://fadetolightblog.wordpress.com.

U.      "Communication(s)" or "Communicate(d)" means and shall refer to the oral or written transmittal of information (in the form of facts, ideas, inquiries or otherwise).

V.      "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Rule 34(a) of the Federal Rules of Civil Procedure and includes, but is not limited to, video recordings, film, and digital files. A draft or non-identical copy is a separate document within the meaning of this term.

W.      "Person" means and shall refer to any natural person or any legal entity, including, but not limited to, any business or governmental entity or association.

X.      The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

**<u>INSTRUCTIONS</u>**

1.      All capitalized terms used but not defined herein shall be defined or interpreted as

they are used in the Counterclaims.

2.      "Any," "all," and "each" shall each be construed as encompassing any and all.

3.      "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this Request all responses that might otherwise be construed to be outside of their scope.

4.      The use of the singular form of any word includes the plural and vice versa.

5.      The past tense shall include the present tense, and vice versa.

6.      The terms "including," "include," and "includes" are used in their broadest sense and are not meant to be limiting.  Any list following these terms contains illustrative examples of the types of documents responsive to the Request, but the list is without limitation and does not constitute an exclusive, all-encompassing, or exhaustive listing of every type of document responsive to the Request.

7.      With respect to each request, you shall produce all documents which are known to you or which can be located or discovered by reasonably diligent effort, including but not limited to all such documents which are in the personal, business, or other files or otherwise in the possession, custody, or control of you or your attorneys, consultants, representatives, agents, and all others acting or purporting to act on your behalf.

8.      If your response to a particular Request is a statement that you lack the ability to understand a word or phrase in the Request, use the common and reasonable interpretation of the word or phrase and explain your interpretation of the word or phrase.

9.      If you contend certain Requests require disclosure of private or confidential information, please mark them as such or as required by the Protective Order entered in this matter. The Protective Order is attached hereto as Exhibit C.

10.    Your obligation to respond to this Request is continuing and your responses are to be supplemented to include subsequently acquired information in accordance with the requirements of Fed. R. Civ. P. 26(e).

11.    If a portion of an otherwise responsive Document contains information subject to a claim of privilege or protection from discovery, those portions of the Document shall be redacted from the Document, and the redacted portions shall be clearly marked as such, and the rest of the Document shall be produced. Any attachment to an allegedly privileged Document shall be produced unless you also contend that the attachment is privileged.

12.    Where a claim of privilege is asserted in objecting to any request herein, and any Documents or parts of Documents responsive to these Requests are withheld on the basis of such assertion, you shall provide the following information:

> (a)    the nature of the privilege claimed and if the privilege is asserted in connection with a claim or defense governed by state law, indicate the state's privilege rule being invoked;

> (b)    the author(s) and addressee(s) of the Document, and where not apparent, the relationship of the author(s) and addressee(s) to each other;

> (c)    the type of Document;

> (d)    the general subject matter of the Document; and

> (e)    the date of the Document.

13.    Pursuant to Rule 34(b) of the Federal Rules, all Documents must be produced as they are kept in the usual course of business with any identifying labels, file markings or similar identifying features, or shall be organized and labeled to correspond to the appropriate request herein. Any electronically stored information must be produced in a form or forms in which it is

ordinarily maintained or in a reasonably usable form or forms.

14.    If there are no Documents responsive to any particular request, you shall so state in writing.

15.    If any requested document has been lost, discarded or destroyed, such document shall be identified as follows: (i) date of disposal; (ii) manner of disposal; (iii) reason for disposal; (iv) person authorizing the disposal; and (v) person disposing of the document.

16.    Pursuant to Rule 26(e) of the Federal Rules, these requests are continuing in nature so as to require supplemental production by you in the event you obtain or discover additional responsive documents after the date of initial production.

17.    Unless otherwise specified, each request seeks information and Documents authored, generated, drafted, disseminated, produced, reproduced, or otherwise created or distributed in the time period from January 1, 2015 to the present.

18.    Documents shall be produced consistent with the Stipulated Order for the Exchange and Production of Electronically Stored Information (the "ESI Protocol") agreed to be the parties and so-ordered by the Court on July 26, 2024.  The ESI protocol is attached hereto as Exhibit D.

## **REQUESTS FOR PRODUCTION**

1.    All Documents and Communications concerning CD, including but not limited to the material and content that Goode and You discussed during your appearances on CD.

2.    All Communications between You and Plaintiffs concerning Gaia, and all Documents concerning such Communications.

3.    All Communications between You and Plaintiffs concerning CD, and all Documents concerning such Communications.

4.      All Communications between You and any Person, including but not limited to Goode, concerning any other Persons who have ever appeared on CD, and all Documents concerning such Communications.

5.      All Communications between You and any Person, including but not limited to Goode, concerning Your relationship with Gaia, and all Documents concerning such Communications.

6.      All Communications between You and any Person, including but not limited to Goode, concerning Goode's relationship with Gaia, and all Documents concerning such Communications.

7.      All Documents and Communications concerning the termination of Your relationship with Gaia.

8.      All Documents and Communications concerning the termination of Goode's relationship with Gaia.

9.      All Documents and Communications with Goode concerning his 2015 Contract, 2016 Contract, or the 2017 Amendments.

10.     All Documents and Communications with any Person, including but not limited to Goode, concerning the Wilcock Email, including any drafts of the Wilcock Email.

11.     All Documents and Communications with any Person, including but not limited to Goode, concerning the Wilcock Email Defamatory Statements.

12.     All Documents and Communications with any Person, including but not limited to Goode, concerning release, disclosure, publication, posting, or dissemination to any Person of the Wilcock Email, including but not limited to the Wilcock Email Defamatory Statements.

13.     All Documents and Communications with any Person concerning the Petition or the subject(s) of the Petition.

14.     All Documents and Communications with any Person concerning the Video or the subject(s) of the Video.

15.     All Documents and Communications with any Person concerning GEM.

16.     All Documents and Communications with any Person concerning the FTL Blog, including but not limited to Communications with "Thomas Crown" (or any person or persons going by such alias or pen name at any time).

17.     All Documents and Communications with any Person, including but not limited to Goode, concerning the Defamatory Statements as defined in the Counterclaims, or the subject(s) of such Defamatory Statements.

18.     All Documents and Communications with any Person concerning Goode's internet posts, including but not limited to any posts on any social media network, related to Gaia, including but not limited to any Documents and Communications concerning posting or removal of such internet posts.

19.     All Documents and Communications concerning any material posted on the internet that is concerning, in any way, Gaia or CD.

Dated:  New York, New York
       December 6, 2024

**DAVIS+GILBERT LLP**

By:  _/s/ Daniel A. Dingerson_____
       Daniel A. Dingerson
       Angela M. Dunay
       1675 Broadway
       New York, New York 10019
       (212) 237-1488
       ddingerson@dglaw.com
       adunay@dglaw.com

       *Attorneys for Defendant Gaia, Inc.*

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-00742-RBJ

**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
2:14 pm, Dec 08, 2020
**JEFFREY P. COLWELL, CLERK**

JAMES COREY GOODE, individually, and GOODE
ENTERPRISE SOLUTIONS INC.

Plaintiffs,

v.

GAIA, INC., JAY WEIDNER, CLIF HIGH, BENJAMIN
ZAVODNICK, ALYSSA MONTALBANO, JIRKA
RYSAVY, BRAD WARKINS AND KIERSTEN MEDVEDICH

Defendants.

---

### SECOND AMENDED COMPLAINT

---

**COMES NOW**, Mr. James Corey Goode ("Mr. Goode") and Goode Enterprise
Solutions, Inc. ("GES", collectively "Goode") for their claims against defendants Gaia, Inc.
("Gaia"), Jay Weidner ("Weidner"), Clif High ("High"), Benjamin Zavodnick ("Zavodnick")
Alyssa Montalbano ("Montalbano"), Jirka Rysavy ("Rysavy"), Brad Warkins ("Warkins")
(each a "Defendant" and collectively, "Defendants"), and respectfully alleges as follows:

### <u>NATURE OF THE ACTION</u>

1.      This is an action at law and in equity against Defendants for various claims of
defamation, deceptive trade practices, breach of contract, misrepresentation, tortious interference,
and racketeering arising from a desire to usurp, tarnish and misappropriate the character, financial
gain, goodwill and work of Mr. James Corey Goode ("Mr. Goode") and that of his company, GES.

2.      Mr. Goode is a Colorado resident of Broomfield, Colorado having a business address
of 1140 US Highway 287 Suite 400-266, Broomfield, Colorado, 80020. Mr. Goode is an educational
and motivational speaker, influencer, author and media figure and is well-known and respected in

the Conscious Community.[1]

3.      GES is a Colorado corporation based out of Broomfield, Colorado and formed by Mr. Goode and his wife, Stacy Renee Goode ("Mrs. Goode"). GES produces educational, spiritual, health and entertainment goods and services geared towards the Conscious Community. GES' address is 1140 US Highway 287 Suite 400-266, Broomfield, Colorado, 80020.

4.      Upon information and belief Gaia Inc. ("Gaia"), is a Colorado corporation with its principal place of business located at 833 W. South Boulder Road, Louisville, Colorado, 80027.

5.      Upon information and belief, Rysavy is the founder and Chairman of Gaia and may be served at Gaia's principal place of business or wherever else he may be found.

6.      Upon information and belief, Warkins is the Chief Operating Officer of Gaia and may be served at Gaia's principal place of business or wherever else he may be found.

7.      Upon information and belief, Medvedich is the Senior Vice President of Content Production for Gaia and may be served at Gaia's principal place of business or wherever else she may be found.

8.      Upon information and belief, Weidner is a Colorado resident and may be served at his residence at 1342 Badger Road, Crestone, Colorado, 81131.  Upon information and belief, Weidner has been both employed and contracted by Gaia to produce a program that featured the Plaintiff, Mr. Goode, as the talent and has continued a relationship with Gaia with the aims to further deprive Goode of its occupation and livelihood.

9.      Upon information and belief, High is a Washington resident and may be served at his residence at 4305 Biscay Street NW, Olympia, Washington, 98502 and has targeted much of his YouTube postings—that reach tens of thousands of followers throughout the United States including in, upon information and belief, Colorado—towards harming Goode in Colorado.

---

[1] The "Conscious Community" is a group of people focused on bettering and furthering their research and experiences in topics such as spirituality, health, wellness, the cosmic and metaphysical. *See* http://consciouscommunitymagazine.com/ [last accessed March 17, 2020] for an example of a publication catered to the Conscious Community

10.     Upon information and belief, Zavodnick is a New Jersey resident with his principal place of business located at 4914 John F. Kennedy Blvd # 203, West New York, NJ 07093 and has targeted much of his YouTube and Twitter postings—that reach thousands of followers throughout the United States including in, upon information and belief, Colorado—towards harming Goode in Colorado.

11.     Upon information and belief, Montalbano is a Colorado resident and may be served at her residence at 2222 Da Vinci Place, Grand Junction, CO 81507.

## JURISDICTION AND VENUE

12.     Goode files this action against Defendants for claims arising under the Lanham Act, 15 U.S.C. 1143(a) et seq. (the "Lanham Act") as well as under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S. Code § 1964 ("RICO") thus granting this Court federal question jurisdiction under 28 U.S.C. §§1331 and 1338.

13.     This Court has supplemental jurisdiction over Goode's common law and state law claims of defamation, deceptive trade practices, breach of contract, promissory estoppel, misrepresentation, and tortious interference pursuant to 28 U.S.C. §§1367. Because these claims are so related to the claims within the Court's original jurisdiction, they form part of the same case or controversy under Article 3 of the U.S. Constitution.

14.     This Court has personal jurisdiction over Defendants Gaia, Weidner, Montalbano, Rysavy, Warkins and Medvedich because they reside in, and/or are organized in Colorado. Further, aforementioned Defendants have availed themselves of the benefits and protections of this District and have substantial contacts with this forum through business activities and otherwise.

15.     This Court has personal jurisdiction over Defendants High and Zavodnick because they have availed themselves of the benefits and protections of this District and have substantial contacts with this forum through business activities and otherwise, have aimed activities that have caused harm that has been felt in Colorado, and have consented to jurisdiction in Colorado.

16.     Venue is proper pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims stated herein occurred in this District.

## ALLEGATIONS COMMON TO ALL
## CAUSES OF ACTION

17.     Mr. Goode is a motivational speaker, influencer, author, producer and public figure. Since around 2014, Mr. Goode has been publicly sharing the story of his life experiences and garnering the attention of scientists, researchers, and media personalities across the globe.

18.     Mr. Goode's charisma and positivity attracts a following that spans the spectrum of race, religion and nationality. Unfortunately, in the last several years, Mr. Goode has also attracted the attention of a group of individuals who seek to slander and disparage Mr. Goode, his message, his reputation, and ultimately, deprive him of his following, career and livelihood.

19.     GES was formed by Mr. Goode and holds all right, title and interest to the intellectual property ("IP") that Mr. Goode has formed and developed, in addition to other work and projects he undertakes, including classes, movies, comic books and other goods and services tied to his branding and message.

## The Beginning: Mr. Goode's Early Career as a Public
## Speaker and Influencer

20.     As early as 2008, Mr. Goode began speaking at various events and recounting his personal experiences tied to a secret space program, which he termed the "20 and Back™" missions undertaken by the Secret Space Program—a top-secret military project focused on travel beyond the confines of Earth. As a result of Mr. Goode publicly sharing his story and experiences, the "Sphere Being Alliance ®" ("SBA") branding and message and its progeny were developed by Mr. Goode. In connection with this, Mr. Goode also began sharing his stories and experiences involving angelic beings that he called the "Blue Avians™", which inspired Mr. Goode's message advocating for love, inclusion, and acceptance of all people and all things positive. Mr. Goode's message, and the narrative he developed, began garnering attention in the Conscious Community.

GOODE v. GAIA et al SECOND AMENDED COMPLAINT                                    4

21.     During the early years of Mr. Goode's public dissemination of his story, he became close friends with an author and researcher by the name of David Wilcock. The two began working together to share their knowledge of, and passion for, both advanced technologies and ancient histories alike, and their personal stories and experiences with a wider audience. After a sudden turn of events thrust Mr. Goode into the forefront of the "Disclosure" movement, Mr. Goode garnered the attention of the movie and television network by the name of Gaia, a defendant in the instant action.

### Mr. Goode's Testimony Launches the Show "Cosmic Disclosure" on Gaia

22.     On or about June 2015, Gaia—through Weidner, Rysavy, Warkins and Medvedich—approached Mr. Goode and Mr. Wilcock with a proposal to star on a show premised on Mr. Goode's testimony by the name of "Cosmic Disclosure" ("CD"). The two agreed, and the hit show took off for a successful three-year stint that doubled Gaia's worth and brought in hundreds of thousands of new subscribers. Indeed, taking a look at Gaia's stock price shows a constant increase in its worth beginning when CD first premiered through June 2018, when Mr. Goode left the show, at which time it took a sudden and continued downturn…that has yet to right itself:



2 Last accessed August 31, 2020 at
https://www.google.com/search?q=NASDAQ:GAIA&tbm=fin&stick=H4sIAAAAAAAAAONgecRoyi3w8sc9Y
SmdSWtOXmNU4-IKzsgvd80rySypFJLgYoOy-KR4uLj0c_UNzKtyLctzeRaxcvs5Brs4Blq5O3o6AgD-
1vF_SAAAAA#scso=_T49NX82FJMmGsQXU0bvoDg1:0&wptab=OVERVIEW

23.     While working on CD, Mr. Goode filmed approximately 52 episodes each year for a period of three years, which generated thousands of hours of content, hundreds of hours of in-person presentation and testimony, and millions of dollars in revenue, which directly benefited and enriched Gaia. Further, during the three years that Mr. Goode was working on CD, the content he generated included his personal story and subject matters that he had been sharing and developing prior to his involvement with Gaia, including but not limited to the Blue Avians ™, 20 and Back ™, and SBA ® branding and message.

### Defendants Directly Caused Losses for Mr. Goode and GES

24.     Mr. Goode and GES were harmed by Defendants' actions, as discussed more fully herein below, because he was forced to leave CD as a result of, *inter alia*, various broken promises and false, harmful remarks and misrepresentations that caused confusion and mistake throughout the Conscious Community and his fanbase. Defendants tarnished his reputation with malicious attacks, causing financial harm, and disparaging social media posts, which have caused a loss of goodwill in his community that substantially and negatively affects his ability to continue to earn an income.  The Defendants all have strong ties to Gaia.  These actions were taken in retaliation to either [1] Mr. Goode terminating his professional relationship with Gaia and leaving CD, or [2] jealousy of Mr. Goode's sudden rise to status in the Conscious Community as a leader and influencer .

### Breach of Contract by Gaia and Resulting Financial Loss to Plaintiff

25.     While negotiating his talent contract, as well as any amendments thereto and subsequent verbal agreements, Mr. Goode met with Gaia CEO, Rysavy, and/or employees and agents of Gaia, Warkins, Weidner and Medvedich.

26.     On August 22, 2016, Gaia entered into a Talent Agreement (the "2016" Contract") with Mr. Goode, promising certain compensation for his work on Cosmic Disclosure, as well as various speaking arrangements. The parties executed an Amendment to the 2016 Contract on or about

August 29, 2017, under which Gaia promised Mr. Goode additional compensation for his word on CD (the "2017 Amendment"). Subsequently, Gaia entered into a verbal agreement with Plaintiff, promising to issue him stock options in exchange for Mr. Goode's agreement to continue working on CD. The 2016 Contract, all amendments thereto, and any and all subsequent oral agreement(s) are collectively referred to herein as the "Contracting Agreement."[3]

27.     Under the Contracting Agreement, Gaia, through Rysavy, promised Mr. Goode various forms of compensation in exchange for his appearance on Cosmic Disclosure ("CD") including, inter alia: (a) Talent Fees or a Performance Bonus and monthly reports on the revenue brought in by CD used to calculate any such performance bonus; (b) Fees under the "Ambassador Program", (c) Licensing Royalties; and (d) $150,000.00 in stock options. Mr. Goode agreed to work with Gaia in exchange for these promises, as well as additional monetary amounts agreed to by the parties. Mr. Goode fulfilled his contractual obligations.

28.     Gaia, through Rysavy, breached the contracting agreement by failing to pay the promised Performance Bonus and/or the fees owed under the "Ambassador Program" in full. Further, no qualified viewing time data, which is used to calculate the performance bonus, was provided to Mr. Goode.  Since Mr. Goode was not given access to the monthly revenue reports, he was unable to calculate financial losses for the bonus.

29.     In addition, Gaia, through Rysavy, wholly failed to pay the Licensing Royalties owed to Mr. Goode under Section 6(E) of the 2016 Contract, which was not modified by the 2017 Amendment. Gaia licensed CD to Amazon for syndication, and pursuant to Section 6(E), Mr. Goode was entitled to a royalty payment of 20% of the television syndication licenses paid to Gaia by third parties, less expenses paid by Gaia directly related to the license. To date, Gaia has failed to pay Mr. Goode the promised royalty payments.

---

[3] All documents included in the Contracting Agreement are filed in addition to this filing under restriction as agreed to by counsel for Plaintiffs and Gaia.

30.     Furthermore, Gaia has failed and refused to issue Mr. Goode the $150,000.00 in stock options that he was promised. Based on information and belief, Gaia—through Medvedich, Warkins and Rysavy—verbally agreed to issue $150,000.00 in stock options to Mr. Goode prior to the execution of the 2017 Amendment, and subsequently ratified that agreement by promising to issue the stock options to Mr. Goode in 2018, if Mr. Goode agreed to participate in the filming of additional CD episodes through June 2018. Mr. Goode accepted the offer and fulfilled his obligations to stay on the show through June 2018. However, Mr. Goode was never issued the stock options.

31.     Rysavy repeatedly assured Mr. Goode that he would keep his word throughout Mr. Goode's tenure working on CD. Rysavy, to date, has reneged on all of these agreements. Thus, Gaia, through Rysavy, breached the Contracting Agreement, causing financial loss to Mr. Goode in the form of unpaid performance bonuses, "Ambassador Program" fees, royalty payments, and unissued stock options.

<u>**Goode's Departure from CD**</u>

32.     During Mr. Goode's time at Gaia shooting CD, he came to meet—and work with—Defendant Weidner.

33.     On a regular basis, Weidner was known to continually scream and curse at Mr. Goode and other CD hosts and guests, disperse deprecating, defaming and untrue comments that spread throughout the cast and crew.

34.     Mr. Goode reported Weidner's hostile outbursts multiple times to Gaia, Rysavy, Medvedich, and Warkins.

35.     Weidner was eventually fired from Gaia due to his abusive outbursts.

36.     After almost three years of the harassment, lack of compensation that was promised, and more broken promises, Mr. Goode decided that it was time to part ways with Gaia. He fulfilled his contracted requirement of a year's worth of filmed content and went off on his own.

## Mr. Goode Files to Protect His Trademarks

37.     Just prior to Mr. Goode's departure from CD, he decided to make the prudent business decision to protect his independent branding by filing for various federal trademarks with the United States Patent and Trademark Office ("USPTO").

38.     Mr. Goode had worked autonomously on print, clothing and media goods and services tied to his arbitrary, protected phrases: Blue Avians ™, 20 and Back ™, Sphere Being Alliance ® and SBA® (the "Goode Marks"). This work was done well in advance of—and separate and apart from—his work with and for Gaia. The Goode Marks have become a source indicator of Goode's goodwill, branding and message and have, as such, acquired secondary meaning.

39.     Mr. Goode filed for Federal Trademark Registrations for BLUE AVIANS (Application No. 87821423), 20 AND BACK (Application No. 87821401), SPHERE BEING ALLIANCE (Application No. 87821504), and SBA (Application No. 87821495) in March of 2018.

40.     Mr. Goode was granted the rights to SBA® and SPHERE BEING ALLIANCE® in November of 2018 and April of 2019, respectively. (See Exhibit A).

41.     After BLUE AVIANS and 20 AND BACK were published by the USPTO, Gaia instituted opposition proceedings Nos. 91245558 and 91246954 (the "Opposition Proceedings") with the Trademark Trial and Appeal Board ("TTAB") against the claimed marks (the "Opposed Marks") despite Mr. Goode having sent various Cease and Desist and Demand Letters to Gaia instructing them to cease use of his protected phrases (as further explained below).

42.     Gaia claimed, in its oppositions to the Opposed Marks, that the applied-for marks are descriptive, not arbitrary. Gaia has yet to be able to explain what goods and services they are descriptive of.

43.     To date, Gaia has failed to effectively pursue its claims against the Opposed Marks. Indeed, the discovery periods for both oppositions are now closed and Gaia failed to propound but

minimal discovery requests— altogether failing to respond to GES' attempt to move things along discovery-wise.

44.     GES sent over abundant discovery requests for both oppositions, receiving scant responses that were effectively copies of the discovery produced for the other opposition.

45.     Subsequent to Mr. Goode filing for his federal trademarks, Gaia filed a number of trademarks as well, including: DISCLOSURE, OPEN MINDS (both now abandoned), DEEP SPACE, MISSING LINKS, COSMIC DISCLOSURE, WISDOM TEACHINGS and HEALING MATRIX.

46.     Gaia merely filed the Oppositions to prevent Mr. Goode from expanding and profiting off of his branding, message and goodwill. Goode has been financially harmed due to his inability to utilize his intellectual property freely because of the Oppositions filed by Gaia.

47.     Gaia, including through Rysavy, Warkins and Medvedich, violated the trademark application for 20 AND BACK by continuing to use Goode's protected phrase on various advertising and promotional materials, and staging the opposition to the 20 AND BACK mark without any intention to defend their opposition in good faith, failing to stop using 20 AND BACK, not participating in discovery, and neglecting to pursue its claims.  Gaia, including through Rysavy, Warkins and Medvedich, demonstrated bad faith in continuing to use the mark 20 AND BACK after the application was filed, after receiving notice from Mr. Goode, building on a cornerstone of his testimony.

### Gaia's Hiring of Imposter Talent that Used Mr. Goode's Protected Terms and Content and Ensuing Attacks on Goode and his IP

48.     Just prior to Mr. Goode's departure from Gaia and CD, Gaia hired additional talent to take over Mr. Goode's role on the show. Individuals like Jason Rice, Emery Smith and others appeared on CD and, to Mr. Goode's shock and dismay, proceeded to use Goode's Marks protected

phrases and testimony.

49.    Gaia defrauded consumers by continuing to use Mr. Goode's content and claimed marks after Mr. Goode left the show, and after it received cease and desist letters from GES.

50.    In response, and in an attempt to prevent any dilution and tarnishment of his branding and goodwill, Goode sent out multiple Cease and Desist letters to Gaia and the talent that was appearing on Gaia utilizing Goode's protected IP. In response, Gaia's attorneys and talent (in an attempt to turn the Conscious Community against Goode) launched an attack on Mr. Goode for attempting to protect his business assets.

51.    The talent at issue at that time, Jason Rice, released a statement attempting to shame Goode for protecting his IP.

52.    Later, through discovery in the trademark oppositions, Goode discovered that Gaia offered to provide legal representation for Rice's defense. After Warkins and Medvedich sent Rice a letter offering legal protection in response to Goode's Cease and Desist letter, Rice sent it back signed and released the aforementioned public statement. This was not the first nor the last time that Gaia used bribery, witness tampering, counterfeiting and wire fraud against Mr. Goode in conjunction with its agents named in this suit.

53.    Gaia hired Rice to shame Goode, and they protected Rice from legal liability. Although Gaia did not make explicit statement against Goode, any harm to Mr. Goode's reputation that was caused by Rice's statements, are the direct result of his contract with Gaia, and the legal protection provided by Gaia, so Gaia is indirectly responsible for the shaming statements.

54.    In its letter to Rice (Exhibit B), Gaia states: "With respect to Cosmic Disclosure episodes or other Gaia programs relating to the Secret Space Program, Gaia will indemnify you and assume the defense of any intellectual property infringement claims made by Mr. Goode against you arising from Gaia's use, distribution, production or sale of the programs or any advertising or

promotional use of the programs in accordance with the rights Gaia has in such programs. Please confirm your agreement with. These arrangements by signing below [. . .]"

55.     Gaia did not have any 'rights' to the IP Goode was claiming and requesting Rice cease and desist from using, effectively making its offer a hollow attempt to further harm and disparage Mr. Goode.

56.     In Rice's letter (Exhibit C), not only does Rice grossly misstate the factual nature of what Mr. Goode actually did in his attempt to secure his intellectual property rights, but he also includes a call to action—on a large scale—based upon his misrepresentations and false statements.

57.     Focusing on the last line of Rice's letter shows exactly why these individuals that have targeted Goode are doing so: "I ask for your support by reposting this article (**with link and acknowledgement**) [. . .]". (emphasis added). It is the same reason that defendants Zavodnick,

58.     High, Zavodnick, Montalbano, Weidner and Gaia consistently tag Mr. Goode and use the Goode Marks in their Social Media posts—to ride off of the notoriety and reach of Mr. Goode's followers. All four make repeated misuse of the Goode Marks while defaming and harassing Goode—further harming Goode by spreading untruths and baseless statements while bolstering their viewership through the use of "tagging" on various social media platforms.

### Weidner's Continued, Violent Harassment and Stalking

59.     Weidner has engaged in repeated threats and invaded Mr. Corey Goode's privacy by incessantly and repeatedly divulging his private information and disparaging him through social media posts he has posted on YouTube, Twitter, Facebook and the like. In addition to this, he has engaged in sending implicit and explicit threats via email and through videos, livestreams, and other media produced both by him and by others at his direction. (See Exhibits D, E and F).

Case 2:20-cv-00742-DDD-KAS   Document 175-108/filed 05/20/25   Colorado Page 12 of 42

## THREATENING EMAILS

60.     Indeed, most of Weidner's threats today are finished with a "dare" to come on his YouTube "show".

61.     Weidner is inclined to issue violent threats against Mr. Goode without a second thought. In fact, Weidner has even threatened Mr. Goode's life with a gun. Weidner makes threats of bodily harm and harm to Goode's business and reputation through his multitude of videos that he posts on various social media platforms. (See also Exhibits D, E and F).

62.     Weidner has sent as least two threatening emails to Mr. Goode that caused Mr. Goode to fear for his life and the life of his family. One was sent on February 12, 2019 and merely said: (in the subject line) "C U", presumably meant to stand for the phonetic words "See you" and (in the body of the email) simply: "soon …".

63.     The second such email was sent on April 5, 2019 and accused Mr. Goode of "doxing" (leaking private information about) "a friend of [his]", included an expletive, and what amounts to written maniacal laughter. (See Exhibit E).

64.     Weidner had, at this point, started to propagate multiple lies about Mr. Goode and his followers saying that they were "fakes" and that they were "doxing" various people within the Conscious Community.

65.     In fact, it was Weidner that somehow obtained various "recordings", documents and other information that—whether fabricated or of genuine nature—was an invasion of Mr. Goode's privacy. Often, this "information" was actually fabricated and thus more aptly called "disinformation"…a fact that Weidner never has ever admitted.

## THREATENING VIDEOS

66.     Weidner is the owner of the YouTube account "REALiTY CHeCK" that is devoted almost solely to harassing and invading Mr. Goode's privacy.

67.     In fact, the video that begins to play immediately upon opening up Weidner's YouTube

channel is one that ridicules and harasses Mr. Goode:



*See* https://www.youtube.com/channel/UCN7Hdc3Rb3YBMHwd_qi-DpQ (last accessed March

6, 2020). The Goode Mark "Sphere Being Alliance ®" used in the summary of Weidner's video

utilizes the YouTube algorithm to link Weidner's channel of nine thousand followers to Goode's

YouTube channel of one hundred and forty-eight thousand followers.

68.     Perhaps the most disturbing YouTube video was made by Weidner wherein he makes

underhanded death threats against Mr. Goode and his colleague David Wilcock by posting a graphic

on his video "Corey Goode Falling From the Clif Episode 7," on May 24th, 2019, now visible at

https://www.youtube.com/watch?v=FNJyi4JnmOk . Notably, a number of Weidner's videos include

Mr. Goode's name, a snapshot below:



69.     The above representing hours and hours of false and threatening narrative that is made up by Weidner and broadcast to thousands of individuals across the internet.

70.     Weidner's statements are inflammatory of the community and meant to incite violence against Mr. Goode, the same violence that Weidner threatened in his emails and videos.

### Montalbano's Two-Year Lawsuit for "Theft of Dream Visions"

71.     Mr. Goode has undergone years of repeated stalking and harassment by Montalbano that unfortunately, even though she has lost the case she brought against him, has been assessed attorneys fees for frivolous prosecution, and received a Report and Recommendation from a Magistrate that she was delusional and that her case should be dismissed, still shows no sign of going away.

### THE FIRST TRO/STALKING APPLICATION

72.     Mr. Goode has had to seek a TRO/Stalking Order against Montalbano twice in the last two years due to her repeated stalking, threats, and invasion of Mr. Corey Goode's privacy.

73.     Montalbano has stalked Mr. Goode by incessantly and repeatedly contacting and attempting to contact him with the sole purpose of coercing him into some fictitious and fanciful relationship that she has concocted in her mind. (see Exhibit K).

### THE RETALIATORY MESA LAWSUIT

74.     In retaliation to Mr. Goode's Stalking/TRO lawsuit filed on or around June 15, 2018, Montalbano opened a lawsuit in Mesa County against Mr. Goode on June 25, 2018.

75.     Attached is the Register of Actions of the Mesa Action prior to removal, showing thirty- six filings in less than three months. (Exhibit G). These filings are replete with Montalbano's fanciful ideas of being married to Mr. Goode in another dimension, having romantic meetings through astral projection, and other disturbing stories as well as a painstakingly detailed review of

Mr. Goode's career and personal life details.

76.      Due to the nature of Montalbano's claims seeming—to Mr. Goode's counsel's best analysis of the purported claims—to be of the nature of copyright, Mr. Goode removed the action to federal court on or around September of 2018.

77.      After the case was removed, Montalbano amended her claims—at the suggestion of Judge Moore and after Magistrate Gallagher recommended dismissal of the action—and the case was sent back to state court on or around December of 2018. (Exhibit H).

78.      In the just over two months that the case was in federal court, the docket entries totaled eighty docket entries. *Id*.

79.      Over 95% of the filings in both cases were by Montalbano, most stricken and/or ignored by the judges due to their sheer unfounded (in legal or reason), baseless and innocuousness nature.

80.      The amount of filings mounted after removal, and has reached over a hundred.

81.      All have been sent to Mr. Goode. All have been so voluminous that they necessitated packaging in boxes and caused repeated and continuing emotional distress.

82.      For two years now Mr. Goode has dealt with Montalbano's repeated harassment, defamation and unwanted affections and attention.

83.      Now, after years of Montalbano's ongoing and repeated harassment, stalking, and unwanted contact and attention, Mr. Goode has reached the point where he fears an impending attack of Montalbano's intense focus resulting in harm to himself and his family.

84.      Last year, Montalbano received a report and recommendation from a Federal Magistrate Judge calling her "delusional" (see Exhibit I, see also Exhibit J [someone who has met Montalbano stating that when she met her "she was missing a few screws even back then"]).

85.      This, in addition to a dismissal of her case against Mr. Goode by a State Court Judge, her response to both being inflammatory and a huge outlash. An excerpt reproduced below:

> Plaintiff asserts the violation of a legal interest that clearly does not exist or facts that do not support an arguable claim for relief. The complaint(s) lack coherent factual allegations or claims. They describe what seems a delusional scenario of use of supposed dreams emailed to another party. The nonsensical allegations do not support an arguable claim for relief, and a more specific pleading would not cure the failure of the purported claims nor place them in a position to clear the hurdles of Rule 8 or 12. The complaint fails to provide a short

86. She has since filed multiple motions against the Judge in the Mesa action calling for his recusal for "perjury" and accusing him of working with Mr. Goode and his counsel.

## MONTALBANO'S YOUTUBE ACCOUNT FOCUSED SOLELY ON MR. GOODE

87. Most recently, Montalbano has created a YouTube account purely for the purpose to harass, defame, threaten and discredit Mr. Goode.[4]

88. On her YouTube channel Montalbano reads aloud—for hours at a time—her voluminous, nonsensical court filings and inserts delusional commentary about her imaginary husband-and-wife or "twin flame" relationship she has been asserting since at least 2018 exists between herself and Mr. Goode. She accuses Goode of criminal acts and links her channel to Zavodnick and Weidner's YouTube channels.

### Goode is Blacklisted from Conferences Sponsored or Held by Gaia

89. Upon information and belief, Goode has been blacklisted from major ufology events sponsored by Gaia, as well as by two leading ufology radio shows including Coast to Coast and Fade to Black Radio. This was due to the direct influence by both Gaia, Rysavy, Medvedich, Warkins and

---

[4] Accessible at https://www.youtube.com/channel/UCyiuJjzwQKX0dQGp8_kd8_w on March 17, 2020

Weidner both before and after he was fired from Gaia. Upon information and belief, the aforementioned malicious postings by Zavodnick, High and Montalbano contributed to Goode's blacklisting from said events.

90. Goode regularly attended a conference called "Conscious Life Expo" ("CLE").

91. Upon information and belief, Gaia has an ownership interest in CLE.

92. After the relationship between Goode and Gaia started breaking down, CLE no longer invited Goode to attend as a speaker. In fact, Goode was not invited to attend at all.

93. Goode regularly attended a conference called "Contact in the Desert" ("CITD").

94. Upon information and belief, Gaia was a sponsor of CITD.

95. After the relationship between Goode and Gaia started breaking down, CITD no longer invited Goode to attend as a speaker. In fact, Goode was not invited to attend at all.

96. Goode regularly attended a conference called "New Living Expo" ("NLE").

97. Upon information and belief, Gaia was a sponsor of NLE.

98. After the relationship between Goode and Gaia started breaking down, NLE no longer invited Goode to attend as a speaker. In fact, Goode was not invited to attend at all.

99. Upon information and belief, Weidner, Rysavy, Medvedich and/or Warkins spoke to the heads of CLE, CITD and NLE and told them not to invite Goode to their Conferences.

### CW Chanter and Clif High Disturbing Posts and Baseless Accusations of Doxing

100. Perhaps the most violent and offensive harassment has been spearheaded by a New Jersey-licensed attorney by the name of Zavodnick. In addition to his disturbing chanting and singing, often with a slurred voice, Zavodnick litters his YouTube videos with expletives.

101. Zavodnick began his attacks on Goode starting at least in 2015. They have increased in intensity and with more and more information as to the connectedness of the Association. In fact, Zavodnick, High and Weidner have all been on each other's YouTube channels to accuse Goode of

criminal acts and support each others' live streams on multiple occasions. (*See* https://www.youtube.com/watch?v=LHN1hW3936U last accessed August 31, 2020 Clif High and Jay Weidner on June 1, 2019; see also https://www.youtube.com/watch?v=z-cey6QBks8&feature=share Zavodnick and High doing the same, referencing Montalbano on November 5, 2017; last accessed August 31, 2020; https://www.youtube.com/watch?v=ykDCraGusdM&feature=share Zavodnick bashing Goode on August 23, 2020 last accessed August 31, 2020).

102.    Weidner at one point brings Zavodnick on his "show" for what amounts to an a all-star "Corey Goode-Bashing" where all involved engage in making harassing and defamatory statements about Goode:



https://www.youtube.com/watch?v=FFjVml8bGM0 last accessed March 17, 2020. All involved spin a narrative of Goode supposedly "doxing" various influencers in the Conscious Community.

103.    Similarly, Defendant High uses social media to attack Goode. High took to social media to make threats of bodily harm and further attempt to defame Mr. Goode.



104. The author of the above Tweet, High, has known, established relationships with Zavodnick and Weidner. In addition, he has made statements, on video, that he is an unstable person. (See https://www.youtube.com/watch?v=FNJyi4JnmOk, accessed on March 17, 2020).

### Interconnectedness of the Parties – The Association

105. There is a reasonable suspicion there is an underlying motivation to remove Goode from his livelihood by creating a lengthy campaign of innuendo, possible presentation of doctored evidence and continual rehash of prior statements using different individuals to make them by the "enterprise" of Weidner, High, Zavodnick and Montalbano (the "Association").

106. The Association's purpose is simple: to accuse Goode of criminal activities through social media outlets and other wirings and to use extortion (specifically, through an email sent by Weidner), harassment and any other manipulative tactic to deprive him of his livelihood.

107. The Association does not even try to hide its connectedness through relationships evidenced through social media and built on the same purpose as shown through their various social media posts and "live streams" wherein they host discussions by and

between each other and use the same terms and phrases in order to promote their purpose.

108.    This has been going on since at least 2015, and continues until as recently as within the last week—with no sign of cessation.

109.    This endeavor rises to the level of multiple criminal acts including stalking, harassment, mail and wire fraud and various obstructions of justice such as witness tampering. The rise of this motivation is observed in multiple statements made throughout this period of time by the Association.

110.    As shown herein, and upon further information and belief, the Association is interconnected and functioning for the purpose of preventing Goode from disseminating his message and providing for himself and family. The below statement by Weidner shows Gaia (a separate "enterprise" as further explained herein) is a strong influence on the Association as well:



Screenshot taken from Weidner's Facebook account on March 5, 2020.

111.    Weidner does not state that he is NOT still "with" (i.e., "working") for Gaia—
and he further says that he thinks that Gaia is "[his] child".

112.    Montalbano, aka "Ari Stone" is known to be connected with Weidner on social
media (and since at least 2017 through discussions regarding a potential work relationship with
Gaia), an example below:



Screenshot taken from Montalbano's Twitter account on March 17, 2020. Montalbano and Weidner's connection was first revealed to Goode by Montalbano through an email she sent to him on Tue, Sep 12, 2017 at 12:58 AM (Exhibit N).

113.    Note, again, the "watch, share like and subscribe" Montalbano includes after using the hashtag "#CoreyGoode" so that she can reach the tens of thousands of people who follow Mr. Goode's hashtag. Montalbano's following on Twitter is one-tenth as large.

114.    Members in the Conscious Community have come forward to speak out on the harassment of Goode by Gaia and those involved in the Association. Mr. Robert Vannoy has witnessed much of the harassment that has gone on through the years. (See Exhibits L and M).

<u>**Gaia's Recent Removal of Goode's Content and Goode's**</u>
<u>**Loyal FanBase**</u>

115.    Gaia took down tapings of CD including Mr. Goode on or around the beginning of March, 2020. The response has been overwhelming—Goode's followers want to see his material. Gaia is clearly taking down his content in an attempt to harm Goode's reputation. Like the old adage goes, out of sight—out of mind.

116.    Despite Gaia's best efforts, Goode's following is loyal—Gaia has every motive to harm Goode since he made the decision to leave them:



Accessed on March 17, 2020 at https://twitter.com/Jeffrey33793811/status/1239008355961593858



Accessed on March 17, 2020 at https://twitter.com/shaneceriale/status/1235251769514397696



Accessed on march 17, 2020 at https://twitter.com/MsAnnabellucy/status/1235289988503396354

117.    Gaia is falsely accusing Goode of disparaging them, when it is the other way around, in an attempt to tarnish his name:



Accessed on March 17, 2020 at https://twitter.com/shaneceriale/status/1235251769514397696

118.    Unfortunately, some of Goode's former supporters have chosen to believe the misrepresentations of the Association. Despite his mostly-faithful following, Goode has indeed felt a backlash from some that believe the lies the Association has propagated in addition to the loss of the monetary support that he was formerly able to rely on from speaking at the aforementioned conferences.

119.    Goode has appeared on shows like the Jenny McCarthy show—a testament to his versatility and ability to connect with people from every walk of life.[5]

_____

[5] The Jenny McCarthy Show reaches hundreds of thousands of viewers daily.



120. The nefarious activities of the Association as a whole as well as the actions of each individual Defendant has taken a toll on Goode who has for almost two years tried every avenue to make things right outside of litigation, but alas has been forced to bring the issues in front of a tribunal that can hopefully lend some guidance.

121. Mr. Goode suffered financial losses through the breach of contract with Gaia, he suffered damages from the harassment and loss of reputation, losses by the abuse of his trademarks, and monetary losses by the consternation in the community that followed his loss of good will. Gaia's actions, and the people who perpetrated actions to harm Mr. Goode, were unconscionable.

## I. Claim I: Racketeer Influenced and Corrupt

Organizations Act, 18 U.S. Code § 1964

**(Defendants Rysavy, Warkins, Medvedich, the "Gaia Defendants")**

122.    Plaintiff realleges each and every allegation and fraud set forth in Paragraphs 1 through 122 as if set forth herein at length .

## APPLICABLE STATUTES

123.    18 U.S. Code § 1962(c) makes it unlawful for "any person employed by or associated with an enterprise engaged in or the activity of which affect, interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such enterprise's affairs for a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(d) makes it unlawful to conspire to violate any of the RICO substantive provisions, including section 1962(c).

124.    18 U.S. Code § 1964(c) creates a private right of action for any person injured in his business or property by reason of violation of § 1962 and provides for threefold the damages sustained as a result of recovery for the cost of suit including reasonable attorney fees.

## THE ENTERPRISE

125.    Gaia, Inc., a legal entity, is an Enterprise as described in 18 U.S.C. § 1961(4). Defendants Rysavy, Warkins and Medvedich (the "Gaia Defendants"), are senior officers and employees of Gaia Inc. and with others, conduct and manage the affairs of Gaia Inc.

126.    The activities of Gaia Inc, a legal entity which provides services in interstate commerce, was engaged in and its activities affected interstate commerce.  Gaia broadcasts various content to the Conscious Community throughout the United States and the world.

## THE RACKETEERING VIOLATION

127.    From on or about 2016, and continuing up through the date of the filing of this Complaint, the Gaia Defendants, each of whom are persons associated with or employed by Gaia Inc., did knowingly and unlawfully conduct or participate, directly or indirectly, in the

affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and § 1961(5), all in violation of 18 U.S.C. § 1962(c).

128.    The Gaia Defendants have engaged in a pattern of racketeering activity by committing at least two acts of racketeering activity after the effective date of RICO and also within 10 years of each individual act, specifically, Gaia Defendants' actions described violate the following provisions:  a) the federal wire fraud statute 18 U.S. Code § 1343, which is identified by 18 U.S. Code § 1961(1)(A) as indictable predicate act for purposes of racketeering; and the federal mail fraud statute, 18 U.S.C. § 1341, which is identified by 18 U.S. Code § 1961(A) as an indictable predicate act for purposes of racketeering.

## RACKETEERING ACTIVITY

129.    Over the course of years, the Gaia Defendants knowingly, intentionally and recklessly engaged in an ongoing pattern of racketeering activity under 18 U.S. Code § 1962(c) by committing the predicate acts of wire fraud and mail fraud as set forth below.  The fraudulent schemes involved using the mails and wires to defraud Plaintiffs of millions of dollars.

Mail and Wire Fraud

130.    In furtherance of their scheme to defraud, and with the purpose of executing their schemes to defraud, the Gaia Defendants herein, caused the use of the mails, and interstate wires for the purpose of defrauding Plaintiffs of millions of dollars.   Some representations of these mailings and interstate wirings, which consist of electronic messages which constitute interstate transmissions and interstate telephone calls between Gaia Defendants and Plaintiff, are as follows:

131.    Medvedich: on March 27, 2018 at 5:53 pm, knowing that Gaia had no intent on fulfilling its financial obligations to Mr. Goode, Medvedich sent an email to him demanding he appear for filming episodes of Cosmic Disclosure. Mr. Goode declined, stating that a few days' notice was not sufficient. That same day at 11:07 pm she informed him that Gaia would

be moving forward with shooting scenes for CD with or without him, knowing Gaia was intending to use Goode's branding, Marks and message (his "IP") through another guest on CD that was not authorized by Goode to use Goode's protected IP.

132.    Warkins: on February 25, 2016 at 7:02 pm Warkins sent an email to his colleague at Gaia, Kevin Spracht, asking for information on a payment that had been sent to Goode. Goode stated he did not believe that it was the right amount. Warkins knew it was not the right amount. On February 26, 2018 at 12:38 pm Warkins replied to Goode that he had spoken with Rysavy and that the amount was correct. Both Warkins and Rysavy knew it was an underpayment. Neither remedied the payment.

133.    Rysavy: On February 26, 2018 Rysavy and Warkins exchanged emails related to an underpayment to Goode that they knew was an underpayment. Rysavy was to get back to Goode personally. Over a week later, on March 5, 2018 at 10:36 pm Rysavy finally responded to Goode and "explained" how the pay structure was to work, knowing that it was not what Goode and Gaia/Rysavy himself had agreed to.

Racketeering Acts: the Broken Agreements

134.    While negotiating his talent contract, Mr. Goode met with the Gaia Defendants. Mr. Goode was promised various forms of compensation in exchange for his appearance on CD including, inter alia, $150,000.00 in stock options, a percentage of the revenue brought in by CD through Talent Fees, fees under the "Ambassador Program" and monthly access to the information that showed the revenue brought in by CD.  Mr. Goode agreed to work with Gaia in exchange for these promises in addition to a monetary amount agreed to by the parties. Gaia, through Rysavy, Warkins and Medvedich, never reduced these agreements to writing although Mr. Goode requested they be memorialized in his written contract. All three Defendants through interstate emails and phone calls assured Mr. Goode that Gaia would keep its word. All three Defendants, to date, have reneged on all of these agreements.

Racketeering Acts: the Contract Breaches

Case 2:20-cv-00742-DDD-KAS Document 475-1 Filed 05/20/25 Colorado Page 8 of 42
Case No. 1:20-cv-00742-DDD-KAS Document 475-1 filed 05/20/25 USDC Colorado
pg 44 of 169

135.    As herein alleged, the Contracting Agreements were breached by the Gaia Defendants, who made multiple misrepresentations to Mr. Goode as to the monetary compensation he was due and receiving through interstate emails and phone calls.

Racketeering Acts: Defrauding Plaintiffs' of His Trademarks

136.    The Gaia Defendants knew that the Goode Marks belonged to, and were claimed by, Goode. They intentionally caused, through interstate emails and phone calls, the Goode Marks to be used in interstate commerce through its broadcasts without Goode's approval.

**Racketeering Acts: Hiring of Imposter Talent to Defraud Plaintiffs**

137.    As alleged herein, Goode discovered that Gaia offered to provide legal representation for Rice's defense. After Warkins and Medvedich sent Rice a letter offering legal protection in response to Goode's Cease and Desist letter, Rice sent it back signed and released the aforementioned public statement. This was in furtherance of the scheme to defraud Goode of his claimed marks.

## PATTERN OF RACKETEERING ACTIVITY

138.    Plaintiffs allege that the course of conduct engaged in by the RICO defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5). Plaintiffs can show the relatedness prong because the predicate acts have the "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise." All predicate acts had the same purpose of defrauding Plaintiffs of millions of dollars, all for the personal enrichment of the Defendants and their associates.

139.    Plaintiffs allege that the continuity of the pattern of racketeering activity arises from the threat of continued activity given the predicate activity is continuous, ongoing and will continue unless Defendants are stopped from continuing these racketeering activities. The threat of continued activity also is shown by the fact that Defendants throughout the years have repeatedly engaged in the same illegal and illicit activities involving other entities such as a former talent actor with Gaia

by the name of Patty Greer.

140.     Thus, engaging in the pattern of racketeering as set forth herein is the regular way Defendants regularly conducted the operations of Gaia, Inc., the legal entity enterprise.  Although certain of the players have changed, the Defendants named herein have been conducting the operations of Gaia Inc. since at least 2016, and will continue the cycle of deception and illegal actions against Goode  into the future if not stopped.   Thus, the Gaia Defendants remain a threat to others and their racketeering activity meets the open-ended continuity test.

## II.      Claim II: Civil RICO Conspiracy Pursuant to 18 U.S.C. § 1962(d) – RICO Defendants

### (Weidner, High, Zavodnick and Montalbano)

141.     Goode repeats each of the allegations contained in Paragraphs 1 through 140 as if set forth herein at length.

142.     Goode alleges that commencing in 2016, and during and continuing at all times through the date of this Amended Complaint, the Defendants conspired to violate section 1962(c), i.e., each defendant agreed that a conspirator would conduct or participate in the affairs of the Enterprise through a pattern of racketeering, including acts indictable under 18 U.S.C. §§ 1341, and §1343, as more fully described in Count One.   Goode alleges that the conspiratorial objective of that mutual agreement was intended to obtain Goode's interests in business and/or property, and that such conspiratorial conduct violates RICO § 1962(d).

143.     Defendants acted in concert with one another in deceiving and defrauding Plaintiffs. Each knew or should have known that the others' conduct constituted a breach of duty and provided assistance to accomplish unlawful results.

## III.      Claim III: FEDERAL TRADEMARK INFRINGEMENT (Under 15 U.S.C. §§ 1114 and 1125(a))

### (All Defendants)

144.     Goode repeats each of the allegations contained in Paragraphs 1 through 143 as if set

forth herein at length.

145. GES is the owner of the valid and subsisting federal trademark registrations for the SPHERE BEING ALLIANCE® and SBA® marks, the federal registration documents attached hereto as Exhibit A.

146. GES is also the Owner of common law marks 20 AND BACK™ and BLUE AVIANS™, currently the subject of oppositions with the TTAB but will be filing a motion to stay proceedings upon filing of this First Complaint.

147. GES' paper, clothing and educational and entertainment goods and services are marketed and sold globally. In offering and selling its products GES uses the marks SPHERE BEING ALLIANCE ®, SBA®, 20 AND BACK ™ and BLUE AVIANS ™ (the "GES Marks").

148. GES has invested tremendous time, effort and financial resources in developing and promoting its products and services bearing the SPHERE BEING ALLIANCE ®, SBA®, 20 AND BACK ™ and BLUE AVIANS ™ marks (the "GES Goods and Services") with the marketing and sale of GES' goods in interstate commerce. The GES Marks have become, through widespread and favorable industry acceptance and recognition, an asset of substantial value symbolizing GES, its quality products and services and its goodwill.

149. Consumers of paper, clothing and educational and entertainment goods and services in the Conscious community recognize the GES Marks as a source indicator for Goode.

150. As evidenced by the valid and subsisting trademark registrations, the SPHERE BEING ALLIANCE® and the SBA® (the "SBA Marks") are inherently distinctive. The marks 20 AND BACK ™ and BLUE AVIANS™ (the "Pending GES Marks") are also inherently distinctive and entitled to trademark protection under the Lanham Act.

151. Defendants (and/or Defendants' agents or affiliates) wrongfully and illegally made use of GES Marks by wrongfully and illegally obtaining access to Goode's content and asking its talent NOT including Mr. Goode but appearing on Gaia TV in a role akin to Mr. Goode's to use the GES Marks in their commentary and dialogue in Gaia-produced and/or Gaia- related content thereby

GOODE v. GAIA et al SECOND AMENDED COMPLAINT                                    32

causing the GES marks to be displayed prominently and in association with the Gaia (or other Defendant-related) names when searching for GES Marks in a Google (or other search engine or Social Media) search. These activities were carried out without GES' or Mr. Goode's consent or knowledge.

152.    The activities in the foregoing paragraph continued for a period of months until GES was able to have Defendants (and/or Defendants' agents or affiliates) comply with its Cease and Desist letters sent by its counsel throughout 2018.

153.    Defendants (and/or Defendants' agents or affiliates) sent existing and prospective Goode customers numerous emails and social media messages and marketing which promoted their own products or services under the GES Marks or represented that their products or services were offered under GES Marks when in fact they are not.

154.    The wrongful and illegal attribution of the GES Marks with Defendants (and Defendants' agents or affiliates) have created a likelihood that consumers will be confused or deceived as to the source of the parties' products and any quality assurance with resulting substantial and irreparable harm to GES' Marks, reputation, and goodwill residing therein.

155.    Defendants' (and/or Defendants' agents or affiliates) actions are knowing, intentional, willful, and carried out with clear intent to trade on the reputation and goodwill associated with GES' business and Marks.

156.    Defendants' (and/or Defendants' agents or affiliates) actions are knowing, intentional, willful, and carried out with clear intent to divert and harm Goode's business and convert the reputation and goodwill associated with Goode's names and GES Marks.

157.    Defendants' (and/or Defendants' agents or affiliates) have caused and are likely to continue to cause substantial injury to Goode's names and GES Marks, and are entitled to injunctive relief, recovery of Defendants' profits, GES' damages, enhanced damages, costs and reasonable attorney fees.

## IV.  Claim IV: False Designation of Origin and Federal Unfair Competition under 15 U.S.C. § 1125

### (All Defendants)

158.  Goode repeats each of the allegations contained in Paragraphs 1 through 157 as if set forth herein at length.

159.  Defendants' (and/or Defendants' agents or affiliates) made repeated representations about the source, origin, and nature of Defendants' products that have created the false and misleading impression that Defendants' goods or services are manufactured by GES, affiliated with GES, connected or associated with GES, and/or endorsed, controlled, or approved by GES when, in fact, they are not.

160.  Defendants' (and/or Defendants' agents or affiliates) have made false representations, false descriptions, and false designations of origin regarding Defendants and Defendants' goods or services in violation of 15 U.S.C. § 1125(a), and such activities have caused, and unless enjoined, will continue to cause a likelihood of confusion and deception of members of the trade and the public and, additionally, injury and harm to GES' goodwill and reputation.

161.  Defendants' (and/or Defendants' agents or affiliates) have caused and are likely to continue to cause substantial injury to the public and to GES, for which GES is entitled to obtain injunctive relief and to recover profits, actual damages, enhanced damages, and other damages as may be provided by statute. The knowing, willful, and continuing nature of Defendants' conduct makes this an exceptional case for which GES is entitled to recover its costs and reasonable attorney fees.

### V.  Claim V: Colorado Common Law Trademark and Trade Name Infringement

### (All Defendants)

162.  Goode repeats each of the allegations contained in Paragraphs 1 through 161 as if set forth herein at length

163.    GES' Marks and its associated trade names are all trademarks and names used by Goode in connection with its goods and services, which names and marks are arbitrary and/or inherently distinctive.

164.    Defendants' (and/or Defendants' agents' or affiliates') unauthorized use of GES' Marks and names for in connection with the same or similar products and services infringes upon Goode's common law trademark and trade name rights.

165.    As a result of aforementioned infringing conduct, Goode has suffered irreparable harm to its marks and the reputation and goodwill associated therewith, and will continue to suffer irreparable harm, for which there is no adequate remedy at law.

## VI. Claim VI: Colorado Common Law Unfair Competition

### (All Defendants)

166.    Goode repeats each of the allegations contained in Paragraphs 1 through 165 as if set forth herein at length

167.    As its fifth grounds for relief, Goode asserts violation of Colorado common law unfair competition.

168.    Defendants' (and/or Defendants' agents or affiliates) have made unauthorized and infringing use of Goode's trademarks and trade names, wrongfully and illegally took control of Goode's content causing Goode's information and favorable social media content to be associated with Defendants', clearly intending to benefit from the reputation and goodwill residing in Goode's, utilized Gaia's position as an content provider and director of CD to gain access to Goode's existing and prospective customers with the intent of and undertaking actions and deceptive communications to create confusion and misperception and thereby diverting their business to Gaia.

169.    Defendants' (and/or Defendants' agents or affiliates) conduct as described above has led to confusion and deception of consumers with regard to the identity of the parties and the products

offered by them.

170.    Defendants' (and/or Defendants' agents or affiliates) have, or have sought to, pass off their goods as those of Defendants' by virtue of use of Goode's trademarks and trade names, leading to actual confusion on the part of the consumer.

171.    Defendants' (and/or Defendants' agents or affiliates) have misappropriated and exploited GES' business values.

172.    Goode has no adequate remedy at law for the damages caused by Defendants (and/or Defendants' agents or affiliates) and their common law unfair competition, conduct and activities, and Goode has been irreparably damaged thereby.

## VII.    Claim VII: Colorado Consumer Protection Act

### (All Defendants)

173.    Goode repeats each of the allegations contained in Paragraphs 1 through 172 as if set forth herein at length.

174.    Defendants' (and/or Defendants' agents or affiliates) engaged in deceptive trade practices in the course of business in violation of C.R.S. § 6-1-105 and otherwise in violation of Colorado law.

175.    Without limiting the generality of the foregoing paragraph, Defendants' (and/or Defendants' agents or affiliates) knowingly: (a) sought to pass off Defendants' products and/or services as being Goode products or otherwise affiliated with, controlled or approved by GES; (b) made false representations attributing the source, sponsorship, approval, or certification of Defendants' goods and/or services to GES; and (c) made false representations that Defendants and Defendants' goods and/or services are affiliated, connected, associated with, or certified by Goode.

176.    Defendants' (and/or Defendants' agents' or affiliates') deceptive trade practices occurred in the course of their occupation and business.

177.     Defendants' (and/or Defendants' agents' or affiliates') deceptive trade practices significantly impact the consumers of paper, clothing and educational and entertainment goods and services in the Conscious community as actual or potential consumers of Defendants' products and/or services who have been deceptively led to believe that Goode and its commitment to high-quality products and services underlies the products and/or services being offered and sold by Defendants when in fact this is false; consumers acting in reliance on Goode's stellar reputation and history of quality products in dealing with Defendants are unaware of the lack of this safety net and the risk being assumed to their detriment.

178.     In the course of its business, Goode has been and will continue to be injured as a result of Defendants' deceptive trade practices.

179.     Goode has suffered and will continue to suffer injury in fact to a legally-protected interest as a result of Defendants' deceptive trade practices.

180.     Goode has suffered and will continue to suffer actual damages as a result of Defendants' deceptive trade practices.

181.     Goode is entitled to injunctive relief to prohibit Defendants from continuing their deceptive trade practices pursuant to C.R.S. §§ 6-1-110(1) and 6-1-113(1).

### VIII.     Claim VIII: Breach of Contract

### (Gaia, Rysavy, Warkins, Medvedich, and Weidner)

182.     Goode repeats each of the allegations contained in Paragraphs 1 through 181 as if set forth herein at length .

183.     Goode entered into a contract with Gaia governing the terms and conditions of his ongoing contractual relationship with Gaia, including Defendant Weidner and the Gaia Defendants.

184.     On information and belief, Weidner's job description included compliance with company policies and procedures, as did Goode's, the Gaia Defendants' and Gaia's.

185.     Weidner and Gaia breached that contract by failing to adhere to company policies,

including but not limited to those concerning the confidentiality and use of GES' confidential and proprietary information. The Gaia Defendants, Weidner and Gaia also breached that contract by failing to act appropriately in a work environment.

186.     Gaia and the Gaia Defendants further breached that contract by failing to adhere to the compensation guidelines laid out in in and the subsequent amendments.

187.     Weidner, the Gaia Defendants and Gaia further breached their contract with Goode by acting in a manner contrary to the implied duty of good faith and fair dealing.

188.     Goode suffered damages as a result of Gaia, the Gaia Defendants and Weidner's breaches of contract, in an amount to be proven at trial, together with restitution and disgorgement.

## IX.        Claim IX: Fraudulent Misrepresentation

### (Gaia and the Gaia Defendants)

189.     Goode repeats each of the allegations contained in Paragraphs 1 through 188 as if set forth herein at length.

190.     On multiple occasions Gaia and the Gaia Defendants made misrepresentations regarding the employment contract between Goode and Gaia that included compensation beyond what Gaia did in fact pay to Goode.

191.     Gaia and the Gaia Defendants knew such representations were false.

192.     Gaia and the Gaia Defendants knew Goode would rely—and in fact did rely—on such misrepresentations.

193.     Gaia and the Gaia Defendants induced Goode to enter the Contractor Agreement by relaying said misrepresentations to Goode.

194.     The aforementioned acts or omissions by Gaia and the Gaia Defendants have caused harm or injury to Goode.

## X.  Claim XIII: Slander Per Se

(All Defendants)

195.    Goode repeats each of the allegations contained in Paragraphs 1 through 193 as if set forth herein at length.

196.    Defendants' (and/or Defendants' agents' or affiliates') made a multitude of false, spoken statements (e.g., accusing Goode of a criminal act) purporting to be facts.

197.    These statements were published or communicated to a third person (e.g., through any of Defendants' social media accounts).

198.    Defendants did so intentionally—or, at the very least, negligently.

199.    Goode suffered damages because of the aforementioned defamatory statements.

## XI. <u>Claim XIV: Libel Per Se</u>

### (All Defendants)

200.    Goode repeats each of the allegations contained in Paragraphs 1 through 199 as if set forth herein at length.

201.    Defendants' (and/or Defendants' agents' or affiliates') made a multitude of false, written statements (e.g., accusing Goode of a criminal act) purporting to be facts.

202.    These statements were published or communicated to a third person (e.g., through any of Defendants' social media accounts).

203.    Defendants did so intentionally—or, at the very least, negligently.

204.    Goode suffered damages because of the aforementioned defamatory statements.

## XII.        <u>Claim XV: Tortious Interference with a Business Expectancy</u>

### (All Defendants)

205.    Goode repeats each of the allegations contained in Paragraphs 1 through 204 as if set

forth herein at length.

206. Goode had a multitude of actual or prospective business contracts with the aforementioned Conferences and various entertainment agencies.

207. Defendants knew of these actual or prospective business contracts and intentionally and improperly interfered with the performance of these contracts.

208. The aforementioned interference with the aforementioned contracts resulted in monetary loss and harm and damage to Goode's reputation and goodwill.

### XIII.   Claim XVII: Declaratory Judgments of Validity of GES Trademarks

#### (Gaia)

209. Goode repeats each of the allegations contained in Paragraphs 1 through 245 as if set forth herein at length.

210.

211. GES has suffered injury due to Gaia's filing of oppositions against its 20 AND BACK ™ and BLUE AVIANS ™ trademarks. GES has not been able to license the IP that it has poured countless hours, money and effort into building because Gaia filed oppositions against the pending marks merely to harass and delay.

212. This delay has caused GES to lose out on licensing fees as well as other media deals due to the pending oppositions, who are not set to go to trial until early 2021. Gaia has been slow to respond to requests for discovery and for early settlement.

213. This harm is certain to be curtailed if this honorable Court determines the validity of GES' Marks.

### CONCLUSION AND PRAYER FOR RELIEF

CONSIDERING THE HEREIN DESCRIBED, GES and Mr. Goode pray this Court consider the facts allegations contained hereby:

GOODE v. GAIA et al SECOND AMENDED COMPLAINT                    40

A.  Enter judgment against Defendants for all aforementioned claims;

B.  Enter an injunction barring Defendants from any of the aforementioned harmful conduct;

C.  Ordering Gaia to withdraw any Opposition proceeding it has brought in front of the TTAB;

D.  Find that all individual Defendants are liable individually for their transgressions as well as any attributable to Gaia;

E.  Order Defendants to pay all actual damages suffered by Goode as a result of Defendants' fraudulent and harmful activities;

F.  Order Defendants to give Goode all right and title to any materials at issue;

G.  Order Defendants to pay for additional damages Goode has and will incur from reliance on Defendants' false representations;

H.  Grant Goode special damages, due to the willful, reckless, wanton, egregious, unfair, unethical, deceptive and unscrupulous conduct of Defendants;

I.  Enter judgment against the Defendants for compensatory consequential damages, trebled;

J.  Grant Goode an award of attorneys' fees, costs and interest;

K.  Grant Goode all monetary and other relief available at law and in equity.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, GES hereby demands a trial by jury of all claims in this litigation.

Date: August 31, 2020                    Respectfully submitted,


                                         s/ Valerie A. Yanaros
                                         Valerie A. Yanaros
                                         Texas Bar No. 24075628
                                         Yanaros Law, P.C.
                                         5057 Keller Springs Rd, Suite 300
                                         Addison, TX, 75001
                                         Telephone: (512) 826-7553
                                         valerie@yanaroslaw.com


                                         **ATTORNEY FOR PLAINTIFF**

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-742-DDD-KAS

JAMES COREY GOODE, individually, and
GOODE ENTERPRISE SOLUTIONS INC.,

Plaintiffs,

v.

GAIA, INC.,
JAY WEIDNER,
CLIF HIGH,
BENJAMIN ZAVODNICK,
ALYSSA MONTALBANO,
JIRKA RYSAVY,
BRAD WARKINS, and
KIERSTEN MEDVEDICH,

Defendants.

-----------------

ALYSSA CHRYSTIE MONTALBANO, individually,

Counter-Claimant,

v.

JAMES COREY GOODE, individually, and
GOODE ENTERPRISE SOLUTIONS INC.,

Counter-Defendants,

LIGHT WARRIOR LEGAL FUND, LLC;
DAVID WILCOCK,
THE WILCOCK SPIRITUAL HEALING AND EMPOWERMENT FOUNDATION
VALERIE YANAROS WILDE,
ELIZABETH LORIE,
BRIAN JAMES FLYNN,
WILLIAM CAMPBELL,
MATTHEW GROVE,

1

DIANA TERRY, and
CHRISTINA GOMEZ,

Third-Party Defendants.

---

**GAIA, INC.'S AMENDED ANSWER AND COUNTERCLAIMS TO THE SECOND AMENDED COMPLAINT OF PLAINTIFFS JAMES COREY GOODE AND GOODE ENTERPRISE SOLUTIONS, INC.**

---

Defendant Gaia, Inc. ("Gaia"), by and through its attorneys, Davis+Gilbert LLP, pursuant to Federal Rules of Civil Procedure 7(a), 13, and 15, and Colorado Revised Statute § 13-80-109, and by written consent of Plaintiffs, for its Amended Answer and Counterclaims to the Second Amended Complaint (the "Complaint") of Plaintiffs James Corey Goode and Goode Enterprise Solutions, Inc. ("GES"), denies all factual allegations contained in the headings and unnumbered paragraphs and states as follows:

1.      The allegations of paragraph 1 state legal conclusions and Plaintiffs' intent in filing the Complaint, to which no response is required.  To the extent any response is required, Gaia denies the allegations of paragraph 1.

2.      Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 2.

3.      Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 3.

4.      Gaia admits the allegations in paragraph 4.

5.      Gaia admits that Jirka Rysavy is the founder and Executive Chairman of Gaia.  The remaining allegations of paragraph 5 state legal conclusions, to which no response is required.  To the extent any response is required, Gaia denies the remaining allegations in paragraph 5.

6.      Gaia denies the allegations in paragraph 6.

7.      Gaia denies the allegations in paragraph 7.

8.      Gaia admits that Jay Weidner has been employed by and contracted with Gaia at various times.  Gaia denies that Weidner has a continued relationship with Gaia or that it ever had a relationship with Weidner "with the aims [sic] to further deprive Goode of its [sic] occupation and livelihood".  Gaia lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 8.

9.      Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 9.

10.     Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 10.

11.     Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 11.

12.     The allegations of paragraph 12 state legal conclusions and Plaintiffs' intent in filing the Complaint, to which no response is required.  To the extent any response is required, Gaia denies the allegations of paragraph 12.

13.     The allegations of paragraph 13 state legal conclusions, to which no response is required.  To the extent any response is required, Gaia denies the allegations of paragraph 13.

14.     The allegations of paragraph 14 state legal conclusions, to which no response is required.  To the extent any response is required, Gaia admits it is organized in Colorado but lacks knowledge or information sufficient to form a belief about the truth of or denies the remaining allegations of paragraph 14.

15.     The allegations of paragraph 15 state legal conclusions, to which no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 15.

16.     The allegations of paragraph 16 state legal conclusions, to which no response is required.  To the extent any response is required, Gaia denies the allegations of paragraph 16.

17.     Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 17.

18.     Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 18.

19.     The allegations of paragraph 19 state legal conclusions, and the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 19.

20.     Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 20.

21.     Gaia admits it became aware of Goode.  Gaia lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 21.

22.     Gaia admits that it approached Goode to appear on the series *Cosmic Disclosure*, and that he and David Wilcock appeared on that series.  Gaia further admits that the series was successful and contributed to attracting new subscribers to Gaia's platform.  Gaia denies that *Cosmic Disclosure* doubled Gaia's net worth, brought in hundreds of thousands of new subscribers, and the remaining allegations in paragraph 22.

23.     Gaia admits that Goode filmed in-person and provided testimony concerning "Blue Avians", "20 and Back", and the "Sphere Being Alliance", among other topics, while he was contractually obligated to provide his services to Gaia, resulting in 128 episodes of *Cosmic Disclosure* being produced, in total.  Gaia denies that Goode personally generated thousands of hours of content or millions of dollars in revenue.  Gaia lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 23.

24.     Gaia denies the allegations of paragraph 24.

25.     Gaia admits that, beginning in 2015, Rysavy and Warkins met with Goode and GES to negotiate a series of written contracts concerning, generally, Goode appearing in Gaia programs.  Gaia denies that there were any verbal agreements between Gaia and Goode or GES and the remaining allegations of paragraph 25.

26.     Gaia admits that Gaia and GES entered into a contract on or about August 22, 2016, for Goode to perform on-camera services and consult regarding pre-production of series including *Cosmic Disclosure*, as well as make efforts to promote and market the Gaia programs in which Goode appeared, in exchange for Gaia paying GES.  Gaia further admit that Gaia and GES entered into an amendment to the prior contract, dated August 18, 2017, on or about August 29, 2017, for the continued services of Goode to appear in Gaia programs (including *Cosmic Disclosure*).  Gaia further states that such contracts and any amendments thereto speak for themselves.  Gaia denies the allegations in paragraph 26 to the extent that they are inconsistent with the terms of the parties' contracts or their amendments.  Gaia further denies that it entered into any verbal agreement with Goode or GES and the remaining allegations of paragraph 26.

27.     Gaia admits that Gaia and GES and/or Goode entered into various written contracts and amendments thereto.  Gaia further states that such contracts and any amendments thereto speak for themselves.  Gaia denies the allegations in paragraph 27 to the extent that they are inconsistent with the terms of the parties' written contracts or their amendments.  Gaia further denies that it entered into any verbal agreement with Goode or GES, that it agreed to pay Goode and/or GES any amount in stock options or any additional amounts not reflected in the parties' written contracts, and the remaining allegations of paragraph 27.

28.     Gaia admits that it did not regularly provide viewing time data to Goode, and further states that it was not obligated to do so.  Gaia denies the remaining allegations in paragraph 28.

29.     Gaia denies the allegations in paragraph 29.

30.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia denies that Goode was promised any stock options and the remaining allegations in paragraph 30.

31.     Gaia denies that Rysavy did not keep "his word" to Goode, that he reneged on any agreements, and the remaining allegations in paragraph 31.

32.     Gaia admits that Goode worked with Weidner while filming for *Cosmic Disclosure*. Gaia lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 32.

33.     Gaia admits that, at times, Weidner admonished Goode and others to stay on topic while filming content for *Cosmic Disclosure*.  Gaia denies the remaining allegations in paragraph 33.

34.     Gaia admits that, on one occasion, Goode complained to Rysavy and Medvedich about Weidner, resulting in Weidner being removed as producer of *Cosmic Disclosure*.  Gaia denies the remaining allegations in paragraph 34.

35.     Gaia denies the allegations in paragraph 35.

36.     Gaia denies the allegations in paragraph 36.

37.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 37.

38.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 38.

39.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39.

40.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 40.

41.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia admits that it filed oppositions with the Trademark Trial and Appeal Board to the purported marks "Blue Avians" and "20 and Back" and that Goode sent demand letters to Gaia but otherwise denies the allegations in paragraph 41.

42.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia further states that its opposition filings speak for themselves.  Gaia denies the allegations in paragraph 42 to the extent that they are inconsistent with Gaia's opposition filings, and otherwise denies the allegations in paragraph 42.

43.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 43.

44.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 44.

45.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia admits it has filed for various trademarks both prior to and after Goode filed for trademarks.

46.      Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 46.

47.      Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 47.

48.      Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia admits that other individuals, including Jason Rice and Emery Smith, have been engaged by Gaia and appeared on *Cosmic Disclosure*, but otherwise denies the allegations in paragraph 48.

49.      Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 49.

50.      Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia admits that Goode sent purported cease-and-desist letters, but otherwise denies the allegations in paragraph 50.

51.      Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia admits that Rice released a statement but denies the remaining allegations in paragraph 51.

52.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia admits that it entered a letter agreement with Rice by which it offered to pay for Rice's defense against Goode's attacks, but otherwise denies the allegations in paragraph 52.

53.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 53.

54.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia states that any letter agreement with Rice speaks for itself.  Gaia denies the allegations in paragraph 54 to the extent that they are inconsistent with the text of the letter agreement.

55.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 55.

56.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia states that any letter from Rice speaks for itself.  Gaia denies the allegations in paragraph 56 to the extent that they are inconsistent with the text of the letter agreement.  Gaia further lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 56.

57.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia states that any letter from Rice speaks for itself.  Gaia denies the allegations in paragraph 57 to the extent that they are inconsistent with the text of the letter agreement.  Gaia further lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 57.

58.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia denies any allegations directed at Gaia and otherwise lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 58.

59.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 59.

60.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 60.

61.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 61.

62.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 62.

63.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 63.

64.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 64.

65.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 65.

66.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 66.

67.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is

required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 67.

68.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 68.

69.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 69.

70.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 70.

71.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 71.

72.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 72.

73.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 73.

74.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 74.

75.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 75.

76.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 76.

77.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 77.

78.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is

required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 78.

79.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 79.

80.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 80.

81.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 81.

82.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 82.

83.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 83.

84.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 84.

85.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 85.

86.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 86.

87.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 87.

88.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 88.

89.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is

required, Gaia denies the allegations to the extent they concern Gaia, Rysavy, Medvedich, and/or Warkins. Gaia further states that it lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 89.

90. Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia admits that Goode has attended the Conscious Life Expo conference but otherwise lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 90.

91. Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia denies the allegations in paragraph 91.

92. Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 92.

93. Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia admits that Goode has attended the Contact in the Desert conference but otherwise lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 93.

94.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia admits that it has been a sponsor of Contact in the Desert.

95.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 95.

96.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 96.

97.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 97.

98.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 98.

99.     Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 99 to the extent they concern Gaia, Rysavy,

Medvedich, and/or Warkins. Gaia further states that it lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 99.

100. Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 100.

101. Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 101.

102. Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 102.

103. Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 103.

104. Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 104.

105.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 105.

106.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 106.

107.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 107.

108.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 108.

109.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 109.

110.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required.  To the extent any response is

required, Gaia denies the allegations in paragraph 110 to the extent they concern Gaia. Gaia lacks

knowledge or information sufficient to form a belief about the truth of the remaining allegations

in paragraph 110.

111.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations

in this paragraph pertain, and that therefore no response is required. To the extent any response is

required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the

allegations in paragraph 111.

112.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations

in this paragraph pertain, and that therefore no response is required. To the extent any response is

required, Gaia denies the allegations in paragraph 112 to the extent they concern Gaia. Gaia lacks

knowledge or information sufficient to form a belief about the truth of the remaining allegations

in paragraph 112.

113.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations

in this paragraph pertain, and that therefore no response is required. To the extent any response is

required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the

allegations in paragraph 113.

114.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations

in this paragraph pertain, and that therefore no response is required. To the extent any response is

required, Gaia denies it has harassed Goode. Gaia lacks knowledge or information sufficient to

form a belief about the truth of the remaining allegations in paragraph 114.

115.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations

in this paragraph pertain, and that therefore no response is required. To the extent any response is

required, Gaia admits that it removed content including Goode from its website around the time
Plaintiffs filed this action.  Gaia denies that it took down content including Goode to harm Goode's
reputation.  Gaia lacks knowledge or information sufficient to form a belief about the truth of the
remaining allegations in paragraph 115.

116.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations
in this paragraph pertain, and that therefore no response is required.  To the extent any response is
required, Gaia denies that it is trying to harm Goode.  Gaia lacks knowledge or information
sufficient to form a belief about the truth of the remaining allegations in paragraph 116.

117.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations
in this paragraph pertain, and that therefore no response is required.  To the extent any response is
required, Gaia denies the allegations in paragraph 117.

118.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations
in this paragraph pertain, and that therefore no response is required.  To the extent any response is
required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the
allegations in paragraph 118.

119.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations
in this paragraph pertain, and that therefore no response is required.  To the extent any response is
required, Gaia lacks knowledge or information sufficient to form a belief about the truth of the
allegations in paragraph 119.

120.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations
in this paragraph pertain, and that therefore no response is required.  To the extent any response is
required, Gaia denies the allegations in paragraph 120 to the extent they concern Gaia, Rysavy,

Medvedich, and/or Warkins. Gaia lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 120.

121.    Gaia states that the Court has dismissed Plaintiff's claim to which the allegations in this paragraph pertain, and that therefore no response is required. To the extent any response is required, Gaia denies the allegations in paragraph 121.

## **CLAIM I**

122.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required. To the extent any response is required, Gaia repeats and re-alleges each and every answer contained in paragraphs 1 through 121 as if fully set forth herein.

123.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required. To the extent any response is required, Gaia denies the allegations in paragraph 123.

124.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required. To the extent any response is required, Gaia denies the allegations in paragraph 124.

125.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required. To the extent any response is required, Gaia denies the allegations in paragraph 125.

126.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required. To the extent any response is required, Gaia denies the allegations in paragraph 126.

127.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 127.

128.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 128.

129.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 129.

130.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 130.

131.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 131.

132.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 132.

133.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 133.

134.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 134.

135.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 135.

136.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 136.

137.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 137.

138.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 138.

139.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 139.

140.    Gaia states that the Court has dismissed Claim I and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 140.

## CLAIM II

141.     Gaia states that the Court has dismissed Claim II and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia repeats and re-alleges each and every answer contained in paragraphs 1 through 140 as if fully set forth herein.

142.     Gaia states that the Court has dismissed Claim II and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 142.

143.     Gaia states that the Court has dismissed Claim II and that this Claim was not pleaded against Gaia, and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 143.

## CLAIM III

144.     Gaia states that the Court has dismissed Claim III and that therefore no response is required.  To the extent any response is required, Gaia repeats and re-alleges each and every answer contained in paragraphs 1 through 143 as if fully set forth herein.

145.     Gaia states that the Court has dismissed Claim III and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 145.

146.     Gaia states that the Court has dismissed Claim III and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 146.

147.     Gaia states that the Court has dismissed Claim III and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 147.

148.    Gaia states that the Court has dismissed Claim III and that therefore no response is
required.  To the extent any response is required, Gaia denies the allegations in paragraph 148.

149.    Gaia states that the Court has dismissed Claim III and that therefore no response is
required.  To the extent any response is required, Gaia denies the allegations in paragraph 149.

150.    Gaia states that the Court has dismissed Claim III and that therefore no response is
required.  To the extent any response is required, Gaia denies the allegations in paragraph 150.

151.    Gaia states that the Court has dismissed Claim III and that therefore no response is
required.  To the extent any response is required, Gaia denies the allegations in paragraph 151.

152.    Gaia states that the Court has dismissed Claim III and that therefore no response is
required.  To the extent any response is required, Gaia denies the allegations in paragraph 152.

153.    Gaia states that the Court has dismissed Claim III and that therefore no response is
required.  To the extent any response is required, Gaia denies the allegations in paragraph 153.

154.    Gaia states that the Court has dismissed Claim III and that therefore no response is
required.  To the extent any response is required, Gaia denies the allegations in paragraph 154.

155.    Gaia states that the Court has dismissed Claim III and that therefore no response is
required.  To the extent any response is required, Gaia denies the allegations in paragraph 155.

156.    Gaia states that the Court has dismissed Claim III and that therefore no response is
required.  To the extent any response is required, Gaia denies the allegations in paragraph 156.

157.    Gaia states that the Court has dismissed Claim III and that therefore no response is
required.  To the extent any response is required, Gaia denies the allegations in paragraph 157.

## CLAIM IV

158.    Gaia states that the Court has dismissed Claim IV and that therefore no response is required.  To the extent any response is required, Gaia repeats and re-alleges each and every answer contained in paragraphs 1 through 157 as if fully set forth herein.

159.    Gaia states that the Court has dismissed Claim IV and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 159.

160.    Gaia states that the Court has dismissed Claim IV and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 160.

161.    Gaia states that the Court has dismissed Claim IV and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 161.

## CLAIM V

162.    Gaia states that the Court has dismissed Claim V and that therefore no response is required.  To the extent any response is required, Gaia repeats and re-alleges each and every answer contained in paragraphs 1 through 161 as if fully set forth herein.

163.    Gaia states that the Court has dismissed Claim V and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 163.

164.    Gaia states that the Court has dismissed Claim V and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 164.

165.    Gaia states that the Court has dismissed Claim V and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 165.

## CLAIM VI

166.     Gaia states that the Court has dismissed Claim VI and that therefore no response is required.  To the extent any response is required, Gaia repeats and re-alleges each and every answer contained in paragraphs 1 through 165 as if fully set forth herein.

167.     Gaia states that the Court has dismissed Claim VI and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 167.

168.     Gaia states that the Court has dismissed Claim VI and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 168.

169.     Gaia states that the Court has dismissed Claim VI and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 169.

170.     Gaia states that the Court has dismissed Claim VI and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 170.

171.     Gaia states that the Court has dismissed Claim VI and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 171.

172.     Gaia states that the Court has dismissed Claim VI and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 172.

## CLAIM VII

173.     Gaia states that the Court has dismissed Claim VII and that therefore no response is required.  To the extent any response is required, Gaia repeats and re-alleges each and every answer contained in paragraphs 1 through 172 as if fully set forth herein.

174.     Gaia states that the Court has dismissed Claim VII and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 174.

175.    Gaia states that the Court has dismissed Claim VII and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 175.

176.    Gaia states that the Court has dismissed Claim VII and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 176.

177.    Gaia states that the Court has dismissed Claim VII and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 177.

178.    Gaia states that the Court has dismissed Claim VII and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 178.

179.    Gaia states that the Court has dismissed Claim VII and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 179.

180.    Gaia states that the Court has dismissed Claim VII and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 180.

181.    Gaia states that the Court has dismissed Claim VII and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 181.

## CLAIM VIII

182.    Gaia repeats and re-alleges each and every answer contained in paragraphs 1 through 181 as if fully set forth herein.

183.    Gaia admits that, beginning in 2015, Goode and GES entered a series of written contracts concerning, generally, Goode appearing in Gaia programs.  Gaia further states that such contracts and any amendments thereto speak for themselves.  Gaia denies the allegations in paragraph 183 to the extent that they are inconsistent with the terms of the parties' contracts or their amendments.  Gaia further states that paragraph 183 states a legal conclusion to which no

response is required and that the Court has dismissed Claim VIII as pleaded against Jirka Rysavy,

Kiersten Medvedich, Brad Warkins, and Jay Weidner.  To the extent any response is required,

Gaia denies the remaining allegations in paragraph 183.

184.    Gaia denies the allegations in paragraph 184.

185.    Gaia denies the allegations in paragraph 185.

186.    Gaia denies the allegations in paragraph 186.

187.    Gaia denies the allegations in paragraph 187.

188.    Gaia denies the allegations in paragraph 188.

## CLAIM IX

189.    Gaia states that the Court has dismissed Claim IX and that therefore no response is
required.  To the extent any response is required, Gaia repeats and re-alleges each and every answer
contained in paragraphs 1 through 188 as if fully set forth herein.

190.    Gaia states that the Court has dismissed Claim IX and that therefore no response is
required.  To the extent any response is required, Gaia denies the allegations in paragraph 190.

191.    Gaia states that the Court has dismissed Claim IX and that therefore no response is
required.  To the extent any response is required, Gaia denies the allegations in paragraph 191.

192.    Gaia states that the Court has dismissed Claim IX and that therefore no response is
required.  To the extent any response is required, Gaia denies the allegations in paragraph 192.

193.    Gaia states that the Court has dismissed Claim IX and that therefore no response is
required.  To the extent any response is required, Gaia denies the allegations in paragraph 193.

194.    Gaia states that the Court has dismissed Claim IX and that therefore no response is
required.  To the extent any response is required, Gaia denies the allegations in paragraph 194.

## CLAIM XIII[1]

195.    Gaia states that the Court has dismissed Claim XIII and that therefore no response is required.  To the extent any response is required, Gaia repeats and re-alleges each and every answer contained in paragraphs 1 through 194 as if fully set forth herein.

196.    Gaia states that the Court has dismissed Claim XIII and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 196.

197.    Gaia states that the Court has dismissed Claim XIII and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 197.

198.    Gaia states that the Court has dismissed Claim XIII and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 198.

199.    Gaia states that the Court has dismissed Claim XIII and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 199.

## CLAIM XIV[2]

200.    Gaia states that the Court has dismissed Claim XIV and that therefore no response is required.  To the extent any response is required, Gaia repeats and re-alleges each and every answer contained in paragraphs 1 through 199 as if fully set forth herein.

201.    Gaia states that the Court has dismissed Claim XIV and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 201.

202.    Gaia states that the Court has dismissed Claim XIV and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 202.

---

[1] The tenth claim pleaded in the Complaint is denominated as "Claim XIII".
[2] The eleventh claim pleaded in the Complaint is denominated as "Claim XIV".

203.    Gaia states that the Court has dismissed Claim XIV and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 203.

204.    Gaia states that the Court has dismissed Claim XIV and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 204.

## CLAIM XV[3]

205.    Gaia states that the Court has dismissed Claim XV and that therefore no response is required.  To the extent any response is required, Gaia repeats and re-alleges each and every answer contained in paragraphs 1 through 204 as if fully set forth herein.

206.    Gaia states that the Court has dismissed Claim XV and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 206.

207.    Gaia states that the Court has dismissed Claim XV and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 207.

208.    Gaia states that the Court has dismissed Claim XV and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 208.

## CLAIM XVII[4]

209.    Gaia states that the Court has dismissed Claim XVII and that therefore no response is required.  To the extent any response is required, Gaia repeats and re-alleges each and every answer contained in paragraphs 1 through 208 as if fully set forth herein.

210.    There are no allegations in this paragraph and, as such, no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 210.

---

[3] The twelfth claim pleaded in the Complaint is denominated as "Claim XV".
[4] The thirteenth claim pleaded in the Complaint is denominated as "Claim XVII".

211.    Gaia states that the Court has dismissed Claim XVII and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 211.

212.    Gaia states that the Court has dismissed Claim XVII and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 212.

213.    Gaia states that the Court has dismissed Claim XVII and that therefore no response is required.  To the extent any response is required, Gaia denies the allegations in paragraph 213.

## DEFENSES

As further, separate defenses, without assuming the burden of proof of any such defense that would otherwise rest with Plaintiffs, Gaia asserts the following:

### FIRST DEFENSE
**(Failure to State a Claim)**

The Complaint, in whole or in part, fails to state a claim upon which relief can be granted.

### SECOND DEFENSE
**(Breach/Failure to Perform)**

Plaintiffs' claims are barred, in whole or in part, because of their own failures to perform pursuant to the terms of any contracts or agreements between the parties.

### THIRD DEFENSE
**(No Breach by Gaia)**

Plaintiffs' claims are barred, in whole or in part, because Gaia performed all duties owed pursuant to the parties' contracts or agreements, other than any duties that were prevented or excused.

### FOURTH DEFENSE
**(Lack of Damages)**

Plaintiffs did not suffer any damages, or if they did, such damages are *de minimis*.

## SIXTH DEFENSE
### (Offset or Credit)

Plaintiffs' recovery is barred or must be reduced to the extent Plaintiffs are liable to Gaia

on the Counterclaims brought by Gaia and/or to the extent that Gaia paid Plaintiffs more than they

were otherwise entitled to pursuant to the parties' contracts or agreements.

## SEVENTH DEFENSE
### (Unclean hands)

Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

## EIGHTH DEFENSE
### (Plaintiffs' Conduct)

If Plaintiffs were injured or damaged as alleged in the Complaint, such injury or damage

was caused, in whole or in part, or was contributed to, by reason of Plaintiffs' own conduct.

## NINTH DEFENSE
### (Limitation of Damages)

If Plaintiffs were injured or damaged as alleged in the Complaint, the extent of any such

damages that are recoverable are subject to limitations imposed by contract or agreement.

## TENTH DEFENSE
### (Failure of Conditions Precedent)

The Complaint is barred, in whole or in part, by the failure of required conditions precedent.


Gaia reserves the right to further amend this Answer to raise and rely upon any defenses

that become available or apparent during discovery or to assert further defenses as to any claims

not currently pleaded, including any claims that have been dismissed by the Court or Plaintiffs.

**WHEREFORE**, Gaia denies that Plaintiffs are entitled to any of the requested relief and respectfully requests entry of judgment dismissing Plaintiffs' Complaint with prejudice and awarding to Gaia any further relief that the Court deems just and proper.

## COUNTERCLAIMS

Gaia, by and through its attorneys, Davis+Gilbert LLP, pursuant to Federal Rules of Civil Procedure 7(a) and 13, and Colorado Revised Statute § 13-80-109, for its counterclaims against Plaintiffs James Corey Goode and GES, alleges as follows:

## NATURE OF THE COUNTERCLAIMS

1.      These counterclaims are in response to Plaintiffs' claims and seek to recover damages from Plaintiffs for malicious tortious acts of defamation, as well as breach of contract, trademark infringement, tortious interference, and unjust enrichment, and to enjoin Plaintiffs from further causing harm to Gaia.

## PARTIES

2.      Defendant/Counterclaimant Gaia, Inc. ("Gaia") is a Colorado corporation with its principal place of business located at 833 W. South Boulder Road, Louisville, Colorado, 80027. Gaia is a global conscious media and community company that operates a global digital video subscription service that caters to a unique and under-served subscriber base.  Gaia is a rapidly growing company with a digital content library of over 8,000 titles available to subscribers.

3.      Upon information and belief, Plaintiff/Counter-defendant James Corey Goode is an individual living in Boulder, Colorado.

4.      Upon information and belief, Plaintiff/Counter-defendant Goode Enterprise Solutions, Inc. ("GES") is a Colorado corporation with its principal place of business located at

6525 Gunpark Dr., Unit 370 PMB 227, Boulder, Colorado, 80301. Stacey Goode, who is, on information and belief, Goode's wife, is listed as the registered agent for GES.

## JURISDICTION AND VENUE

5.        Jurisdiction is proper in this Court because Gaia has suffered injury as a result of Plaintiffs' commission in Colorado of tortious acts, including publishing defamatory statements about Gaia, and because the contract between Gaia and Plaintiffs was entered into and performed in Colorado. Additionally, by filing in this Court the original and amended complaints alleging claims concerning the same subject matter as these counterclaims, Plaintiffs have consented to the jurisdiction of the Court. Further, this Court has personal jurisdiction over Plaintiffs because, on information and belief, Goode is domiciled in this District and GES's principal place of business is in this District. Additionally, the Court has personal jurisdiction over Plaintiffs pursuant to Colo. Rev. Stat. § 13-1-124(1)(a) and (b) because Plaintiffs transact business within the state of Colorado, and have committed tortious acts within the state of Colorado.

6.        By filing in this Court the original and amended complaints alleging claims concerning the same subject matter as these counterclaims, Plaintiffs have consented to venue in this District. Further, venue in this District is proper under 28 U.S.C. §§ 1391(b) and (c) because, upon information and belief, Goode resides in this District, GES's principal place of business is in this District, and a substantial part of the events or omissions giving rise to Gaia's claims occurred in this District.

## **FACTUAL ALLEGATIONS**
### **Overview**

7.       Gaia contracted with GES for Goode to appear on the show *Cosmic Disclosure* ("CD"), a relationship that lasted for approximately three years—June 2015 to August 2018.

8.       On CD, Gaia provided a platform for Goode to tell his story, which allowed Goode to gain attention and fame in the "disclosure" community.

9.       Gaia paid Goode and his company GES generously during that time, including for his appearances on CD, his relocation from Texas to Colorado, and for various planned speaking events.

10.       However, while he was still involved in appearing on CD, upon information and belief, Goode became concerned that he was running out of material and that Gaia would replace him with new talent.

11.       Rather than quietly cede the spotlight, upon information and belief, Goode began plotting to destroy Gaia and CD.

12.       For example, Goode stopped appearing for shooting dates and threatened to interfere with any filming and production of CD that involved other talent.

13.       Upon information and belief, Goode also started an online campaign to defame and harass Gaia, which involved the posting of numerous articles, petitions, and emails that made wild and false accusations about Gaia and its executives.

14.       Accordingly, due to GES and Goode's various breaches and tortious conduct, Gaia eventually terminated the then-operative contract, thereby ending the parties' business relationship.

15.    At that time, Goode and GES owed Gaia reimbursement for certain advances previously made, the total amount of which exceeded any final contract payments to which Goode and GES may have been otherwise entitled.

16.    Nevertheless, despite GES and Goode's failure to make such reimbursements and Goode's other tortious conduct, Gaia did not pursue any legal action against Plaintiffs.

17.    However, after having his contract terminated, upon information and belief, Goode continued his vendetta and smear campaign against Gaia in an attempt to steal Gaia's significant subscriber base and drive Gaia's stock price down.

18.    Goode's vendetta continued to involve him making malicious and false statements about Gaia and its executives, accusing them of reprehensible illegal and immoral activity.

19.    Upon information and belief, Goode also directed others to make additional or similar malicious and false statements in an attempt to provide corroboration to his fabrications.

20.    Upon information and belief, Goode then disseminated and amplified the publication of others' statements through a calculated scheme designed to punish Gaia for terminating its relationship with him and elevating other talent to appear on CD.

21.    Upon information and belief, Goode communicated to his friends that his defamatory statements and other actions were specifically designed to adversely impact Gaia's stock price, and he purportedly reacted with glee anytime Gaia's stock price went down.

22.    As part of his plot, Goode also misappropriated Gaia's intellectual property by posting Gaia's copyrighted materials on his own website (in multiple languages) and using Gaia's trademark to attempt to divert Gaia's customers and revenues to his own businesses.

23.     Goode's vendetta of malicious and false statements and other tortious acts reached its zenith when he filed the original complaint in this Action.

24.     Upon information and belief, the filing of the original complaint—and all subsequent filings, including the operative Complaint—are part of Goode's calculated scheme to attack Gaia's business and its professional reputation.   Goode's actions were and are, upon information and belief, intended to publicly humiliate, harass, threaten, and harm Gaia and its employees.

25.     Goode's scheme involved publishing his defamatory statements on various internet and social media sites, all of which are publicly available and have been viewed by an unknown number of third parties, including Gaia's business partners and potential customers.

26.     Goode and his acolytes have continued their attacks despite Gaia requesting on numerous occasions that Goode take down the defamatory statements, and cease and desist committing any further tortious acts.

27.     Because of Goode's actions, including filing the Complaint and pursuing the claims therein, Gaia is left with no alternative but to assert these counterclaims.

**Contracts between the Parties**

28.     In June 2015, Plaintiffs and Gaia began discussing Goode's appearance on CD.

29.     On or about June 20, 2015, Gaia contracted with GES for the services of Goode to appear in Gaia programs (including CD) (the "2015 Contract", a copy of which was previously filed as Exhibit A, Dkt. 194, 260).[5]

---

[5] Exhibits A-E to this Amended Answer and Counterclaims were previously filed with Gaia's Answer (Dkt. 194), followed by a Motion for Leave to Restrict Access pursuant to Local Civil Rule 7.2(e) (Dkt. 198).  The Court subsequently granted, in part, the Motion for Leave to Restrict

30.     Pursuant to the 2015 Contract, Goode was to perform on-camera services and consult regarding pre-production, as well as make efforts to promote and market the Gaia programs in which Goode appeared.  (Ex. A at ¶¶ 3-4).

31.     The 2015 Contract contemplated that no fewer than 52 "Programs" (approximately 30 minutes in duration) would be produced during the term.  (Ex. A at ¶ 3(A)(i)).

32.     The 2015 Contract provided that Goode's responsibilities related to performing in the Programs would include attendance and performance at rehearsals, principal photography and voice-over sessions, and any necessary "re-take" or "overdub" sessions.  (Ex. A at ¶ 3(A)(iii)).

33.     In exchange for the talent services to be provided by Goode, Gaia agreed to pay Goode a fee for appearing in the Programs plus certain expenses.  (Ex. A at ¶ 6).

34.     Gaia agreed to provide a refundable upfront advance of $20,000 for a portion of the fees due to Goode for services performed.  (Ex. A at ¶ 6(B)).

35.     The 2015 Contract was for a term of 90 days beyond the completion of Goode's agreed talent services.  (Ex. A at ¶ 2).

36.     On or about August 22, 2016, Gaia again contracted with GES for the services of Goode to appear in Gaia programs (including CD) (the "2016 Contract", a copy of which was previously filed as Exhibit B, Dkt. 194, 260).

---

Access (Dkt. 257) and the Exhibits were re-filed, publicly and with redactions, pursuant to the Court's Order (Dkt. 260).  To avoid the need to burden the Court with an identical Motion for Leave to Restrict Access, the Exhibits are not being attached again and citation is made to the versions already filed with the Court and appearing on the Docket.

37.     Pursuant to the 2016 Contract, Goode was to perform on-camera services and consult regarding pre-production, as well as make efforts to promote and market the Gaia programs in which Goode appeared.  (Ex. B at ¶¶ 3-4).

38.     The 2016 Contract left open the number of Programs that would be produced during the term, but provided that Goode was to work with Gaia in good faith to determine the number. (Ex. B at ¶ 3(A)(i)).

39.     The 2016 Contract provided that Goode's responsibilities related to performing in the Programs would include attendance and performance at rehearsals, principal photography and voice-over sessions, and any necessary "re-take" or "overdub" sessions.  (Ex. B at ¶ 3(A)(iii)).

40.     In exchange for the talent services to be provided by Goode, Gaia agreed to pay Goode a fee for appearing in the Programs.  (Ex. B at ¶ 6(B)).

41.     Additionally, Gaia agreed to pay Goode for certain expenses, a commission for referring new subscribers, and, if applicable, a royalty based on "Licensing Net Receipts" earned via television syndication.  (Ex. B at ¶ 6(C)-(E)).

42.     Gaia agreed to provide in advance a portion of the fees due to Goode for services performed upon completion of principal photography.  (Ex. B at ¶ 6(A)).

43.     The 2016 Contract was for a term of the later of one year beginning August 1, 2016, or the completion of Goode's agreed talent services.  (Ex. B at ¶ 2(A)).

44.     The 2016 Contract provided that it would automatically renew for successive one-year periods unless either party terminated earlier by notice.  (Ex. B at ¶ 2(B)).

45.     The 2016 Contract provided that Gaia could terminate the agreement and be relieved of its obligations thereunder by providing 30-days written notice of "Cause", the

definition of which includes, *inter alia*, Goode's material and persistent failure to perform his obligations pursuant to the 2016 Contract and Goode's making of malicious or defamatory comments about Gaia, the Programs, or Gaia's officers or employees.  (Ex. B at ¶ 7(K)).

46.     The 2016 Contract provided that it would be construed in accordance with the laws of the State of Colorado.  (Ex. B at ¶ 7(H)).

47.     Both the 2015 Contract and the 2016 Contract provided that Gaia would retain all rights to CD and the Programs.  (Ex. A at ¶ 7(D), (K); Ex. B at ¶ 7(G), (L)).

48.     On or about August 29, 2017, Gaia and GES agreed to amend the 2016 Contract for the continued services of Goode to appear in Gaia programs (including CD) (the "August 2017 Amendment", a copy of which was previously filed as Exhibit C, Dkt. 194, 260).

49.     The August 2017 Amendment extended the term of the 2016 Contract for an additional one year beginning September 1, 2017, and continuing through August 31, 2018.  (Ex. C at § I).

50.     The August 2017 Amendment also revised the payment of fee advances, the rate for completing production of Programs, and the commission rate for referring new subscribers.  (Ex. C at § II).

51.     The August 2017 Amendment added a subparagraph providing that Gaia would pay Goode $50,000 for appearances at two live events, and that Gaia would make an advance payment of $25,000 upon execution of the Amendment.  (Ex. C at § II).

52.     On or about August 25, 2017, Gaia made the $25,000 advance payment related to Goode's anticipated appearance at two future live events (the "Advance Event Payment").

53.     On or about November 7, 2017, Gaia and GES agreed to further amend the 2016 Contract for the continued services of Goode to appear in Gaia programs (including CD) (the "November 2017 Amendment", a copy of which was previously filed as Exhibit D, Dkt. 194, 260; collectively the November 2017 Amendment and the August 2017 Amendment are the "2017 Amendments").

54.     The November 2017 Amendment revised the paragraph regarding "Programs", but left open the number of Programs that would be produced during the term, still requiring that Goode was to work with Gaia in good faith to determine the number.  (Ex. D at § I).

55.     The November 2017 Amendment added a subparagraph providing that Gaia would reimburse Goode up to $20,000 for relocation expenses, subject to an additional agreement—the "Relocation Benefit Agreement"—made an exhibit to the November 2017 Amendment.  (Ex. D at § II).

56.     The Relocation Benefit Agreement (a copy of which was previously filed as Exhibit E, Dkt. 194, 260) between Goode and Gaia provides that Goode would have no obligation to repay the reimbursed (or directly paid) relocation costs if he remained "Under Contract" with Gaia for 36 months from the date of his relocation.  (Ex. E ¶ 2).

57.     "Under Contract" was defined as there being a fully executed agreement between Goode and Gaia, and Goode appearing in a minimum of 360 minutes of published content per quarter.  (Ex. E ¶ 1).

58.     The Relocation Benefit Agreement provided that if Goode was not "Under Contract" at any time in the 36 months after his relocation, he would repay Gaia a portion of the relocation expenses prorated to the amount of time he was "Under Contract".  (Ex. E ¶ 3).

59.     Goode agreed to repay any relocation expenses due within two weeks of no longer being "Under Contract".  (Ex. E ¶ 5).

60.     Goode further agreed that if he was obligated to repay any relocation expenses that Gaia could deduct that amount from any future payment to which he may otherwise be entitled. (Ex. E ¶ 7).

61.     Goode further agreed that in any legal action brought to enforce the terms of the Relocation Benefit Agreement that the prevailing party shall be entitled to recover the costs of such action, including attorneys' fees.  (Ex. E ¶ 8).

62.     Upon information and belief, Goode relocated from Texas to Colorado in or around November 2017.

63.     On or about December 11, 2017, Gaia reimbursed Goode $6,083.62, and on or about December 18, 2017, Gaia reimbursed Goode $4,986.00, both reimbursements made pursuant to the Relocation Benefit Agreement and the November 2017 Amendment (collectively, the combined payments of $11,069.62 are the "Relocation Payment").

64.     After executing the 2017 Amendments, Goode began to breach the terms of the 2016 Contract, including by failing on multiple occasions to appear for scheduled production dates.

65.     Indeed, after executing the November 2017 Amendment and the Relocation Benefit Agreement, Goode appeared in less than 360 minutes of published content per quarter.

66.     Additionally, upon information and belief, in 2018, Goode began to make malicious and defamatory comments about Gaia and certain Gaia officers and employees, many of which were published online (as detailed herein, infra).

67.     As a result of his actions in failing to appear for scheduled production dates and making malicious and defamatory comments, Gaia exercised its right to terminate the 2016 Contract with cause, on or about July 13, 2018, by notifying Plaintiffs in writing of such termination.

68.     Pursuant to paragraph 7(K) of the 2016 Contract, Gaia's termination thereof was effective on August 12, 2018.

69.     Because the Performance Contract was terminated as of August 12, 2018—less than 36 months after Goode's relocation—and Goode was never deemed to be "Under Contract" because of his failure to appear in a minimum of 360 minutes of published content per quarter, Goode was obligated to repay the entire Relocation Payment, consistent with the terms of the Relocation Benefit Agreement.

70.     Gaia determined that the amount due from Goode for the Relocation Payment was greater than any further amounts due to Goode pursuant to the 2016 Contract, and therefore withheld, pursuant to the Relocation Benefit Agreement, any further payments to Goode.

71.     Even taking into account any payments to which Goode otherwise may have been entitled, Goode still owes Gaia for repayment of the Relocation Payment.

72.     Gaia has made numerous demands to Goode for repayment of the amount of the Relocation Payment owed—including most recently on March 7, 2019—but Goode has refused to reimburse Gaia.

73.     Further, GES and Goode owe Gaia for repayment of the Advance Event Payment.

74.    Gaia has made numerous demands to GES for repayment of the $25,000 advance on the Live Events fees—including most recently on March 7, 2019—but GES has refused to reimburse Gaia.

75.    Both GES and Goode have refused to make payment of the amounts they each owe Gaia.

76.    Unfortunately, Gaia's termination of its contract with Goode did not mark the end of his misconduct, as thereafter Goode continued his calculated plot to threaten, harass, and defame Gaia in an attempt to get "revenge".

### Additional Background on Goode

77.    Although unknown to Gaia at the time it began doing business with him, upon information and belief, Goode has a history of "bad breakups" and fabricating information about former business partners and employers, including accusing them of illegal activities.

78.    For example, based on court records from a case filed in the District Court, Dallas County, Texas, 116th Judicial District, Cause Number DC-14-04807, upon being fired from a position with Darling International Inc. ("Darling"), in 2013, Goode fabricated a story accusing his former employer of threatening and terrorizing him.

79.    Based on court records from that case, Goode claimed in a video posted to YouTube that Darling employees had made "Terrorist Threats" to him and his family, including by placing a knife and bullet outside of Goode's home.

80.    Based on sworn affidavits submitted by two of Darling's employees, and based on the allegations of the verified complaint filed in the action, Goode's claims in the YouTube video were completely false.

81.     Based on court records from that case, after posting the video on YouTube, Goode contacted Darling by an email that included a link to the YouTube video and a threatening statement that "Darling Partners and future prospective Partners will be shocked to see/hear/read some of the behavior that has thus far been allowed to continue in this organization."

82.     Based on additional court records from that case, the court first entered a temporary restraining order against Goode enjoining him from threatening, harassing, or harming Darling and its agents, and from going within 200 yards of any of the protected parties.

83.     Based on additional court records from that case, the court then entered a temporary injunction, and finally an agreed permanent injunction, to enjoin the same behavior and continue the same protections to Darling and the protected parties.

84.     Similarly, based on court records from another case before this Court—case number 20-cv-947—Goode has accused other former business partners of various crimes, including extortion and embezzlement.

85.     Upon information and belief, including based on the false and defamatory allegations against Gaia and its employees, when a business relationship sours, Goode goes on the offensive by falsely accusing his business partners of crimes and other deplorable activities.

### Goode's Defamatory Statements about Gaia

86.     As Goode had previously done, upon information and belief, to Darling and others, after the parties' business relationship ended, Goode engaged in a vendetta against Gaia.

87.     Upon information and belief, Goode pursued his malicious vendetta by knowingly spreading false statements about Gaia through a barrage of emails, social media, and internet postings.

88.     Upon information and belief, Goode has directly posted or been involved in creating hundreds of disparaging and often defamatory statements about Gaia and its executives.

*The David Wilcock Email—July 1, 2018*

89.     One of Goode's co-hosts on CD was David Wilcock.

90.     Upon information and belief, in late-2017 or early-2018, prior to having his contract terminated by Gaia, Goode became concerned that he was running out of material to present on CD and that Gaia would replace him with new talent.

91.     Accordingly, upon information and belief, Goode approached Wilcock and conspired with him to refuse to agree to work with any other talent on CD.

92.     However, Goode and Wilcock were not able to persuade Gaia to limit appearances on CD to the two of them, and they were asked to record episodes of CD with new talent.

93.     Upon information and belief, Goode's concern about this development led him to further conspire with Wilcock for both to end their relationship with Gaia and embark on a calculated scheme to bring down Gaia and take its customer base for their own planned platform.

94.     Upon information and belief, to that end, Goode worked with Wilcock to craft a departure email that would initially be sent to Gaia executives as one of the first phases of Goode's plot.

95.     On July 1, 2018, Wilcock sent the departure email (the "Wilcock Email") to Gaia executives Brad Warkins and Kiersten Medvedich.

96.     Beyond merely notifying Gaia of Wilcock's intent to end his relationship with Gaia, the Wilcock Email included numerous false and defamatory statements accusing Gaia and certain of its executives of illegal and immoral behavior.

97.     For example, Wilcock claimed that another Gaia show in which he was involved "is literally saying that God is Evil and Lucifer is God – who (ahem) also happens to be a reptilian alien" ("Defamatory Statement WE1").

98.     Discussing his belief about the entirely debunked "Pizzagate" conspiracy theory and apparently connecting Gaia to the purported conspiracy, Wilcock went on to say that the Gaia show *Ancient Civilizations* "went forward on the Gaia network despite my public attestations of the evidence that pedophilia, human sacrifice, cannibalism and Luciferianism are being practiced in elite circles" ("Defamatory Statement WE2").

99.     Wilcock further stated that "[t]herefore the Company was apprised at the very beginning that the *Ancient Civilizations* program was promoting Lucifer" (italics added for consistency) ("Defamatory Statement WE3").

100.    Lest there be any doubt about Wilcock's accusations against Gaia, he expressly stated that the Gaia program *Ancient Civilizations* "is Luciferian propaganda disguised as entertainment. Luciferianism is the religion of the elite globalist group I oppose. Luciferianism is commonly used as an excuse for pedophilia, human sacrifice, cannibalism and genocidal aspirations, among other very unsavory things" ("Defamatory Statement WE4").

101.    To further clarify his accusations, Wilcock stated that "[t]he ongoing promotion of Lucifer on Gaia is also an enormous corporate liability" ("Defamatory Statement WE5").

102.    Wilcock continued his denigration of Gaia by stating "I have witnessed multiple cases in which a commercial for Lucifer, I mean *Ancient Civ*, is burned into the end of my show *Cosmic Disclosure*. This is tantamount to a propaganda war against my own following, which is almost entirely Judeo-Christian. It also violates my own religious freedom, since publicly I have

made it very clear that I do not think the God of the Abrahamic religions is a 'demiurge' that is

luring everyone into a soul trap, and that Lucifer is our misunderstood reptilian savior" (italics

added for consistency) ("Defamatory Statement WE6").

103.    Wilcock then made allegations about Gaia's business practices, including by stating

"[t]o then edit Corey Goode and me both into a show that aggressively attacks God as Evil, and

Lucifer as Good, constitutes a breach of the contract I signed as an employee. This could

furthermore be legitimately considered as fraud . . ." and "the lack of integrity in Gaia's verbal

agreements is so high that I no longer trust anything that anyone in this company says to me unless

I get it in writing" ("Defamatory Statement WE7").

104.    In short, Wilcock accused Gaia and/or its employees of being "Luciferians"

engaged in or promoting "pedophilia, human sacrifice, cannibalism and genocidal aspirations."

105.    Wilcock also attacked Gaia's business practices by claiming it committed fraud and

breached contracts.

106.    Defamatory Statement WE1, Defamatory Statement WE2, Defamatory Statement

WE3, Defamatory Statement WE4, Defamatory Statement WE5, Defamatory Statement WE6,

and, Defamatory Statement WE7 (collectively, the "Wilcock Email Defamatory Statements") are

false statements of fact.

107.    In total, the Wilcock Email was thousands of words and included numerous and

various allegations and diatribes.

108.    Completely shocked by the allegations in the Wilcock Email, Gaia responded to

Wilcock and asked to talk to him to understand where the allegations were coming from.

109.    Wilcock was largely non-responsive to Gaia's outreach.

110. Gaia would come to learn why, and the reason for the Wilcock Email and the Wilcock Email Defamatory Statements, because of what came next.

111. Upon information and belief, the reprehensible allegations against Gaia in the Wilcock Email, including the Wilcock Email Defamatory Statements, were not merely for the purpose of explaining Wilcock's departure.

112. Upon information and belief, Goode assisted in drafting the Wilcock Email and the Wilcock Email Defamatory Statements because he intended to "leak" it online as part of his plan to attack and defame Gaia.

113. Upon information and belief, Goode published the Wilcock Email, including the Wilcock Email Defamatory Statements, by forwarding it to numerous others in the "disclosure" community and suggested that they post it online.

114. In fact, there were postings online of the Wilcock Email itself or of videos involving people reading the Wilcock Email, including by Laura Eisenhower and others.

115. Goode—as well as Wilcock and others who posted it—knew that the Wilcock Email Defamatory Statements were false or recklessly disregarded the falsity of the statements, and published them with malice and with the intent to cause harm to Gaia.

116. The Wilcock Email Defamatory Statements are injurious and defamatory *per se*, in that they are specifically directed at Gaia and the defamatory meaning is apparent from the face of the statements without the aid of extrinsic proof. The Wilcock Email Defamatory Statements accuse Gaia of promoting Lucifer and Luciferianism, and they directly injure Gaia's business and professional reputation.

117.     Additionally, the Wilcock Email Defamatory Statements caused direct damages to Gaia by encouraging Gaia's subscribers to terminate their relationship with Gaia, thus causing the loss of subscription fees.

*The Change.org Petition—June 2018*

118.     Upon information and belief, in addition to attacking Gaia from within using the Wilcock Email, Goode took his campaign public by working with his associates to draft defamatory statements about Gaia and post them on various websites.

119.     Upon information and belief, one such screed was posted on Change.org, a petition website often used for social justice initiatives.

120.     Unlike those using Change.org to gain support for social justice, upon information and belief, Goode was using the platform as part of his scheme to defame and attack Gaia.

121.     A Change.org petition posted on or before June 11, 2018, titled "Please, Cancel Your GAIA Subscription" (the "Petition") was purportedly posted by someone identifying themselves as "Team Gaia".[6]

122.     Upon information and belief, Goode, either individually or through others who he informed and directed, posted the Petition on Change.org.

123.     Moreover, Goode linked to and commented on the Petition on his own Facebook page.

124.     Included in the Petition were defamatory and otherwise tortious statements.

---

[6] The posting appeared at the following site, which is no longer active:
https://www.change.org/p/please-cancel-your-gaia-subscription.

125.    For example, the Petition includes statements that Gaia's management team "lacks honesty" ("Defamatory Statement CP1") and engages in "perpetual emotional, mental, and fear-based verbal abuse, [and] inappropriate and harassing treatments" ("Defamatory Statement CP2").

126.    The statements that Gaia's management team is untruthful and abusive are false.

127.    Defamatory Statement CP1 and Defamatory Statement CP2 (collectively, the "Petition Defamatory Statements") are false statements of fact.

128.    Upon information and belief, Goode assisted in drafting the Petition and the Petition Defamatory Statements and was involved with posting the Petition online.

129.    Upon information and belief, Goode published the Petition, including the Petition Defamatory Statements, by hyperlinking to it in his social media accounts and forwarding it to numerous others in the "disclosure" community.

130.    Upon information and belief, Goode—as well as others involved in posting it— knew that the Petition Defamatory Statements were false or recklessly disregarded the falsity of the statements, and published them with malice and with the intent to cause harm to Gaia.

131.    The Petition Defamatory Statements are injurious and defamatory *per se*, in that they are specifically directed at Gaia and the defamatory meaning is apparent from the face of the statements without the aid of extrinsic proof.  The Petition Defamatory Statements state that Gaia and its management team are dishonest and abusive, and they directly injure Gaia's business and professional reputation.

132.    Beyond just including the Petition Defamatory Statements, the Petition also used such statements as the basis for an express call to action for Gaia subscribers to cancel their subscriptions.

133.     Indeed, the Petition Defamatory Statements caused direct damages to Gaia by encouraging Gaia's subscribers to terminate their relationship with Gaia, thus causing the loss of subscription fees.

134.     Upon information and belief, through the Petition, Goode interfered with the business relationship between Gaia and many of its subscribers using wrongful means, namely the assertion of false and defamatory statements about Gaia and its management team.

135.     The Petition also misappropriated at least one of Gaia's trademarks (a pictorial depiction reading "gaia seeking truth", hereinafter the "Mark").

136.     The use of the Mark in the Petition was for the purpose of competing with Gaia, as the Petition encouraged Gaia customers to cancel their subscriptions and instead direct such money to another "truth-seeking researcher, insider, or experiencer", as Goode claims to be.

_The GEM Emails – July 2018_

137.     Upon information and belief, Goode also attacked Gaia by posing as a fabricated group named "GEM".

138.     Upon information and belief, GEM was purportedly a group of current and former Gaia employees—hence the name, "Gaia Employee Movement"—leaking information about Gaia to others in the "disclosure" community.

139.     Upon information and belief, GEM's manner of operating was to "drop" information by sending emails and/or documents to those considered to be "friendly" to its purpose.

140.     One such "drop", which was eventually forwarded to Gaia employees, contained numerous false and defamatory statements about Gaia and its executives.

141.    For example, the purported "drop" stated that it was from "GEM movement=gaia employee movement" and went on to assert that "DEN Lucifer Coven = CIA front?", "Talent . . . Kept as slaves", and "Other Talent OWNED! . . . SLAVES!" (collectively, the "Defamatory GEM Statements").

142.    Upon information and belief, Goode intentionally published the Defamatory GEM Statements by acting as GEM and sending (or "dropping") the email to others in the "disclosure" community.

143.    Upon information and belief, Goode knew that the Defamatory GEM Statements were false or recklessly disregarded the falsity of the statements, and published them with malice and with the intent to cause harm to Gaia.

144.    The Defamatory GEM Statements are injurious and defamatory *per se*, in that they are specifically directed at Gaia and the defamatory meaning is apparent from the face of the statements without the aid of extrinsic proof.  The Defamatory GEM Statements state that Gaia is an illegitimate CIA front and improperly controls "talent", all of which directly injures Gaia's business and professional reputation.

### *Fade to Light Blog – Late-2018*

145.    Upon information and belief, Goode also attacked Gaia by giving information to bloggers, including one named Thomas Crown who posted defamatory statements about Gaia on the website https://fadetolightblog.wordpress.com (the "FTL Blog")[7].

146.    Upon information and belief, Goode linked to and commented on the FTL Blog on his own social media accounts and/or pages.

---

[7] As of the date of filing, the blog is no longer available at that link.

147. In a November 28, 2018, post titled "The Fall of Gaia, Inc.", the FTL Blog stated that "Gaia, Inc. employees are allegedly directly responsible for contacting the group Goode refers to as the Dark Alliance, who attacked Goode mercilessly last year through cyber and in-person harassment, stalking and doxxing in an attempt to completely destroy his reputation in the UFO community." ("Defamatory Statement FTL1").

148. In the same post, the FTL Blog stated that the "conspiracy originated and was coordinated at the very top of Gaia leadership . . . who [] encouraged and required employees to harass and blacklist Goode from the entire UFO industry." ("Defamatory Statement FTL2").

149. Defamatory Statement FTL1 and Defamatory Statement FTL2 (collectively, the "FTL Blog Defamatory Statements") are false statements of fact.

150. Upon information and belief, Goode published the FTL Blog Defamatory Statements to "Thomas Crown", and may have assisted in drafting the FTL Blog and the FTL Blog Defamatory Statements.

151. Upon information and belief, Goode—as well as others involved in posting it—knew that the FTL Blog Defamatory Statements were false or recklessly disregarded the falsity of the statements, and published them with malice and with the intent to cause harm to Gaia.

152. The FTL Blog Defamatory Statements are injurious and defamatory *per se*, in that they are specifically directed at Gaia and the defamatory meaning is apparent from the face of the statements without the aid of extrinsic proof. The FTL Blog Defamatory Statements state that Gaia and its management team are dishonest and abusive, and they directly injure Gaia's business and professional reputation.

*YouTube Video – March 21, 2020*

153.    Upon information and belief, Goode is one of the speakers in a video titled "Corey
Goode As You Wish Talk Radio Exclusive Tell All Interview" (the "Video").

154.    Upon information and belief, the Video was recorded in or around March 2020.

155.    Upon information and belief, the Video was published on YouTube.com on March
21, 2020 (youtube.com/watch?v=FnlrSExC2Lo)[8] by James Gilliland.

*YouTube Video – Gaia Allegations*

156.    At approximately 6:08-6:24 of the Video, Goode states that "[t]hen certain
executives, contractors and employees at Gaia then went on a war path and started gas lighting all
of these very disturbed people that have been cyber stalking us" ("Defamatory Statement V1") .

157.    At approximately 10:48-11:05 of the Video, Goode states, "[a] lot of people, they
were unable to get people to come and do new shows because everyone was figuring out that your
intellectual property could get stolen.  My life story turned Gaia from $150 million company into
a $300 million company.  When we left, guess what, it went right back down" ("Defamatory
Statement V2").

158.    At approximately 11:13-11:15 of the Video, Goode states that "[t]he employees
were encouraged to harass me as well" ("Defamatory Statement V3").

159.    At approximately 26:32-26:40 of the Video, Goode states that (referring to Gaia
and others) "[e]ach of these people, if you look at them, they profess some form of Luciferian, or
satanic sort of dark magical beliefs" ("Defamatory Statement V4").

---

[8] As of the date of filing, the video is no longer available on YouTube at that link.

160.  At approximately 31:00-31:21 of the Video, Goode states that (again referring to Gaia and others) "[b]ut some of these people, they're in those triggered states. They're being used as useful idiots by corporate and other people that are giving them money or encouragement to go after us.  So that is extremely irresponsible because who knows. One of these people could do something very bad" ("Defamatory Statement V5").

161.  Defamatory Statement V1, Defamatory Statement V2, Defamatory Statement V3, Defamatory Statement V4, and Defamatory Statement V5 (collectively, the "Defamatory Video Statements") are false statements of fact.

162.  Upon information and belief, Goode intentionally published the Defamatory Video Statements to Gilliland, who then published them on the internet.

163.  Upon information and belief, Goode knew that the Defamatory Video Statements were false or recklessly disregarded the falsity of the statements, and published them with malice and with the intent to cause harm to Gaia.

164.  The Defamatory Video Statements are injurious and defamatory *per se*, in that they are specifically directed at Gaia and the defamatory meaning is apparent from the face of the statements without the aid of extrinsic proof.  The Defamatory Video Statements imply that Gaia has hired people to stalk and harass Goode, that its executives worship Lucifer, and that Gaia lost $150 million upon Goode's departure, all of which directly injures Gaia's business and professional reputation.

*Video – Wilcock Email*

165.  At approximately 5:28-5:30 of the Video, Goode refers to the Wilcock Email and states that it "spells out beautifully what went on there".

166.     Goode goes on to say, at approximately 5:32 of the Video, again referring to the
Wilcock Email, "everyone should read it".

167.     Goode then says, at approximately 5:38 of the Video, "[w]e'll find it and make sure
there's a link in the description" in a continued bad-faith effort to promote, publish, and publicize
the Wilcock Email Defamatory Statements.

168.     The Video contains numerous other defamatory false statements about Gaia, and
upon information and belief, contains other fabricated information.

*Twitter Response – August 23, 2021 (or thereabouts)*

169.     Goode's vendetta and defamatory statements continued even after this Action was
commenced.

170.     A post on Twitter dated August 23, 2021, included the statements "Are [sic] Gaia
to be trusted?" and "I fell back into Gaia recently, in particular Cosmic Disclosure and I'm not
sure if I can trust it anymore."

171.     In response, Goode posted, "Details are in our Federal Racketeering lawsuit against
Gaia. Our lead Attorney was nearly killed in a hit n run by an organized crime member recently.
Very suspicious timing. Who goes to Police/Courts for help, Victims or perpetrators?"

172.     Upon information and belief, Goode intentionally published the Twitter
Defamatory Statement.

173.     Upon information and belief, Goode knew that the Twitter Defamatory Statement
was false or recklessly disregarded the falsity of the statement, and published it with malice and
with the intent to cause harm to Gaia.

174.     The Twitter Defamatory Statement is injurious and defamatory *per se*, in that it is directed at Gaia and the defamatory meaning is apparent from the face of the statements without the aid of extrinsic proof.  The Twitter Defamatory Statement claims or implies that Gaia is responsible for a "hit n run" car accident injuring Goode's counsel, which directly injures Gaia's business and professional reputation.

175.     Upon information and belief, Goode published each of the Wilcock Email Defamatory Statements, the Defamatory Petition Statements, the Defamatory GEM Statements, the FTL Blog Defamatory Statements, the Defamatory Video Statements, and the Twitter Defamatory Statement (collectively, the "Defamatory Statements"), and caused them to be communicated and distributed widely on the internet.

176.     The various Defamatory Statements have been republished or linked to on numerous websites, including YouTube (www.youtube.com), X (formerly Twitter) (twitter.com) and Facebook (www.facebook.com), and have thus been widely disseminated to the public.

177.     Upon information and belief, in addition to publishing the Defamatory Statements directly to certain individuals, Goode linked to the Defamatory Statements through his social media pages on X/Twitter (@CoreyGoode), Facebook (CoreyGoodeOfficial), and other sites in order to further disseminate the statements therein across the internet.

178.     The entirety of each of the Defamatory Statements gives a false and defamatory impression of Gaia's business and its executives.

179.     Upon information and belief, Goode was motivated to make and promote the Defamatory Statements because of a desire to drive down Gaia's stock price.

180.    Upon information and belief, Goode communicated with friends and colleagues using the messaging application WhatsApp about his desire and efforts to impact Gaia's stock price.

181.    Gaia has been damaged by the Defamatory Statements in the operation of its business.

182.    Gaia has also been forced to incur costs to take extra security measures due to the numerous threats that Gaia has received.

183.    Gaia has been further damaged in an amount yet to be determined, including without limitation due to the loss of current and potential new customers and business partners who have been exposed to each of the Defamatory Statements.

### Goode's Other Torts

184.    Beyond making and disseminating the Defamatory Statements, Goode's scheme to "take down" Gaia including the commission of other torts.

185.    On or about October 3, 2018, Goode sent a threatening letter to Jason Rice, one of the individuals who replaced him on CD.

186.    Goode threatened that he would take "any necessary precautions"—clearly implying litigation—if Rice participated in any broadcast by Gaia that "improperly" used Goode's purported trademarks (as alleged by Goode).

187.    After receiving Goode's threatening letter, Rice ended his relationship with Gaia.

188.    Additionally, Goode posted on his personal website, https://spherebeingalliance.com, transcripts from at least 164 episodes of CD (including a number of episodes that did not include Goode), which remained on Goode's website until August 9, 2018.

189.   Per the Parties' agreements, the rights to the CD transcripts were Gaia's and Goode had no right to post them on his website.

190.   Upon information and belief, Goode's posting of CD transcripts on his personal website was done intentionally and in bad faith.

191.   For example, Goode retained the transcripts on his website even after receiving multiple requests from Gaia and its counsel to remove the transcripts.

192.   Although Goode eventually did remove the transcripts, thereafter, in or around November 2019, he posted at least one full video of a new CD episode, at the website https://spherebeingalliance.com/videos/sba/ZXLP5Q-WdR4/guide-to-non-terrestrial-beings-cosmic-disclosure-w-corey-goode-alien-species-agenda-guide/, again violating Gaia's rights.[9]

193.   Goode's bad faith is further established by his later actions directing individuals to other websites where episodes or transcripts of CD were illegally uploaded.

194.   For example, in a Facebook post in early-October 2021, Goode posted a link to season 2, episode 14, of CD, which had been posted on the website bitchute.com.

195.   Around that same time, in response to another user asking to see "videos of Gaia that you were in", Goode posted a response writing, "COSMIC DISCLOSURE – Full Transcripts can be found online" followed by a link to the website https://pdfcoffee.com.

## FIRST CAUSE OF ACTION
### DEFAMATION

196.   Gaia hereby realleges and incorporates by reference paragraphs 13, 17-21, 24-26, 76, 86-134, and 137-183 of the Counterclaims as if fully set forth herein.

---

[9] As of the date of filing, the video is no longer available on Goode's website at that link.

197.     Goode made or published each of the Defamatory Statements regarding Gaia, which are false statements of fact.

198.     Goode intentionally published each of the Defamatory Statements to an unknown number of third parties and further encouraged them to disseminate the Defamatory Statements to an even broader audience.

199.     Goode knew that each of the Defamatory Statements was false or recklessly disregarded the falsity of each statement, and published each of them with malice and with the intent to cause harm to Gaia.

200.     Each of the Defamatory Statements are injurious and defamatory *per se*, in that they are specifically directed at Gaia and the defamatory meaning is apparent from the face of the publication without the aid of extrinsic proof.  In particular, each of the Defamatory Statements impute to Gaia the commission of one or more crimes or other improprieties, and directly injure Gaia's business and professional reputation.

201.     Further, Gaia has suffered injury, including from subscribers who cancelled their subscriptions, as a result of each of the Defamatory Statements.

202.     As a result of publishing each of the Defamatory Statements with reckless disregard for their truth, Goode is liable to Gaia for presumed and actual damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**<u>BREACH OF CONTRACT</u>**

203.     Gaia hereby realleges and incorporates by reference paragraphs 7, 15, 36-52, 64-68, and 73-75 of the Counterclaims as if fully set forth herein.

204.     The 2016 Contract (as amended by the 2017 Amendments) is a valid and binding contract between Gaia and GES for the benefit of Goode.

205.     Gaia has performed all, or substantially all, of its duties and responsibilities pursuant to the 2016 Contract.

206.     Plaintiffs breached the terms of the 2016 Contract (as amended by the 2017 Amendments) by failing to repay Gaia amounts due and owing, including repayment of the Advance Event Payment.

207.     As a result of Plaintiffs' breach of the 2016 Contract, Gaia has been damaged in an amount to be determined at trial but not less than $25,000.00, plus prejudgment interest and Gaia's reasonable costs of this action, including attorneys' fees.

### THIRD CAUSE OF ACTION
### BREACH OF CONTRACT

208.     Gaia hereby realleges and incorporates by reference paragraphs 7, 15, 36-50, 53-72, and 75 of the Counterclaims as if fully set forth herein.

209.     The Relocation Benefit Agreement is a valid and binding contract between Gaia and Goode.

210.     Gaia has performed all of its duties and responsibilities pursuant to the Relocation Benefit Agreement.

211.     Goode has breached the Relocation Benefit Agreement by failing to reimburse Gaia for the Relocation Payment.

212. As a result of Goode's breach of the Relocation Benefit Agreement, Gaia has been damaged in an amount to be determined at trial, plus prejudgment interest and Gaia's reasonable costs of this action, including attorneys' fees.

## FOURTH CAUSE OF ACTION
## <u>BREACH OF CONTRACT</u>

213. Gaia hereby realleges and incorporates by reference paragraphs 22, 47, and 188-195 of the Counterclaims as if fully set forth herein.

214. The 2015 Contract and the 2016 Contract are valid and binding contracts between Gaia and GES for the benefit of Goode.

215. Pursuant to the 2015 Contract and the 2016 Contract, Gaia owns the rights to CD episodes, including transcripts and recordings of such episodes.

216. Gaia has performed all of its duties and responsibilities pursuant to the 2015 Contract and 2016 Contract.

217. Goode breached the 2015 Contract and 2016 Contract by posting transcripts and video recordings of CD episodes on his personal website.

218. Upon information and belief, Goode acted willfully in violating Gaia's rights in the transcripts and video of CD episodes.

219. As a result of Goode's breach of the 2015 Contract and 2016 Contract, Gaia has been damaged in an amount to be determined at trial, plus prejudgment interest.

## FIFTH CAUSE OF ACTION
## <u>TRADEMARK INFRINGEMENT</u>

220. Gaia hereby realleges and incorporates by reference paragraphs 22 and 135-136 of the Counterclaims as if fully set forth herein.

221.    The Mark is a valid and subsisting trademark under the Lanham Act.

222.    Gaia owns the Mark and consumers associate the Mark with Gaia.

223.    Goode's use of the Mark in the Petition likely caused confusion, or mistake, or deceived as to the affiliation, connection, or association of the Petition with Gaia, or as to the origin, sponsorship, or approval of the Petition's goods, services, or commercial activities by Gaia, all to the damage and detriment of Gaia's reputation and goodwill.

224.    Goode's use of the Mark without Gaia's consent and without causing, inducing or materially contributing to such use, constitutes direct and contributory trademark infringement under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

225.    Upon information and belief, Goode's acts in using the Mark were done intentionally and with knowledge of Gaia's rights.

226.    As a result of this trademark infringement, Gaia has sustained damages in an amount to be determined at trial, plus interest, costs, and attorneys' fees.

## SIXTH CAUSE OF ACTION
## FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION

227.    Gaia hereby realleges and incorporates by reference paragraphs 22 and 135-136 of the Counterclaims as if fully set forth herein.

228.    Gaia owns the Mark and consumers associate the Mark with Gaia.

229.    Goode's use of the Mark in the Petition without Gaia's consent and/or causing, inducing or materially contributing to such use, constitutes false designation of origin and unfair competition under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

230.     Upon information and belief, Goode's acts in using the Mark were done intentionally and with knowledge of Gaia's rights.

231.     As a result of Goode's false designation of origin and unfair competition, Gaia has sustained damages in an amount to be determined at trial, plus interest, costs, and attorneys' fees.

**SEVENTH CAUSE OF ACTION**
**COMMON LAW TRADEMARK INFRINGEMENT**

232.     Gaia hereby realleges and incorporates by reference paragraphs 22 and 135-136 of the Counterclaims as if fully set forth herein.

233.     The Mark is a valid and subsisting trademark under common law.

234.     Gaia owns the Mark and consumers associate the Mark with Gaia.

235.     Goode's use of the Mark without Gaia's consent and without causing, inducing or materially contributing to such use, constitutes trademark infringement under Colorado common law.

236.     Upon information and belief, Goode's acts in using the Mark were done intentionally and with knowledge of Gaia's rights.

237.     As a result of Goode's trademark infringement, Gaia has sustained damages in an amount to be determined at trial, plus interest, costs, and attorneys' fees.

**EIGHTH CAUSE OF ACTION**
**COMMON LAW UNFAIR COMPETITION**

238.     Gaia hereby realleges and incorporates by reference paragraphs 22 and 135-136 of the Counterclaims as if fully set forth herein.

239.     Gaia owns the Mark and consumers associate the Mark with Gaia.

240.    Goode's use of the Mark in the Petition without Gaia's consent constitutes unfair competition under Colorado common law.

241.    Upon information and belief, Goode's acts in using the Mark were done intentionally and with knowledge of Gaia's rights.

242.    As a result of Goode's unfair competition, Gaia has sustained damages in an amount to be determined at trial, plus interest, costs, and attorneys' fees.

### NINTH CAUSE OF ACTION
### TORTIOUS INTERFERENCE

243.    Gaia hereby realleges and incorporates by reference paragraphs 132-134 and 185-187 of the Counterclaims as if fully set forth herein.

244.    Goode intentionally and improperly interfered with Gaia's contractual relationship with Jason Rice.

245.    Goode caused Rice to end his relationship with Gaia.

246.    Goode interfered in Rice's relationship with Gaia by using wrongful means, namely the threat of civil prosecution.

247.    Upon information and belief, Goode intentionally and improperly interfered with Gaia's contractual relationship with certain of its subscribers.

248.    Upon information and belief, Goode's actions caused certain of Gaia's then-subscribers to terminate their relationship with Gaia.

249.    Upon information and belief, Goode interfered with the subscribers' relationship with Gaia by using wrongful means, namely by making defamatory statements about Gaia.

250.    Gaia has been damaged by each of Goode's actions, including as a result of subscribers terminating their relationship with Gaia, thus causing the loss of subscription fees.

**TENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**

251.    Gaia hereby realleges and incorporates by reference paragraphs 22, 47, and 188-195 of the Counterclaims as if fully set forth herein.

252.    Gaia owns the rights to transcripts of CD episodes.

253.    Gaia owns the rights to video recordings of CD episodes.

254.    Upon information and belief, Goode received a benefit by posting transcripts and video recordings of CD episodes on his personal website.

255.    It would be unjust to allow Goode to retain the benefit he received by posting transcripts and/or video recordings of CD episodes on his personal website.

**WHEREFORE**, Gaia respectfully requests that this Court enter an order in favor of Defendant/Counterclaimant Gaia, Inc., and against Plaintiffs/Counter-defendants James Corey Goode and Goode Enterprise Solutions, Inc., as follows:

A.     Requiring Goode and GES to remove the Defamatory Statements and any materials in which they appear, in their entirety, from https://spherebeingalliance.com and any other sites to which Plaintiffs have posted the Defamatory Statements or posted a link to any materials containing the Defamatory Statements, including but not limited to twitter.com, facebook.com, and youtube.com; and, to withdraw any submissions of the Defamatory Statements, or related information made to other websites and/or applications;

B.      Requiring Goode and GES to issue a public apology for defaming Gaia, to issue a retraction in full, and to publish such apology and retraction on his personal website, https://spherebeingalliance.com, and on all other websites and social media accounts on which the Defamatory Statements were published;

C.      Enjoining Goode and GES from publishing any further defamatory statements regarding Gaia, Gaia's employees, and any other related entities;

D.      Awarding damages to Gaia and against Goode based on his defamatory statements, in an amount to be determined at trial;

E.      Awarding damages to Gaia and against Goode and GES, jointly and severally, based on their breach of contract, in an amount to be determined at trial;

F.      Awarding damages that Gaia has sustained, and profits Goode has derived, as a result of his trademark infringement, false designation of origin, unfair competition, in an amount to be determined at trial;

G.      Awarding treble damages in accordance with section 35 of the Lanham Act, 15 U.S.C. § 1117, and awarding exemplary or punitive damages as is deemed appropriate because of the willful and intentional nature of Goode's conduct;

H.      Awarding interest and costs of this action together with statutory attorneys' fees pursuant to section 35 of the Lanham Act, 15 U.S.C. § 1117;

I.      Requiring that Goode make restitution to Gaia for any unjust enrichment caused by virtue of its unlawful conduct as complained of herein;

J.      Awarding damages to Gaia and against Goode for his tortious interference with Gaia's business relationships with its talent and subscribers;

K.     Awarding pre-judgment interest, and costs and disbursements of this Action;

L.     Awarding attorneys' fees to Gaia pursuant to the Relocation Benefit Agreement;

M.     Awarding attorneys' fees to Gaia for the entire cost of this Action; and

N.     Providing for such other and further relief as this Court deems to be just and proper.

## DEMAND FOR JURY TRIAL

Gaia demands trial by jury on all claims and issues so triable.

Dated: April 15, 2024          **DAVIS & GILBERT LLP**


By:   /s/ *Daniel A. Dingerson*
        Daniel A. Dingerson
        Ina B. Scher
        ddingerson@dglaw.com

1675 Broadway
New York, New York 10019
(212) 468-4800

*Attorneys for Defendant Gaia, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2024, I caused a copy of the foregoing Gaia, Inc.'s Amended Answer and Counterclaims to the Second Amended Complaint of Plaintiffs James Corey Goode and Goode Enterprise Solutions, Inc., to be served via ECF on all other parties who have appeared in this matter.

        /s/ Daniel A. Dingerson
        Daniel A. Dingerson

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-742-DDD-KAS

JAMES COREY GOODE,

      Plaintiff,

and

GOODE ENTERPRISE SOLUTIONS, INC,

      Plaintiff and Counter Defendant,

v.

GAIA, INC,

      Defendant and Counter Claimant.

## STIPULATED CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER

**WHEREAS**, Plaintiffs James Corey Goode and Goode Enterprise Solutions, Inc., and Defendant Gaia, Inc. (collectively the "Parties" and individually a "Party") request that this Court issue a protective order pursuant to Federal Rule of Civil Procedure 26(c) to protect the confidentiality of nonpublic and competitively sensitive information that they may need to disclose pursuant to and during the course of discovery in the above-captioned action (the "Action");

**WHEREAS**, the Court having found that good cause exists for issuance of an appropriately tailored confidentiality order governing discovery in this Action, and the Parties, through counsel , having stipulated to the following provisions, it is hereby,

**ORDERED** that any person subject to this Protective Order—including without limitation the Parties to this Action, their attorneys, representatives, agents, experts, and consultants, acting as such, all third parties providing discovery in this Action, and all other interested persons with actual notice of this Protective Order—shall adhere to the following terms, upon pain of contempt and any other sanction deemed appropriate by the Court:

**Discovery Materials May Be Designated as Confidential**

1.     This Protective Order shall be applicable to and govern all deposition transcripts and recordings, documents or electronically stored information (whether exchanged between the Parties prior to formal discovery or produced by the Parties or any third parties in response to requests for production or subpoenas), answers to interrogatories, responses to requests for

admission, and other discovery taken pursuant to the Federal Rules of Civil Procedure, as well as

any other information and materials hereafter furnished, directly or indirectly (including in

connection with any mediation or settlement negotiations among the Parties), by or on behalf of

any Party or third party in connection with this Action (collectively, "Discovery Materials").

2.      The Party or third party producing Discovery Materials may designate as

"Confidential" any portion thereof that they reasonably and in good faith believe comprise or

reflect confidential and/or proprietary information which is not generally known and which they

normally would not reveal to third parties or would cause third parties to maintain in confidence,

including, without limitation, proprietary, commercially sensitive, or otherwise confidential

financial, business, commercial, research, development, technical, strategic, and/or personal

information, the public disclosure of which is either restricted by law or would likely, in the good

faith opinion of the producing Party or third party, seriously harm the producing Party's or third

party's business, commercial, financial, or personal interests or cause the producing Party or third

party to violate his, her, or its privacy or confidentiality obligations to others.

3.      The Party or third party producing Discovery Materials may designate as "Highly

Confidential" any portion thereof that they reasonably and in good faith believe is of such a

personally, commercially, or competitively sensitive nature that disclosure to persons other than

those specified herein could reasonably be expected to result in injury to that producing Party or

third party.   "Highly Confidential" Discovery Materials shall include, without limitation,

information that is not known or available to the public and that constitutes, contains, or reflects

trade secrets; proprietary business information, methods or processes; financial data, reports, or

analysis; pricing or cost information; customer or consumer information; sales and marketing

information, analysis, or planning; and other confidential information that is highly proprietary or competitively sensitive. Discovery Materials designated either as "Confidential" or "Highly Confidential" shall collectively be referred to as Confidential Discovery Material.

4.     Any person subject to this Order who receives from any other person any Confidential Discovery Material shall use such Confidential Discovery Material solely for the purpose of conducting the Action (not any other judicial or other proceeding) and for no other purpose whatsoever, and shall not disclose, divulge, or communicate any such Confidential Discovery Material to anyone else except as expressly permitted hereunder.

5.     The designation of information or material for purposes of this Order shall be made in the following manner by the Party or third party seeking protection:

       a.     In the case of documents, electronically stored information, interrogatory responses, responses to requests for admission, or other material (apart from deposition transcripts and recordings): by affixing a plainly visible confidentiality designation legend ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL," as appropriate) in a manner that will not interfere with legibility or audibility: (i) on each page of any document containing any confidential material; or (ii) physically on the outside of any media for storing electronic documents that are not reasonably capable of having a designation attached to each page; at the time such documents or materials are produced or such information is disclosed, or as soon thereafter as the Party or third party seeking protection becomes aware of the confidential nature of the information or material disclosed and sought to be protected hereunder. The terms "documents" and "electronically stored information" as used in this Protective Order, shall have the broadest meaning permissible under the

Federal Rules of Civil Procedure and shall include, as relevant and without limitation, all "writings," "recordings," and "photographs" as defined in Rule 1001 of the Federal Rules of Evidence, and any information stored in or through any computer system or other electronic or optical data storage device;

b. In the case of depositions: (i) by a statement on the record, by counsel=, during such deposition that a portion of the transcript shall be designated either "Confidential" or "Highly Confidential" hereunder; or (ii) by written notice of such designation sent by counsel=, to all Parties within twenty-one (21) days after the Party's receipt (via counsel) of the transcript of the deposition. If so designated, the final transcript of the designated testimony shall be bound in a separate volume and marked "Confidential Information Governed by Protective Order" by the reporter. At or during a deposition, the deponent or his or her counsel, or any other counsel, acting in good faith, may invoke the provisions of this Order in a timely manner, giving adequate warning to the Party and/or their counsel that testimony about to be given is deemed protected under this Order. Whether or not so designated on the record at deposition, the Parties shall treat all deposition testimony as Highly Confidential under this Order until the expiration of twenty-one (21) days after the Party's receipt (via counsel) of the transcript of the deposition.

6. The disclosure of a document or information without designating it as Confidential Discovery Material shall not constitute a waiver of the right to designate such document or information as Confidential Discovery Material. If at any time prior to the trial of this Action, a producing Party or third party realizes that some portion of Discovery Material that that Party or

third party previously produced without limitation should be designated as Confidential Discovery Material, the producing Party or third party may so designate that portion by promptly notifying all Parties in writing.  Such designated portion of the Discovery Material will thereafter be treated as Confidential Discovery Material under the terms of this Order.  As soon as the receiving Parties are notified in writing of the inadvertent production, the information must be treated as if it had been timely and initially designated under this Order, and the receiving Parties must promptly endeavor in good faith to obtain all copies of the document which they distributed or disclosed to persons not authorized to access such information, as well as any copies made by such persons.  In addition, the producing Party or third party shall provide each other Party with replacement versions of such Confidential Discovery Material that bears the appropriate designation within ten (10) business days of providing such notice.

7.    Any non-party that produces or discloses information in this Action may obtain protection of this Order by complying with the terms herein.  To the extent a discovery request is made to a non-party in this Action, any Party may notify such non-party that the protections of this Order are available to such non-party.

**Who May Receive Confidential Materials**

8.    No person subject to this Order, other than the producing Party or third party, shall disclose any Confidential Discovery Material to any other person whomsoever, except to:

(a)    the Parties to this Action;

(b)    the Parties' counsel retained specifically for this Action, including any paralegal, clerical, or other assistant employed

by such counsel and assigned specifically to work on this Action;

(c)    as to any document, its author, its addressee(s), and any other person shown on the face of the document as having received a copy;

(d)    any witness who counsel for a Party in good faith believes may be called to testify at trial or deposition in this Action, provided such person has first executed a Non-Disclosure Agreement in the form annexed hereto, and so long as the witness is only shown the Confidential Discovery Material during and in preparation for his/her testimony, or when counsel has made a good faith determination that it is necessary for purposes of prosecuting, defending, or appealing this Action to show such information to the witness, and the witness is not permitted to retain the Confidential Discovery Material;

      i.    Notwithstanding the provisions of subparagraph 8(d), this provision shall not authorize the disclosure to the witness under 8(d) of Confidential Discovery Material which is designated as "HIGHLY CONFIDENTIAL", disclosure of which shall be limited to those persons identified in paragraph 9 below;

ii. The provisions of subparagraph 8(d) shall not preclude a Party from applying to the Court on notice to all other Parties to disclose Confidential Discovery Material to a witness when counsel has made a good faith determination that it is necessary for purposes of prosecuting, defending, or appealing this Action to show such information to such witness; **Any such application must comply with the U.S. Magistrate Judge's discovery dispute procedures.**

(e)    any person retained by a Party to serve as an expert witness or consultant or otherwise provide specialized advice to counsel in connection with this Action, provided such person has first executed a Non-Disclosure Agreement in the form annexed hereto;

(f)    stenographers and video and/or audio technicians engaged to transcribe or record depositions conducted in this Action;

(g)    independent photocopying vendors, graphic production services, contract attorneys, electronic document management vendors, or other litigation support services employed by the Parties or their counsel to assist in this Action, including computer service personnel performing duties in relation to a computerized litigation system;

(h)    the Court, its staff, and court reporters;

(i)     any mediator or arbitrator appointed by the Court or agreed to by the Parties who assists the Parties in trying to reach a settlement of this Action;

(j)     employees of the Parties' insurance carriers to whom it is reasonably necessary that the Confidential Discovery Material be shown for purposes of the Action; and

(k)     any other person whom the producing Party, or other person designating the Confidential Discovery Material, agrees in writing may have access to such Confidential Discovery Material.

9.      Access to and/or disclosure of Confidential Discovery Material pursuant to this Order shall only be permitted or made to the extent counsel reasonably and in good faith believes that such access or disclosure is reasonably necessary to the prosecution or defense of this Action. Notwithstanding any other provision of this Order, access to and/or disclosure of Confidential Discovery Material designated as "CONFIDENTIAL" may be withheld from any Party who would not have the right to request such information through a validly issued discovery request (including but not limited to requests for production of documents, interrogatories, requests for admission, or a notice of deposition). Notwithstanding any other provision of this Order, access to and/or disclosure of Confidential Discovery Material designated as "HIGHLY CONFIDENTIAL" shall only be made to those individuals described in subparagraphs 8(b)-(c) and 8(e)-(k), or upon an order of the Court after the application under subparagraph 8(d)(ii).

10. Prior to the disclosure of any Confidential Discovery Material to any person referred to in subparagraphs 8(d)-(e) above, such person shall be provided with a copy of this Order and shall sign a Non-Disclosure Agreement, in the form annexed hereto, stating that that person has read this Order and agrees to be bound by its terms. The Parties (via counsel) shall retain each signed Non-Disclosure Agreement, hold it in escrow, and produce it to opposing Parties (via counsel), either prior to such person being permitted to testify (at deposition or trial) or at the conclusion of the case, whichever comes first.

11. Each person receiving Confidential Discovery Material will maintain such Confidential Discovery Material in confidence and will not reveal any portion of it to any person not otherwise permitted pursuant to this Order without the prior written consent of the producing Party (via counsel) or an order by the Court authorizing such disclosure.

12. Any person who either objects to any designation of Confidential Discovery Material, or who, by contrast, requests designation of Confidential Discovery Material produced by another Party or third party, may at any time prior to the trial of this Action serve upon the producing Party or third party, and all other Parties, a written notice stating with particularity the grounds of the objection or request. If agreement cannot be reached promptly, the Parties and all affected persons shall jointly seek a ruling from the Court. The information in question shall be treated as Confidential Discovery Material and subject to the terms of this Order until otherwise agreed to by the Parties or ordered by the Court.

**Filing Confidential Materials in this Action**

13. Any Party may use information or documents designated as Confidential Discovery Material during any trial of this Action. In the event that any material designated under this Order

is used, described, characterized, excerpted, or referenced in, or attached to, any Court proceeding

or submission in connection with this Action: (a) it shall not lose its confidential status through

such use; (b) the Parties shall take all steps reasonably required to protect its confidentiality during

such proceeding; and (c) the Party seeking to use the material shall move to file such material

under seal, except that upon the default of the filing Party to so request, any Party may do so.

Where possible, only confidential portions of filings with the Court shall be filed under seal.

      14.     Each person who has access to Confidential Discovery Material shall take all due

precautions to prevent the unauthorized or inadvertent disclosure of such material.  This Order has

no effect upon, and its scope shall not extend to, any Party's or other disclosing person's use or

disclosure of its own Confidential Discovery Material.  A disclosing Party or other disclosing third

party may agree in writing to allow access to its own Confidential Discovery Material for persons

not otherwise identified in subparagraphs 8(a)-(k).

      15.     Nothing herein shall be construed as: (a) a waiver by any Party of its right to object

to any discovery request; (b) a waiver of any privilege or protection; or (c) an admission by any

Party regarding the admissibility or relevance at trial of any document, testimony, or other

evidence.  Each Party specifically reserves the right to object to the use or admissibility of all

Confidential Discovery Material disclosed, in accordance with applicable law and Court rules.

**Termination of the Litigation**

      16.     This Order shall extend beyond the final conclusion of this Action, and shall remain

in full force and effect until modified, superseded, or terminated by written agreement of the

Parties or by Order of the Court.  Within 30 days of the final disposition of this Action (including

appeals, if any), all Confidential Discovery Material and all copies thereof in the possession of any

person who has received such documents pursuant to this Protective Order shall be destroyed or returned to the producing Party or third party (via counsel), such decision whether to destroy or return, to be determined in the receiving Party's sole discretion, together with all copies, extracts and summaries thereof, except that the Parties' counsel shall be permitted to retain any and all working files on the condition that those files will remain confidential consistent with the terms of this Order.  Upon request of the producing Party, after entry of final judgment no longer subject to further appeal, counsel who received the Confidential Discovery Material shall deliver a written certification certifying compliance with the terms of this Protective Order to counsel for the Party that produced the Confidential Discovery Material, within thirty (30) days of such request.

17.     During the pendency of this Action only, this Court shall retain jurisdiction over all persons subject to this Order to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any violation thereof.

18.     This Order may be amended by further stipulation or, if the Parties are unable to agree, by the Court on the application of any Party.

Dated: July 19, 2024

**YANAROS LAW, P.C.**

*/s/ Valerie Yanaros*_____

Valerie Yanaros, Esq.
8300 Douglas Avenue Suite 800
Dallas, Texas 75225
Telephone: (512) 826-7553
Email: valerie@yanaroslaw.com

*Attorneys for Plaintiffs James Corey Goode
and Goode Enterprise Solutions Inc.*

**DAVIS+GILBERT LLP**

/s/ *Daniel A. Dingerson*____

Daniel A. Dingerson
Angela M. Dunay
1675 Broadway
New York NY 10019
Phone: (212) 468-4800
Fax: (212) 468-4888
ddingerson@dglaw.com
adunay@dglaw.com

*Attorneys for Defendant Gaia, Inc.*

**SO ORDERED**:   7/26/2024

_____
Hon. Kathryn A. Starnella
United States Magistrate Judge

-13-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-742-KLM

JAMES COREY GOODE, individually, and
GOODE ENTERPRISE SOLUTIONS INC.,

Plaintiffs,

v.

GAIA, INC.,
JAY WEIDNER,
CLIF HIGH,
BENJAMIN ZAVODNICK,
ALYSSA MONTALBANO,
JIRKA RYSAVY,
BRAD WARKINS, and
KIERSTEN MEDVEDICH,

Defendants.

-----------------

ALYSSA CHRYSTIE MONTALBANO, individually,

Counter-Claimant,

v.

JAMES COREY GOODE, individually, and
GOODE ENTERPRISE SOLUTIONS INC.,

Counter-Defendants,

LIGHT WARRIOR LEGAL FUND, LLC;
DAVID WILCOCK,
THE WILCOCK SPIRITUAL HEALING AND EMPOWERMENT FOUNDATION
VALERIE YANAROS WILDE,
ELIZABETH LORIE,
BRIAN JAMES FLYNN,
WILLIAM CAMPBELL,
MATTHEW GROVE,

-14-

DIANA TERRY, and
CHRISTINA GOMEZ,

Third-Party Defendants.

---

### Non-Disclosure Agreement

---

I, _____ [print name], acknowledge that I have read and understand the terms of the Stipulated Confidentiality Agreement and Protective Order in the above-captioned matter governing the non-disclosure of those portions of Discovery Materials that have been designated as Confidential Discovery Material.

I have been informed by counsel that certain documents or information to be disclosed to me in connection with the above-captioned matter have been designated as Confidential Discovery Material and are thereby confidential by Order of the Court. I agree to be bound by the Order as a condition of receiving access to, copies of, documents or information designated Confidential Discovery Material.

I agree that I will not disclose such Confidential Discovery Material or any notes or other memoranda or writings reflecting such Confidential Discovery Material to anyone other than for purposes of this Action and as specifically authorized under the Order. I further agree not to use any such Confidential Discovery Material for any purpose other than this Action.

I agree that my obligation to honor the confidentiality of such Confidential Discovery Material will continue even after the termination of this Action.

I agree that at the conclusion of the Action I will return all Discovery Materials, including any Confidential Discovery Material, to the Party or attorney from whom I received it or destroy such Discovery Materials along with any copies thereof.

By acknowledging these obligations under the Order, I understand that I am submitting myself to the jurisdiction of the United States District Court for the District of Colorado for the purpose of any issue or dispute arising hereunder and that my willful violation of any term of the Order could subject me to punishment for contempt of Court.

Dated: _____                    _____
                                                        [Signature]

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-00742-DDD-KAS

JAMES COREY GOODE,

      Plaintiff,

and

GOODE ENTERPRISE SOLUTIONS, INC,

      Plaintiff and Counter Defendant,

v.

GAIA, INC,

      Defendant and Counter Claimant.

---

### STIPULATED ORDER FOR THE EXCHANGE AND PRODUCTION OF ELECTRONICALLY STORED INFORMATION

---

**WHEREAS**, Rule 26(f) of the Federal Rules of Civil Procedure states that the parties must develop a proposed discovery plan that states the parties' views and proposals on, among other things, "any issues about disclosure, discovery, or preservation of electronically stored information, including the forms or forms in which it should be produced," Fed. R. Civ. P. 26(f)(3)(C);

**WHEREAS**, Plaintiffs James Corey Goode and Goode Enterprise Solutions, Inc. and Defendant Gaia, Inc. (each individually, a "Party" and collectively, the "Parties") in the above-captioned case (the "Action") mutually seek to manage the time, expense, and other burdens of discovery of certain electronically stored information ("ESI"), and to better define the scope of their obligations with respect to preserving and producing such information and materials;

**WHEREAS**, the Parties are aware of the importance of cooperation and commit to cooperate in good faith to promote the "just, speedy, and inexpensive determination" of this Action, as required by Fed. R. Civ. P. 1.  The Parties agree to use reasonable, good faith, and proportional efforts to preserve, identify, and produce relevant and discoverable information consistent with Fed. R. Civ. P. 26(b)(1).  The Parties' cooperation includes identifying the appropriate scope of eDiscovery, including limitations on the number of custodians, identification of relevant and discoverable subject matter, establishment of appropriate time periods for

eDiscovery, and development of other parameters to limit and guide preservation and eDiscovery issues;

       **NOW THEREFORE**, it is hereby **ORDERED:**

I.     **GENERAL PROVISIONS**

      A.    **Applicability**.  This Stipulation and Order for the Exchange and Production of Electronically Stored Information ("Stipulation") shall govern the format of production of documents and information in the Action.

      B.    **Federal and Local Rules**.  Except as specifically set forth herein, this Order does not alter or affect the applicability of the Federal Rules of Civil Procedure or Local Rules for the United States District Court for the District of Colorado.

      C.    **Cooperation**.  The Parties agree to conduct discovery in a cooperative manner.  To further the application of the proportionality standard set forth in Fed. R. Civ. P. 26(b)(2)(C), requests for production of ESI should be reasonably targeted, clear, and specific (as is practicable).  The Parties (through counsel) agree to meet and confer, as soon as is practicable, regarding custodians to be searched and processes to be employed to collect and produce ESI.

      D.    **Production**.  Absent unusual circumstances that would make it unduly burdensome (in which case the Parties shall confer to discuss alternative production specifications), and subject to modifications as agreed by the Parties, the Parties will prepare their production documents in accordance with the agreed-upon specifications set forth below.

      E.    **Preservation**. To the extent not already done, the Parties agree to take reasonable and proportional steps to preserve discoverable information in the Party's possession, custody, or control.  The Parties shall have a continuing obligation to take reasonable and proportional steps

to identify and preserve custodial and non-custodial data sources that may contain information that is relevant to the claims and defenses in this litigation. If a producing Party or third party is aware of inaccessible data that is likely to contain unique, discoverable ESI, that Party or third party will identify to the requesting Party the source from which it claims the data is not reasonably accessible.

F.  **Objections Preserved**. Nothing in this Stipulation shall be interpreted to require disclosure of relevant information protected by the attorney-client privilege, attorney work-product doctrine, or any other recognized and applicable privilege or immunity. Except as provided expressly herein, the Parties do not waive any objections as to the production, discoverability, authenticity, admissibility, or confidentiality of documents and ESI.

## II.  PRODUCTION OF HARD COPY DOCUMENTS

All hard copy documents will be produced in electronic form. Where necessary and practicable, hard copy documents in color will be scanned in color to ensure full information is communicated in the scanned copy. Scanned color documents will be provided in JPG file format.

A.  **Identification**. Where a document or group of documents has an identification spine, "post-it note," or any other label or marking, the information thereon shall be scanned and produced along with the remainder of the document.

B.  **TIFFs**. Documents shall be produced in the form of single-page, black and white, Group IV TIFFs at 300 dpi, except that any documents containing color where the color would aid in interpreting the document shall be provided in color in .jpg format. Each TIFF image shall be named as its corresponding Bates number. Original document orientation shall be maintained

(i.e., portrait to portrait and landscape to landscape). TIFF image files shall be provided in a self-identified "Images" folder.

C.   **OCR Text Files**. Optical Character Recognition ("OCR") text files shall be provided as a single text file for each document, not one text file per page. Each file shall be named with the beginning Bates number that is assigned to its corresponding document, followed by .txt. OCR text files shall be provided in a self-identified "Text" directory. To the extent a document is redacted, OCR text files for such a document shall not contain text for redacted portions. OCR software shall be set to the highest quality setting during processing.

D.   **Database Load Files/Cross-Reference Files**. Unless otherwise agreed to by the Parties, produced hard copy documents shall be provided with Concordance-compatible image and data load files (i.e., .OPT and .DAT files) using standard Concordance delimiters. Concordance-compatible image and data load files (i.e., .OPT and .DAT files) shall be provided in a self-identified "Data" folder. The Parties will meet and confer to address the production and production format of any responsive data contained in a database or other structured or aggregated data source or otherwise maintained by an application.

E.   **Custodian Identification**. The Parties will utilize reasonable best efforts to ensure that paper records for a particular custodian or department level custodian, which are included in a single production, are produced in consecutive Bates stamp order. Multiple custodians in the "All Custodians" field shall be separated by a semicolon.

F.   **Coding Fields**. Absent undue burden (in which case the Parties shall confer to discuss alternative production specifications), and to the extent such information is available, documents shall be produced with at least the following searchable information in accompanying

delimited data files:  (1) BegBates, (2) EndBates, (3) BegAttach, (4) EndAttach, (5) Custodian, (6) All Custodians, (7) OCRTextPath, and (8) Confidentiality.  Custodians should be identified using any of the following conventions, as appropriate: "Last Name, First Name"; "last name_first name"; "first name last name"; or "FLast."  A producing Party or third party shall use a uniform description of a particular custodian across productions in the Action.  Multiple custodians in the "All Custodians" field shall be separated by a semicolon.

G.     **Parent-Child Relationships**. Parent-child relationships (i.e., the association between an attachment and its parent document) shall be preserved to the extent they exist in the manner in which the documents are maintained in the ordinary course of business.  When applicable, parent emails and any of their attachments shall be produced as separate, contiguous documents.

H.     **Unitizing of Documents**.  Absent undue burden, a producing Party or third party shall, when scanning paper documents, avoid merging distinct documents into a single record, and avoid splitting single documents into multiple records (i.e., paper documents shall be logically unitized).  To the extent practicable, hard copy documents shall be unitized using logical document determinations or "LDD."

## III.     PRODUCTION OF ELECTRONICALLY STORED INFORMATION ("ESI")

A.     **Identification of Responsive Documents.**  The Parties shall meet and confer in an effort to conduct discovery in the most efficient and effective manner.   Specifically, the Parties will attempt in good faith to come to an agreement on search and culling methods used to identify responsive information, including custodians, custodial and non-custodial sources, date ranges, file types, or any additional proposed method to cull documents for review, such as the use of

search terms, technology-assisted-review, predictive coding, etc. The Parties retain the right, upon reviewing the initial production of documents, and conducting other investigation and discovery, to request that files from additional custodial or non-custodial sources be searched and will meet and confer regarding any such requests.

1.    **Sources.**  The Parties will meet and confer regarding custodial and non-custodial data sources likely to contain responsive information. The Parties will identify and describe sources likely to contain responsive information that a Party asserts should not be searched (including, but not limited to, because it is not reasonably accessible) and will explain the reasons for such assertions and will then work in good faith to determine whether such sources need to be searched. The Parties retain the right, upon reviewing the initial production of documents, and conducting other investigation and discovery, to request that files from additional custodial or non-custodial sources be searched and will meet and confer regarding any such requests.

2.    **Identification of Custodians.**  The Parties will meet and confer to identify custodians likely to possess responsive information.

3.    **Easily Targeted Responsive Documents.**  Documents and categories of documents that are relevant to this Action and responsive to a Party's document requests, and that are regularly maintained in a known location, or in a location that is knowable upon reasonable inquiry of those with knowledge about a Party's document management, shall be collected without the use of search terms or other agreed-upon advanced search

methodology (e.g., analytics, predictive coding, technology-assisted-
review).

4. **Search Terms.** Where the Parties agree that potentially responsive ESI
shall be searched through the use of search terms ("search term(s)" shall
mean each combined string of characters and/or operators as used on
particular custodian(s) for a specific date range; for clarity, each word
within a string shall not constitute a separate "search term"), the Parties
shall use the process identified herein and shall meet and confer regarding
any proposed deviation. To the extent the producing Party or third party
believes that the use of search terms would reduce their burden in
identifying and/or producing ESI, a producing Party or third party shall
provide a list of proposed search terms, which shall contain search terms
that it proposes to use to identify relevant documents. Within fourteen (14)
calendar days of receipt of the proposed search terms, the
requesting/receiving Party shall provide any proposed additional or
modified search terms that it believes are necessary to identify responsive
documents. Within fourteen (14) calendar days of receiving additional
proposed or modified search terms, the producing Party or third party will
provide a search term hit list or hit report reflecting results after global de-
duplication (including the number of documents that hit on each search
term, the number of documents that hit on a particular search term but no
other search term on the list, and the total number of documents that would

be returned by using the proposed search term list, with and without families) or advise the requesting Party why additional time is needed. The Parties shall meet and confer regarding the search term hit list or hit report within fourteen (14) calendar days of receipt of such list or report. The time frames listed in this paragraph are subject to modification by the Parties. The Parties will thereafter use best efforts to agree to a set of search terms. If disputed terms still exist at the end of the meet-and-confer process, the Parties may raise the dispute with the Court in accordance with applicable rules. The Parties retain the right to request, upon receipt of documents or other discovery, use of additional search terms. Such request shall be made sufficiently in advance of the end of fact discovery, and the Parties agree to meet and confer regarding any such request.

5. **Technology-Assisted-Review.** The Parties shall be permitted to use predictive coding/technology-assisted-review ("TAR") for the purpose of culling the documents to be reviewed or produced. The Parties shall confer on a TAR protocol should any Party decide to employ TAR (the "TAR Protocol"). Should a Party need to deviate from the TAR Protocol, such Party shall notify the requesting Party before doing so and with ample time to meet and confer in good faith regarding any such deviation. Any such meet and confer shall include the Party's and/or their counsel's e-discovery personnel. An agreed-upon set of search terms does not preclude a Party from using TAR.

6. **Email Threading and Inclusive Review/Production.** The Parties shall be permitted to use threading as part of their review and identification of responsive ESI. A Party's or third party's production shall not be considered insufficient if it excludes documents that would otherwise be responsive, so long as such documents, including attachments, are fully included in produced documents. Production of "inclusive" documents from a thread shall include all divergent instances of the thread (if each is responsive in any part not otherwise included in a produced document) and all instances in the thread that include attachments not otherwise provided in the same thread.

B. **TIFFs**. Documents shall be produced in the form of single-page, black and white, Group IV TIFFs at 300 dpi (.jpgs for documents with color). Each TIFF image shall be named as its corresponding Bates number. Original document orientation shall be maintained (i.e., portrait to portrait and landscape to landscape). TIFFs shall show any and all text and images that would be visible to the reader using the native software that created the document. For example, TIFFs of email messages shall include the BCC line. If the image does not accurately reflect the document as it was kept in the ordinary course of business, including all comments, edits, tracking, etc., the Parties agree to meet and confer in good faith on production format options. TIFF image files shall be provided in a self-identified "Images" folder.

C. **System Files**. Common system and program files as defined by the National Software Reference Library of the National Institute of Standards & Technology (which is

commonly used by e-discovery vendors to exclude system and program files from document review and production) need not be processed, reviewed, or produced.

      D.    **De-Duplication**.   A producing Party or third party is only required to produce a single copy of a responsive document, and is required to de-duplicate responsive ESI by the use of MD5 or SHA-1 hash values at the parent level. "Near duplicate" documents shall be produced rather than removed. The producing Party or third party need only produce a single copy of a particular ESI. However, (1) attachments to emails shall not be eliminated from their parent emails, and (2) hard-copy documents shall not be eliminated as duplicates of responsive ESI. In addition, each producing Party or third party shall make reasonable efforts to remove duplicate data across custodians for each produced document and to produce searchable metadata in the "All Custodians" and "Duplicate File Path" fields for each produced document sufficient for the receiving Party to identify all custodians and file paths of a particular document that were eliminated from review or production through de-duplication. The Parties further agree to meet and confer regarding the use of deduplication methods other than by hash value, should such use be deemed necessary by a Party or third party.

      E.    **Bates Numbering**.   Each TIFF image shall be assigned a Bates number that: (1) is unique across the entire document production; (2) maintains a constant length across the entire production (i.e., padded to the same number of characters); (3) contains no special characters or embedded spaces; and (4) is sequential within a given document. If a Bates number or set of Bates numbers is skipped in a production, the producing Party or third party will so note in a cover letter or production log accompanying the production. Bates numbers will be eight digits long, excluding the prefix. Bates numbers will be located on the bottom right of each page.

Confidentiality designations, if any, will be located on the bottom left of each page. Neither the Bates number nor Confidentiality designation, to the extent practicable, shall obliterate, conceal, or interfere with any information from the source document.

      F.    **Parent-Child Relationships and Non-Responsive Information**. Parent-child relationships (i.e., the association between an attachment and its parent document) shall be preserved unless impossible to do so. When applicable, parent emails and any of their attachments shall be produced as separate, consecutive documents. The Parties agree that if any part of an email or its attachments is responsive, the entire family of documents will be produced, except as to any emails or attachments that may be withheld, in whole or in part, on the basis of privilege.

      G.    **Embedded Objects**. Embedded files shall be produced as attachments to the document that contained the embedded file with the parent/child relationship preserved. The embedded files will be marked with a "YES" in the load file under the "Is Embedded" metadata field. The Parties agree logos need not be extracted as separate documents as long as they are displayed in the parent document.

      H.    **Compressed Files Types.** Compressed file types (e.g., .ZIP, .RAR, .CAB, .Z) should be decompressed so that the lowest level document or file is extracted.

      I.    **Metadata Fields and Processing**. To the extent available, the metadata and coding fields set forth in Appendix I that can be extracted from an electronic document shall be produced for that document. For ESI other than email and e-docs that do not conform to the metadata listed in Appendix I, such as text messages, LinkedIn Messages, iMessage, Google Chat, Yammer, Slack, etc., the Parties will meet and confer as to the appropriate metadata fields to be produced after identification of such document type and/or platform.

J.   **Time Zone**.   All ESI produced shall be normalized to Coordinated Universal Time (UTC).

K.   **Extracted Text Files**.  For each document (other than multimedia or graphic files), a document-level extracted text file shall be provided along with its corresponding TIFF image file(s) and metadata.   The file name of each extracted text file shall be identical to that of the first image page of its corresponding document, followed by .txt.  File names shall not contain any special characters or embedded spaces.  The text of native files shall be extracted directly from the native file.  However, if a document has been redacted, or if a document does not have extracted text, OCR of the document will suffice in lieu of extracted text.

L.   **Database Load Files/Cross-Reference Files**.  Unless otherwise agreed to by the Parties, each production shall include (i) a metadata file (.DAT file) using standard Concordance delimiters or carat pipe delimiters and (ii) an image load file in Opticon format (.OPT file).  Concordance-compatible image and data load files (i.e., .OPT and .DAT files) shall be provided in a self-identified "Data" folder.

M.   **Native Files**.  Source code, large diagrams, documents with tracked changes, Microsoft PowerPoint, Microsoft Excel or other spreadsheet type files, and/or .csv files, documents with tracked changes, media files, and any other files that cannot be practically converted to image files shall be produced in native format ("Native Files"), unless they require redactions or unless production in native format would otherwise be impracticable.   Native Files shall be provided in a self-identified "Natives" directory.   Each Native File shall be produced with a corresponding single-page TIFF placeholder image, which will contain language indicating that the document is being produced as a Native File.  Native Files shall be named with the

-13-

beginning Bates number that is assigned to that specific record in the production. A "NativeLink" entry for each Native File shall be included in the .DAT load file indicating the relative file path to each Native File on the production media. Native Files shall be produced with extracted text and applicable metadata fields as set forth in Paragraph III.I. Redacted documents may be produced in Native, or with TIFF image files and OCR in lieu of a Native File, TIFF placeholder image and extracted text file, except for redacted Excel or other spreadsheet type files, which shall be redacted using a native redaction tool and produced as Native Files. Metadata fields for redacted documents (whether Native or otherwise) that would reveal privileged information may be redacted. Each producing Party or third party will (i) ensure that, prior to conversion to TIFF, hidden data from redacted Native Files is revealed and shown on the TIFF image files and (ii) ensure that redacted Native Files will be formatted so as to be readable (for example, column widths should be formatted so that numbers do not appear as "########").

N. **Structured Data**. To the extent responding to a discovery request requires production of ESI contained in a database, the producing Party or third party will generate and produce a report in a reasonably usable and exportable electronic format (for example, in Excel or .csv format), and the Parties will meet and confer about which data or fields are responsive to such discovery request. The first line of each such file will, to the extent not unduly burdensome, show the column headers for each field of data included. The Parties shall meet and confer to finalize the appropriate data extraction and production format for specific information contained in a database.

O. **Audio and Video Files**. Audio and video files shall be produced in native format with a corresponding single-page TIFF placeholder image containing language indicating that the

file is being produced as a Native File and a Bates number.  If it is not reasonably feasible to produce audio and video files in native format, a reasonably usable alternative format may be agreed upon by the Parties.

P.      **Requests for Other Native Files**.  Other than as specifically set forth above, a producing Party or third party need not produce documents in native format.  If good cause exists for the receiving Party to request production of certain documents in native format, the receiving Party may request production in native format by providing (1) a list of the Bates numbers of documents it requests to be produced in native format; and (2) an explanation of the good-faith need for reviewing such documents in native format.  The producing Party or third party shall not unreasonably deny such requests, but may request a conferral with the requesting Party before agreeing to make any such production of Native Files.  Each document produced in response to such requests shall be produced with corresponding production number fields and a "NativeFileLink" entry in the DAT load file indicating the relative file path to each Native File on the production media and all extracted text (other than for multimedia or graphic files) and applicable metadata fields set forth in Appendix I.

Q.      **Passwords.**  For any ESI that exists in encrypted format or is password-protected, the producing Party or third party will provide the requesting Party a means to gain access to those native files (for example, by supplying passwords) to the extent that the producing Party or third party is in possession of, or has access to the password(s).

R.      **Confidentiality Designations**.      Confidentiality designations shall be made pursuant to the Stipulation and Order for the Production and Exchange of Confidential Information as agreed by the Parties.  If a producing Party or third party produces Native Files or other ESI

-15-

with a confidentiality designation in hardcopy form, it shall mark the hardcopy with the appropriate confidentiality designation. The failure of a producing Party or third party to mark such hardcopy document with the appropriate designation shall not affect such document's designation or the producing Party's or third party's rights and obligations thereto.

S.   **Color**.  Documents containing color need not be produced in color in the first instance, except that any documents containing color where the color is reasonably necessary to interpret the document shall be provided in color.  However, if good cause exists for the receiving Party to request production of certain documents in color, the receiving Party may request production of such documents in color by providing (1) a list of the Bates numbers of documents it requests to be produced in color format; and (2) an explanation of the good-faith need for production in color format.  The producing Party or third party shall not unreasonably deny such requests, but may request a conferral with the requesting Party before agreeing to make any such production of documents in color.

## IV.   PROCESSING OF THIRD-PARTY DOCUMENTS

A.   A Party that issues a non-party subpoena ("Issuing Party") shall include a copy of this Stipulation with the subpoena and request that the non-party produce documents in accordance with the specifications set forth herein.  For any subpoena issued prior to execution and entry of this Stipulation, the Issuing Party shall send a copy of this Stipulation within five (5) days after this Stipulation is entered by the Court.

B.   The Issuing Party is responsible for producing to the other Parties any documents obtained pursuant to a subpoena within twenty-one (21) calendar days of receipt.  If a non-party refuses to produce documents in accordance with the specifications set forth herein, the Issuing

Party has no obligation to conform the non-party's production to such specifications.  If a non-party does not include Bates numbering on its documents, the Issuing Party will add Bates numbering to the documents before producing them to the other Party using a Bates Number that indicates that the document subset was produced by a third party.

      C.    Nothing in this Stipulation is intended to or should be interpreted as narrowing, expanding, or otherwise affecting the rights of the Parties or third parties to object to a subpoena.

## V.    MISCELLANEOUS PROVISIONS

      A.    This Stipulation is intended solely to address the format of document productions. Nothing in this Stipulation is intended to affect the rights of any Party to object to any requests or demand for production.    Nothing in this Stipulation shall constitute, or operate as, a waiver of any rights of any Party to object to, or to avoid, discovery or disclosure, in whole or in part, under the laws of the United States, the Federal Rules of Civil Practice, or any other applicable law, rule, or order.

      B.    The Parties agree that they may employ a categorical approach to privilege designations and privilege logs.

      C.    The Parties to the Action shall make good faith efforts to comply with and resolve any differences concerning compliance with this Stipulation.    If a producing Party or third party, notwithstanding their good faith efforts, cannot comply with a material aspect of this Stipulation or if compliance with such material aspect would be unreasonable, such producing Party or third party shall inform the receiving Party in writing as to why compliance with the Stipulation is impossible or unreasonable as soon as reasonably practicable.  No Party or third party may seek

relief from the Court concerning compliance with the Stipulation unless it has first conferred with the requesting Party and other Parties.

D.      Nothing herein is intended to, nor shall be construed to, diminish or otherwise affect any Party's discovery obligations.

E.      Any application to the Court under or regarding this Stipulation shall be made pursuant to the Local Rules of the United States District Court for the District of Colorado, as well as Judge Daniel D. Domenico Individual Rules (or the individual rules or practices of any other judge or magistrate judge assigned to the Action and who would hear and/or rule on such application).

Dated: July 19, 2024

**YANAROS LAW, P.C.**

/s/ Valerie Yanaros_____

Valerie Yanaros, Esq.
8300 Douglas Avenue Suite 800
Dallas, Texas 75225
Telephone: (512) 826-7553
Email: valerie@yanaroslaw.com

*Attorneys for Plaintiffs James Corey Goode
and Goode Enterprise Solutions Inc.*

**DAVIS+GILBERT LLP**

/s/ Daniel A.  Dingerson_____

Daniel A. Dingerson
Angela M. Dunay
1675 Broadway
New York NY 10019
Phone: (212) 468-4800
Fax: (212) 468-4888
ddingerson@dglaw.com
adunay@dglaw.com

*Attorneys for Defendant Gaia, Inc.*

**SO ORDERED**: 7/26/2024

_____
Hon. Kathryn A. Starnella
United States Magistrate Judge

**Appendix I: ESI Metadata Fields**

| Metadata Table | | |
|---|---|---|
| **Field Name** | **Sample Data** | **Description** |
| PRODBEG | P000000222 | First Bates number of native file document/email |
| PRODEND | P000000222 | Last Bates Number of native file document/email (single-page documents will list beginning and ending Bates number) |
| BEGATTACH | P000000222 | Beginning Bates number of parent document. |
| ENDATTACH | P000000229 | Ending Bates number of last attachment/child document |
| CUSTODIAN | Adams, John; johnadams@1776.gov | Email: mailbox in which the file was located Native: Individual who originated the document |
| ATTACHMENT COUNT | 2 | Total number of attachments to each email |
| PGCOUNT | 1 | Total pages of each original document/email |
| ALL CUSTODIANS | Franklin, Ben; Hancock, John, Whipple, William | When global deduplication has been employed, the custodians who had duplicates of the identical document |
| AUTHOR | Jefferson, Thomas | Author of native document (MS Word, etc.) |
| FROM | Adams, John | Email author/sender |
| TO | Hancock, John [mailto: HANCOCK@JOHNHANCOCK.com] | Recipient(s) of email separated by semicolon |
| CC | Franklin, Ben [mailto: bennyf@1776.com] | Carbon copy recipient(s) of email |
| BCC | NA | Blind carbon copy recipient(s) of email |
| SUBJECT | Declaration w/ edits | Email: subject line Native: document title |
| MD5/SHA1 | E4d909c290d0fb1ca068ffaddf22 cbd0 | Hash code created for file in connection with deduplication |

| MEETING START DATE/TIME | 7/3/1776 3:00 PM | For calendar invites, the starting date and time. |
|---|---|---|
| MEETING END DATE/TIME | 7/4/1776 4:00PM | For calendar invites, the ending date and time. |
| DATE_SENT | 7/3/1776 | Email: date the email was sent |
| TIME_SENT | 12:59 AM | Email: time at which email was sent on date in date field |
| DATE_RECEIVED | 01/01/2020 | Email: date the email was received |
| TIME RECEIVED | 6:02 PM | Email: time at which email was received on date in date field |
| FILE_EXTEN | i.e., MSG, DOCX, PDF, etc. | File extension of email or native document |
| FILE TYPE | Email or attachment | Whether it is a parent email or attachment. |
| DATE_CREATED | 6/1/2009 | Date native document was created |
| TIME_CREATED | 7:32 AM | Time native document was created |
| DATE_MOD | 10/12/2010 | Date native document was last modified |
| TIME_MOD | 5:30 PM | Last modification time |
| TEXT LINK | D:\1969\ P000000222.txt | UNC path to text files of extracted/OCR text (unless redacted) |
| NATIVE PATH | \\Prod001\Natives\ABC0000001 .xls | Path to native file |
| FILE NAME | 1d0cbe9510845fbfbe23519a8 902d.mail | Filename of the original source ESI as stored by the custodian. |
| TIMEZONE | EST | Time zone of documents |
| CONFIDENTIALITY | Highly Confidential | Confidentiality designation assigned to the document. |
| REDACTED | Yes | Identifies documents that were produced with redactions. |